Jay M. Ross, Bar No. 151750
jay.ross@lathropgpm.com
Alexis Hatcher, Bar No. 350159
alexis.hatcher@lathropgpm.com
LATHROP GPM LLP
70 South First Street
San Jose, CA  95113

*mailing address:*
P.O. Box 1469
San Jose, CA  95109-1469
Telephone:    408.286.9800
Facsimile:     408.998.4790

Attorneys for Plaintiff
WESTERN ALLIANCE BANK,
an Arizona Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| WESTERN ALLIANCE BANK, an Arizona Corporation, <br><br> Plaintiff, <br><br> v. <br><br> C6 CAPITAL LLC, a New York limited liability company; C6 CAPITAL FUNDING, LLC, a Utah limited liability company; and DOES 1 through 25, inclusive, <br><br> Defendants. | CASE NO. <br><br> UNLIMITED JURISDICTION <br><br> **COMPLAINT FOR:** <br><br> 1. **Reformation of Contract** <br> 2. **Breach of Subordination Agreement** <br> 3. **Intentional Interference with Prospective Economic Advantage** <br> 4. **Negligent Interference with Prospective Economic Advantage** <br> 5. **Fraud** <br> 6. **Negligent Misrepresentation** |

Plaintiff WESTERN ALLIANCE BANK, an Arizona corporation ("Plaintiff" or "WAB"), alleges as follows:

<u>**PARTIES**</u>

1.     WAB is and at all times herein was an Arizona banking corporation qualified and authorized to do business and doing business in the State of California, with offices located in San Jose, Santa Clara County, California.

81622521v5
COMPLAINT

2.      WAB is informed and believes and thereon alleges that defendant C6 Capital LLC ("C6 CAPITAL") is and, at all times herein alleged, was a limited liability company organized and existing under the laws of the State of New York, located at 8 Hunters Lane, Roslyn, NY 11576.

3.      WAB is informed and believes and thereon alleges that defendant C6 Capital Funding, LLC ("C6 FUNDING" and together with C6 CAPITAL, "C6 DEFENDANTS") is and, at all times herein alleged, was a limited liability company organized and existing under the laws of the State of Utah, located at 375 West 200 South, Suite 225, Salt Lake City, UT 84101.

4.      Plaintiff is unaware of the true names or capacities of defendants DOES 1 through 25, inclusive, and will seek leave of court to allege said true names and capacities when the same have been ascertained.  Plaintiff is informed and believes and thereon alleges that defendant DOES 1 through 25, inclusive, and each of them, are in some means or manners legally obligated and liable for the obligations, duties and claims hereinafter set forth.  (C6 DEFENDANTS and DOES 1-25, collectively "Defendants.")

## JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT

5.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332, as there is complete diversity of jurisdiction because all of the parties are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.  Moreover, jurisdiction, venue and assignment to the San Jose Division of the Court are proper because the written contract at issue in this action, the "Subordination Agreement" (defined below), contains an express agreement to submit to the exclusive jurisdiction of the state and federal courts in Santa Clara County, California.

6.      Pursuant to section 13 of such Subordination Agreement, the parties agreed that claims and disputes arising out of or relating to the Subordination Agreement could be resolved through Judicial Reference in the event the jury trial waiver contained in that Agreement is not enforceable.  WAB hereby preserves its rights under the Subordination Agreement and in no way intends to waive any of its rights pursuant to the Subordination Agreement, including, but not limited to, its rights to proceed by Judicial Reference.

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
- 2 -
COMPLAINT
81622521v5

## GENERAL ALLEGATIONS

**A.    WAB'S LOAN TO BREAKOUT COMMERCE**

7.    On or about September 26, 2023, WAB entered into that certain written loan agreement with Breakout Commerce, Inc. ("BREAKOUT COMMERCE") entitled "Loan and Security Agreement" (the "LSA").  A true and correct copy of the LSA is attached hereto as **Exhibit A** and incorporated herein by this reference.  (Except as defined herein, capitalized terms are defined as set forth in the LSA.)

8.    Pursuant to the LSA, WAB agreed to and did loan money to BREAKOUT COMMERCE on the terms and conditions therein.  WAB loaned and BREAKOUT COMMERCE borrowed $3,500,000.00 (the "WAB Loan") pursuant to the LSA.  BREAKOUT COMMERCE agreed to repay the WAB Loan as required by and pursuant to the terms of the LSA.

9.    Also pursuant to the LSA, BREAKOUT COMMERCE granted and pledged to WAB a continuing security interest in certain Collateral as specified in Exhibit A to the LSA to secure BREAKOUT COMMERCE'S prompt repayment of all Obligations and to secure BREAKOUT COMMERCE'S prompt performance of each and all of its covenants and duties under the LSA and all Loan Documents.

10.    For purposes of perfecting its security interest in the Collateral as granted by the LSA, on or about September 26, 2023, WAB filed a "UCC Financing Statement" (the "UCC-1") in the Delaware Department of State assigned filing number 20236516891.  A true and correct copy of the UCC-1 is attached hereto as **Exhibit B** and incorporated herein by this reference.

11.    The Collateral includes BREAKOUT COMMERCE's accounts receivable.

12.    In addition, on or about September 26, 2023, WAB entered into that certain written intellectual property security agreement with BREAKOUT COMMERCE entitled "Intellectual Property Security Agreement" (the "IPSA").  A true and correct copy of the IPSA is attached hereto as **Exhibit C** and incorporated herein by this reference

13.    Pursuant to the IPSA, BREAKOUT COMMERCE granted and pledged to WAB a continuing security interest in certain Collateral as specified in Exhibits A, B, and C to the IPSA

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5

- 3 -

COMPLAINT
81622521v5

1    to secure BREAKOUT COMMERCE'S prompt repayment of all Obligations and to secure

2    BREAKOUT COMMERCE'S prompt performance of each and all of its covenants and duties

3    under the LSA and all Loan Documents.

4        14.    For purposes of perfecting its security interest in the Collateral as granted by the

5    IPSA, on or about September 29, 2023, WAB filed a "Notice of Recordation of Assignment

6    Document" (the "NOR") in the United States Patent and Trademark Office assigned filing

7    number 8209/0974.  A true and correct copy of the recorded NOR is attached hereto as **Exhibit D**

8    and incorporated herein by this reference.

9    **B.    C6 FUNDING'S LOAN TO BREAKOUT COMMERCE**

10       15.    In early 2024, BREAKOUT COMMERCE approached WAB about the company's

11   need for additional funds for its operations and its pursuit of a third party lender to provide those

12   funds.  BREAKOUT COMMERCE advised WAB that C6 CAPITAL was the source of the loan

13   for those additional funds ("C6 Loan").

14       16.    WAB informed BREAKOUT COMMERCE that, pursuant to the LSA, WAB's

15   consent to the C6 Loan would be conditioned upon the new lender's execition of a subordination

16   agreement with WAB which provided, among other things, that WAB's loan would be repaid

17   prior to repayment of the C6 Loan and that WAB would retain its priority security interest in the

18   Collateral.

19       17.    On or about March 28, 2024, WAB received a loan term sheet (the "Term Sheet")

20   from BREAKOUT COMMERCE, which was executed by representatives of C6 CAPITAL and

21   BREAKOUT COMMERCE, and identified "C6 Capital, LLC.  Or its affiliates or designees" as

22   the source of the C6 Loan (defined in the term sheet as "Investor" or "C6").  The Term Sheet

23   specified that the C6 Loan would be a "Junior Secured Loan." A true and correct copy of the

24   Term Sheet is attached hereto as **Exhibit E** incorporated herein by this reference.

25       18.    Concurrently with BREAKOUT COMMERCE's negotiation of a loan agreement

26   with C6 CAPITAL, WAB initiated the preparation of a subordination agreement associated with

27   the C6 Loan.  On or about April 4, 2024, WAB provided BREAKOUT COMMERCE's

28   Executive Vice President of Operations & Finance with WAB's initial draft of that subordination

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

- 4 -

agreement advising it was "for your/C6's review" and requested to be advised as "what questions come up." On or about April 8, 2024, BREAKOUT COMMERCE's Executive Vice President of Operations & Finance advised WAB that there were "No comments from C6 on the terms of the subordination agreement." Thereafter, WAB and BREAKOUT COMMERCE's Executive Vice President of Operations & Finance had discussions about, among other things, the name, title and contact information to include in the signature block for the person executing the subordination agreement for "C6" and the sequencing of executing the subordination agreement and the "C6" loan documents. In response, BREAKOUT COMMERCE's Executive Vice President of Operations & Finance identified the "C6 signer" as **C6 Capital signer:** Andrew Fellus." And, on or about April 12, 2024, in response to a question about "the information on C6's side for Andrew's title and their address" to include in the signature block of the subordination agreement, BREAKOUT COMMERCE's Executive Vice President of Operations & Finance advised WAB that Mr. Fellus' title was "CEO" and the address for "C6" was "8 Hunters Lane, Roslyn, NY 11576[.]"

19.     On or about April 11 and 12, 2024, versions of the subordination agreement were circulated with requests for information related to signatories and eventually for signature via Docusign. The parties were waiting for the "C6 signature[,]" eventually receiving it and causing WAB to advise that "the Bank is releasing signatures [on the subordination agreement] now and C6/Breakout can now do the same too on the loan agreement."

20.     The identity of the junior lender on the C6 Loan agreement had changed from "C6 Capital, LLC" to "C6 Capital Funding, LLC." At all times, WAB understood that C6 CAPITAL was the source of the C6 Loan, which was reflected in the final version of the subordination agreement as well as the drafts of that agreement circulated for review and comment. However, neither BREAKOUT COMMERCE, C6 CAPITAL nor C6 FUNDING corrected or sought any revision of the subordination agreement to reflect that C6 FUNDING, not C6 CAPITAL, should have been the "Creditor" under the subordination agreement.

21.     On or about April 12, 2024, C6 CAPITAL, as "Creditor," executed that certain written contract with WAB entitled "Subordination Agreement" (the "Subordination

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
- 5 -
COMPLAINT
81622521v5

Agreement"). A true and correct copy of the Subordination Agreement is attached hereto as **Exhibit F** and incorporated herein by this reference.

22. On or about April 12, 2024, C6 FUNDING and BREAKOUT COMMERCE executed and entered into that certain written contract entitled "BUSINESS LOAN AND SECURITY AGREEMENT" (the "C6 Loan Agreement") governing the C6 Loan. A true and correct copy of the C6 Loan Agreement is attached hereto as **Exhibit G** and incorporated herein by this reference.

23. Andrew Fellus signed the Subordination Agreement on behalf of "CREDITOR" C6 CAPITAL as its "Chief Executive Officer" and with its address shown as "8 Hunters Lane, Roslyn, NY 11576[.]" Andrew Fellus signed the C6 Loan Agreement on behalf of C6 FUNDING as its "CEO" and with its address shown as 8791 South Redwood Road, West Jordan, UT 84088.

24. Upon information and belief, C6 CAPITAL and C6 FUNDING are related and alter ego entities controlled by Andrew Fellus.

25. Despite having knowledge that the entity making the C6 Loan had changed from C6 CAPITAL to C6 FUNDING, Andrew Fellus (and all other representatives of the Defendants) failed to identify the need to make a corresponding change to the Subordination Agreement. WAB received no communication from C6 CAPITAL, C6 FUNDING or BREAKOUT COMMERCE calling out the obvious error in the naming of and address for the "Creditor" in the Subordination Agreement.

26. Andrew Fellus, as representative for both C6 DEFENDANTS, executed the Subordination Agreement knowing and aware that (a) the collective intent and understanding of the parties was for the source of the C6 Loan to subordinate its rights and remedies under that loan to WAB, and (b) the party he was signing on behalf of was not the source of the C6 Loan.

27. It was the intent of the parties that the Subordination Agreement be between WAB and the source of the C6 Loan, which was C6 FUNDING, not C6 CAPITAL. It would make no logical sense for WAB to enter into the Subordination Agreement with a party not making a loan to BREAKOUT COMMERCE and equally make no logical sense for a party not making a loan to BREAKOUT COMMERCE to be a party to the Subordination Agreement. Indeed, recitals of the

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

- 6 -

Subordination Agreement expressly state that the "Creditor has extended loans or other credit accommodations to Borrower, and/or may extend loans or other credit accommodations to [BREAKOUT COMMERCE] from time to time."

28.    And, as set forth in the Term Sheet executed in the Spring of 2024, the C6 Loan was intended to be a "Junior Secured Loan."

29.    C6 CAPITAL had multiple opportunities to share that it was not the lender to BREAKOUT COMMERCE, including in response to the following correspondence WAB provided to C6 CAPITAL:

- • Default letter dated 5/16/2025;
- • Blockage notice dated 5/16/2025;
- • Default and demand letter dated 6/9/2025; and
- • Notice of Disposition of Collateral by Private Sale dated 6/18/2025.

30.    Notwithstanding its receipt of the correspondence specified in paragraph 29, above, C6 CAPITAL failed to inform WAB that it was not the lender to BREAKOUT COMMERCE.

31.    The Defendants either have intentionally committed fraud against WAB or made a mistake in failing to identify the correct party to the Subordination Agreement.

**FIRST CAUSE OF ACTION**
Reformation of Contract
(Against C6 FUNDING and C6 CAPITAL)

32.    WAB realleges as if fully set forth at this point, each of the allegations of paragraphs 1 through 31, above.

33.    The Subordination Agreement does not reflect the mutual intention of the parties due to the misidentification of C6 CAPITAL as the "Creditor" and a signatory to that agreement. The parties intended that C6 FUNDING, the junior lender to BREAKOUT COMMERCE, be the "Creditor" and signatory to the Subordination Agreement.

34.    By executing the Subordination Agreement, Andrew Fellus, CEO of both C6 DEFENDANTS, misrepresented to WAB, either innocently or with fraudulent intent, that C6

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

- 7 -

1    CAPITAL had "extended loans or other credit accommodations to" BREAKOUT COMMERCE.

2    *See,* Exhibit F, Subordination Agreement, at § B.

3        35.    In actuality and contrary to the prior representations, C6 FUNDING was the entity

4    who "extended loans or other credit accommodations to" BREAKOUT COMMERCE.

5        36.    Believing, understanding and intending that C6 CAPITAL was the junior lender,

6    and not having received any corrections or changes to the Subordination Agreement from

7    Defendants to the contrary, WAB executed and entered into the Subordination Agreement naming

8    C6 CAPITAL as the "Creditor" and a signatory.

9        37.    Despite having knowledge that C6 CAPITAL was not extending any loan to

10   BREAKOUT COMMERCE, Andrew Fellus nevertheless executed the Subordination Agreement

11   on behalf of the wrong entity.

12       38.    The court should reform the Subordination Agreement to be between WAB and

13   C6 FUNDING, as all parties intended.  The Subordination Agreement should be reformed by

14   replacing C6 CAPITAL with C6 FUNDING as the "Creditor" and signatory to reflect the mutual

15   understanding of the parties at the time of the execution of that contract.

16       39.    Alternatively, the Subordination Agreement should be reformed by replacing C6

17   CAPITAL with C6 FUNDING as the "Creditor" and signatory because Defendants fraudulently

18   induced WAB into entering the Subordination Agreement by failing to disclose the entity making

19   the junior loan to BREAKOUT COMMERCE had changed.

20       WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, as set

21   forth below.

## SECOND CAUSE OF ACTION
Breach of Subordination Agreement
(Against C6 FUNDING, and DOES 1-25, inclusive)

24       40.    WAB realleges as if fully set forth at this point, each of the allegations of

25   paragraphs 1 through 39, above.

26       41.    The Subordination Agreement, as reformed, is a valid and binding agreement

27   between WAB and C6 FUNDING.

28       42.    Under the reformed Subordination Agreement, C6 FUNDING agreed, among

Lathrop GPM LLP
Attorneys At Law
San Jose • Redwood City

81622521v5

- 8 -

COMPLAINT
81622521v5

other things, that WAB's security interest in the Collateral is senior to that of C6 FUNDING's

security interest, regardless of when such security interests were perfected. *See* Exhibit F,

Subordination Agreement, at § 1.

43.    Under the reformed Subordination Agreement, C6 FUNDING also agreed, among

other things, that it would not "exercise any remedy with respect to the Collateral" until

BREAKOUT COMMERCE's obligations owed to WAB under the LSA were paid in full. *See*

Exhibit F, Subordination Agreement, at § 3.

44.    By executing the Subordination Agreement without C6 FUNDING identified as

the "Creditor" and signatory, C6 FUNDING and C6 CAPITAL breached the covenant of good

faith and fair dealing that is implied into every contract under California law, including the

Subordination Agreement.

45.    On or about September 25, 2025, C6 FUNDING breached the reformed

Subordination Agreement when it exercised rights under the Uniform Commercial Code ("UCC")

causing the service of a notice of rights and demand for payment (a "UCC Notice and Demand")

on, among others, Taylor Corporation ("TAYLOR") and characterizing TAYLOR as an "account

debtor" of BREAKOUT COMMERCE.  A true and correct copy of C6 FUNDING'S UCC Notice

and Demand to TAYLOR is attached hereto as **Exhibit H** and incorporated herein by this

reference.

46.    WAB is informed and believes and thereon alleges that C6 FUNDING sent UCC

Notice and Demand letters to as many as forty-four (44) other purported account debtors of

BREAKOUT COMMERCE, also in breach of the Subordination Agreement.

47.    Pursuant to the exercise of its UCC rights and remedies following BREAKOUT

COMMERCE's default under the LSA, WAB issued notice of the sale of certain Collateral.  In

response thereto, TAYLOR sought to purchase the Collateral, which included BREAKOUT

COMMERCE's accounts receivable.  By September 25, 2025, and prior to C6 FUNDING's UCC

Notice and Demand letter sent to TAYLOR, WAB and TAYLOR had negotiated terms of the

Collateral sale and agreed upon a purchase price of $2,750,000 therefor.

48.    After TAYLOR received the UCC Notice and Demand letter from C6 FUNDING,

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

- 9 -

1  TAYLOR recanted the $2,750,000 Collateral purchase price.  As a result of C6 FUNDING's

2  UCC Notice and Demand letter, TAYLOR reduced its Collateral purchase price by $2,000,000,

3  down to $750,000.  Ultimately, WAB and TAYLOR agreed to a reduced Collateral sale price of

4  $1,000,000 and the exclusion of the accounts receivable.

5  49.    TAYLOR indicated to WAB that this reduction in price was a direct result of the

6  UCC Notice and Demand letter received from C6 FUNDING due to the brand damage the letter

7  caused to customer relationships.

8  50.    In a confession of its error that breached the Subordination Agreement, on or about

9  September 30, 2025, C6 FUNDING issued written retractions (each a "Retraction") of its UCC

10  Notice and Demand letters, including the UCC Notice and Demand sent to TAYLOR.  A true and

11  correct copy of C6 FUNDING's Retraction to TAYLOR dated September 30, 2025 is attached

12  hereto as **Exhibit I**, and incorporated herein by this reference.

13  51.    WAB suffered damages as a direct and proximate result of the breach of the

14  Subordination Agreement as alleged herein. Among other things, WAB lost approximately $1.75

15  million on the sale of the Collateral to TAYLOR due to C6 FUNDING's UCC Notice and

16  Demand letter.

17  WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, as set

18  forth below.

19                              **THIRD CAUSE OF ACTION**
                    Intentional Interference with Prospective Economic Advantage
20                        (Against C6 FUNDING and DOES 1-25, inclusive)

21  52.    WAB realleges as if fully set forth at this point, each of the allegations of

22  paragraphs 1 through 51, above.

23  53.    WAB had an economic relationship with TAYLOR that contained the probability

24  of a future economic benefit to WAB.  WAB had negotiated and agreed to the sale of certain of

25  the Collateral to TAYLOR for the purchase price of $2,750,000.

26  54.    WAB disclosed to C6 FUNDING that WAB had received multiple offers for the

27  sale of the Collateral with plans to enter into an agreement to sell the Collateral.

28  55.    C6 FUNDING intentionally and actually disrupted this relationship by wrongfully

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

- 10 -

issuing the UCC Notice and Demand letter to TAYLOR despite agreeing in the Subordination Agreement not to take any actions to collect its subordinated debt ahead of WAB.

56.     Alternatively, C6 FUNDING knew, or should have known, that interference was certain or substantially certain to occur as a result of its action.

57.     As a direct and proximate result of C6 FUNDING's interference, TAYLOR reduced its offer to purchase certain Collateral by $2,000,000 and agreed to purchase it for only $1,000,000, resulting in a loss and damages to WAB in the amount of approximately $1.75 million.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, as set forth below.

## FOURTH CAUSE OF ACTION
Negligent Interference with Prospective Economic Advantage
(Against C6 FUNDING and DOES 1-25, inclusive)

58.     WAB realleges as if fully set forth at this point, each of the allegations of paragraphs 1 through 57, above.

59.     WAB and TAYLOR had an economic relationship related to the sale of the Collateral which contained a reasonably probable future economic benefit or advantage to WAB.

60.     Having been made aware that WAB had received multiple offers to purchase the Collateral as well as being aware of WAB's desire to sell the Collateral, C6 FUNDING knew or should have known of WAB's relationship with TAYLOR and was aware, or should have been aware, that if it did not act with due care its actions would interfere with this relationship and cause WAB to lose in whole or in part the probable future economic benefit or advantage of the relationship.

61.     C6 FUNDING was negligent when it sent the UCC Notice and Demand letter to TAYLOR, and its negligence interfered with WAB's relationship with TAYLOR causing WAB to lose approximately $1.75 million of the economic benefits reasonably expected from the relationship.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, as set forth below.

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

- 11 -

**FIFTH CAUSE OF ACTION**
Fraud
(Against C6 FUNDING, C6 CAPITAL and DOES 1-25, inclusive)

62.     WAB realleges as if fully set forth at this point, each of the allegations of paragraphs 1 through 61, above.

63.     In the alternative to its cause of action for reformation of contract based upon mutual mistake or fraud, WAB pleads this cause of action for damages.

64.     The C6 DEFENDANTS made a false representation to WAB or knowingly concealed material information in entering in the Subordination Agreement with C6 CAPITAL as the "Creditor" and signatory instead of C6 FUNDING while knowing that (a) C6 FUNDING was, in fact, the "CREDITOR" that made the loan to BREAKOUT COMMERCE, and (b) the lender who made the loan to BREAKOUT COMMERCE in or about April 2024 was supposed to be the subordinated "CREDITOR" under and signatory to the Subordination Agreement.

65.     The C6 DEFENDANTS knew that this representation was false.  The C6 DEFENDANTS' CEO, Andrew Fellus, signed the Subordination Agreement on behalf of C6 CAPITAL, and also signed the C6 Loan Agreement on behalf of C6 FUNDING.  WAB's reliance on this representation was reasonable.

66.     If the Subordination Agreement is not reformed and C6 FUNDING asserts that its UCC Notice and Demand letters, including the same to TAYLOR, did not breach the Subordination Agreement because C6 FUNDING is not a party to that Agreement, then WAB suffered damages as a direct and proximate result of DEFENDANTS' fraud in the amount of the approximately $1.75 million by virtue of the reduced sale price for the Collateral.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, as set forth below.

**SIXTH CAUSE OF ACTION**
Negligent Misrepresentation
(Against C6 FUNDING, C6 CAPITAL and DOES 1-25, inclusive)

67.     WAB realleges as if fully set forth at this point, each of the allegations of paragraphs 1 through 66, above.

68.     In the alternative to its cause of action for reformation of contract based upon

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

- 12 -

mutual mistake or fraud, WAB pleads this cause of action for damages.

69.    The C6 DEFENDANTS made a false representation to WAB or concealed material information in entering in the Subordination Agreement with C6 CAPITAL as the "Creditor" and signatory instead of C6 FUNDING while knowing that (a) C6 FUNDING was, in fact, the "CREDITOR" that made the loan to BREAKOUT COMMERCE, and (b) the lender who made the loan to BREAKOUT COMMERCE in or about April 2024 was supposed to be the subordinated "CREDITOR" under the Subordination Agreement.

70.    The C6 DEFENDANTS reasonably should have known that this representation was false.  The C6 DEFENDANTS' CEO, Andrew Fellus, signed the Subordination Agreement on behalf of C6 CAPITAL and signed the C6 Loan Agreement on behalf of C6 FUNDING. When he signed the Subordination Agreement, Mr. Fellus knew or should have known that the wrong entity was identified as the "CREDITOR" and he easily could have and should have corrected that error.

71.    If the Subordination Agreement is not reformed and C6 FUNDING asserts that its UCC Notice and Demand letters, including the same to TAYLOR, did not breach the Subordination Agreement because C6 FUNDING is not a party to that Agreement, then WAB suffered damages as a direct and proximate result of the C6 DEFENDANTS' negligent misrepresentation in the amount of approximately $1.75 million related to the reduced sale price for the Collateral.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, as set forth below.

## **PRAYER**

Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.    On the First Cause of Action:

(a)    Reformation of the Subordination Agreement to replace C6 Capital, LLC with C6 Capital Funding, LLC, thereby making C6 Capital Funding, LLC the "Creditor" under and a signatory to that contract, and,

(b)    In so far as reformation is necessary for and constitutes WAB's

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

- 13 -

enforcement of its legal rights under the Subordination Agreement, attorneys' fees, expenses and costs as authorized by the Subordination Agreement and California law according to proof.

2.    On the Second Cause of Action:

(a)    Damages in the amount of approximately **$1.75 million,**

(b)    Attorneys' fees, expenses and costs as authorized by the Subordination Agreement and California law according to proof, and,

(c)    Interest at the maximum rate permitted and as authorized by California law, according to proof.

3.    On the Third Cause of Action:

(a)    Damages in the amount of approximately **$1.75 million,** and,

(b)    Interest at the maximum rate permitted and as authorized by California law, according to proof.

4.    On the Fourth Cause of Action:

(a)    Damages in the amount of approximately **$1.75 million,** and

(b)    Interest at the maximum rate permitted and as authorized by California law, according to proof.

5.    On the Fifth Cause of Action:

(a)    Damages in the amount of approximately **$1.75 million,** and,

(b)    Interest at the maximum rate permitted and as authorized by California law, according to proof.

6.    On the Sixth Cause of Action:

(a)    Damages the amount of approximately **$1.75 million,** and,

(b)    Interest at the maximum rate permitted and as authorized by California law, according to proof.

////

LATHROP GPM LLP
ATTORNEYS AT LAW
SAN JOSE • REDWOOD CITY

81622521v5
COMPLAINT
81622521v5

1    7.    On all causes of action:

2        (a)    For such other and further relief as this Court deems just and proper.

3

4    Dated:  January 15, 2026                    LATHROP GPM LLP

5

6                                    By: */s/ Jay M. Ross*

7                                        Jay M. Ross
                                         Alexis Hatcher
8                                        Attorneys for Plaintiff
                                         WESTERN ALLIANCE BANK

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lathrop GPM LLP
Attorneys At Law
San Jose • Redwood City

81622521v5
COMPLAINT
81622521v5

- 15 -

Exhibit A

Execution Version

**BREAKOUT COMMERCE, INC., A DELAWARE CORPORATION**

**WESTERN ALLIANCE BANK, AN ARIZONA CORPORATION**

**LOAN AND SECURITY AGREEMENT**

**DATED AS OF SEPTEMBER 26, 2023**

This **LOAN AND SECURITY AGREEMENT** is entered into as of September 26, 2023, by and between **WESTERN ALLIANCE BANK**, an Arizona corporation ("Bank") and **BREAKOUT COMMERCE, INC.,** a Delaware, corporation ("Borrower").

RECITALS

Borrower wishes to obtain credit from time to time from Bank, and Bank desires to extend credit to Borrower.  This Agreement sets forth the terms on which Bank will advance credit to Borrower, and Borrower will repay the amounts owing to Bank.

AGREEMENT

The parties agree as follows:

1.      **DEFINITIONS AND CONSTRUCTION.**

1.1     **Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

"Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Borrower arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Borrower, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Borrower and Borrower's Books relating to any of the foregoing.

"Advance" or "Advances" means a cash advance or cash advances under this Agreement.

"Affiliate" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and partners.

"Agreement" has the meaning set forth in the preamble.

"Bank" has the meaning set forth in the preamble.

"Bank Expenses" means all:  reasonable costs or expenses (including reasonable attorneys' fees and expenses) incurred in connection with the preparation, negotiation, administration, and enforcement of the Loan Documents; reasonable Collateral audit fees; and Bank's reasonable attorneys' fees and expenses incurred in amending, enforcing or defending the Loan Documents (including fees and expenses of appeal), incurred before, during and after an Insolvency Proceeding, whether or not suit is brought or any other Event of Default.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes, such as changes to the definitions of "Business Day," "Interest Period," or timing and frequency of determining rates and making payments of interest, that Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof in a manner substantially consistent with market practice (or, if the Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Borrower" has the meaning set forth in the preamble.

"Borrower's Books" means all of Borrower's books and records including:  ledgers; records concerning Borrower's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks in the State of California are authorized or required to close.

"Change in Control" shall mean a transaction in which any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934) becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of a sufficient number of shares of all classes of stock or other equity securities, as

applicable, then outstanding of Borrower ordinarily entitled to vote in the election of directors, empowering such "person" or "group" to elect a majority of the board of directors of Borrower, who did not have such power before such transaction.

"Closing Date" means the date of this Agreement.

"Code" means the California Uniform Commercial Code, as amended from time to time.

"Collateral" means the property described on **Exhibit A** attached hereto.

"Compliance Certificate" means a compliance certificate substantially in the form of **Exhibit C** hereto to be signed by a Responsible Officer.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of that Person; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Bank in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Control Agreement" is any control agreement entered into among the depository institution at which Borrower maintains a deposit account or the securities intermediary or commodity intermediary at which Borrower maintains a securities account or a commodity account, Borrower, and Bank pursuant to which Bank obtains control (within the meaning of the Code) over any such account.

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"Credit Extension" means the Term Advance or any other extension of credit by Bank for the benefit of Borrower hereunder.

"Credit Extension Request Form" is that certain form, in the form substantially set forth in Exhibit B hereto.

"Daily Balance" means the amount of the Obligations owed at the end of a given day.

"Debt Service Coverage Ratio" means the (i) trailing three-month EBIDTA divided by (ii) the trailing three-month principal and interest payments on all of Borrower's outstanding Indebtedness.

"EBITDA" means, with respect to any period of determination, Net Income (without duplication) plus (i) interest expense, (ii) income tax expense (iii) depreciation and amortization expense, and (iv) non-cash stock compensation expense, each as determined in accordance with GAAP.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Borrower has any interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Article 8.

"GAAP" means generally accepted accounting principles as in effect from time to time.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Guarantor" is any Person providing a Guaranty in favor of Bank.

"Guaranty" is any guarantee of all or any part of the Obligations, as the same may from time to time be amended, restated, modified or otherwise supplemented.

"Guaranty Documents" has the meaning set forth in Section 8.10 hereof.

"Indebtedness" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations and (d) all Contingent Obligations.

"Insolvency Proceeding" means any proceeding commenced by or against any person or entity under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"Intellectual Property Collateral" means all of Borrower's right, title, and interest in and to the following: Copyrights, Trademarks and Patents; all trade secrets, all design rights, claims for damages by way of past, present and future infringement of any of the rights included above, all licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights; all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Inventory" means all inventory in which Borrower has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of Borrower, including such inventory as is temporarily out of its custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Borrower's Books relating to any of the foregoing.

"Investment" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person or the Serbian Subsidiary.

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Loan Documents" means, collectively, this Agreement, the Warrant, any agreements related to letters of credit, any subordination/intercreditor agreements, any pledge or security agreements, any note or notes executed by Borrower or any other Person, and any other agreement, instrument or document entered into in connection with this Agreement, all as amended, restated, supplemented or otherwise modified or extended from time to time.

"Material Adverse Effect" means a material adverse effect on (i) the business operations, condition (financial or otherwise) of Borrower and its Subsidiaries taken as a whole or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents or (iii) the value or priority of Bank's security interests in the Collateral.

"Negotiable Collateral" means all letters of credit of which Borrower is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and Borrower's Books relating to any of the foregoing.

"Obligations" means all debt, principal, interest, Bank Expenses and other amounts owed to Bank by Borrower pursuant to this Agreement, the Loan Documents, or any other agreement, whether absolute or contingent, due or to become due, now existing or hereafter arising, including any interest that accrues after the commencement of an Insolvency Proceeding and including any debt, liability, or obligation owing from Borrower to others that Bank may have obtained by assignment or otherwise; provided, however, notwithstanding anything to the contrary herein the Obligations shall not include Borrower's obligations under the Warrant or any equity securities issued by Borrower in connection with the Warrant.

"Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Periodic Payments" means all installments or similar recurring payments that Borrower may now or hereafter become obligated to pay to Bank pursuant to the terms and provisions of any instrument, or agreement now or hereafter in existence between Borrower and Bank.

"Permitted Indebtedness" means:

(a)     Indebtedness of Borrower in favor of Bank arising under this Agreement or any other Loan Document;

(b)     Indebtedness existing on the Closing Date and disclosed in the Schedule;

(c)     Indebtedness secured by a lien described in clause (c) of the defined term "<u>Permitted Liens</u>," provided (i) such Indebtedness does not exceed the lesser of the cost or fair market value of the equipment financed with such Indebtedness and (ii) such Indebtedness does not exceed One Hundred Thousand Dollars ($100,000) in the aggregate at any given time;

(d)     Indebtedness consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(e)     unsecured Indebtedness to trade creditors incurred in the ordinary course of business to the extent not more than one hundred and twenty (120) days' past due;

(f)     Subordinated Debt

(g)     Indebtedness for deferred purchase price of property, or leases which would be capitalized in accordance with GAAP in an aggregate amount not to exceed $100,000 outstanding at any time;

(h)     Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of Borrower in the ordinary course of business supporting obligations under (A) workers' compensation, unemployment insurance and other social security laws and (B) bids, trade contracts, statutory obligations, surety and appeal bonds, performance bonds and obligations of a like nature, not to exceed $50,000 in aggregate amount outstanding at any time;

(i)     Insurance premium financing not to exceed $75,000 in aggregate amount outstanding at any time;

(j)     unsecured Indebtedness in the form of purchase price adjustments, earn-outs, deferred compensation, or other arrangements representing acquisition consideration or deferred payments of similar nature incurred in connection with any other investment permitted hereunder;

(k)     Indebtedness that constitutes a Permitted Investment;

(l)     Deposit and securities accounts maintained with banks and other financial institutions to the extent permitted under Section 6.8 and as to which Borrower has complied with the requirements of Section 6.8;

(m)     unsecured Indebtedness incurred with respect to credit cards up to an aggregate amount of Two Hundred Fifty Thousand Dollars ($250,000) outstanding at any time; <u>provided that</u>, such credit cards must be closed out on or prior to ninety (90) days after the Closing Date;

(n)     other unsecured Indebtedness in an aggregate amount outstanding not to exceed Fifteen Thousand Dollars ($15,000) at any time; and

(o)     extensions, refinancings, modifications, amendments and restatements of any items of (a) through (n) above, provided that the principal amount thereof is not increased or the terms thereof are not modified to impose more burdensome terms upon Borrower.

"<u>Permitted Investment</u>" means:

(a)     Investments existing on the Closing Date disclosed in the Schedule;

(b)     Investments (i) among Borrowers, (ii) among Subsidiaries that are not Borrowers, (iii) by a Subsidiary that is not a Borrower in a Borrower, provided that if the Investment constitutes Indebtedness of the applicable Borrower to such Subsidiary, such Indebtedness shall be subject to an intercompany subordination agreement in form and substance satisfactory to Bank;

(c)     Investments consisting of repurchases of equity interests permitted pursuant to Section 7.6 or in any amount where the consideration for the repurchase is the cancellation of indebtedness owed by such current or former employees, directors or consultants to Borrower;

4

(d)     Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of Borrower;

(e)     Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(f)     Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business; provided that this paragraph (f) shall not apply to Investments of Borrower in any Subsidiary;

(g)     (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, (ii) commercial paper maturing no more than one (1) year from the date of creation thereof and currently having rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (iii) certificates of deposit maturing no more than one (1) year from the date of investment therein issued by Bank and (iv) Bank's money market accounts;

(h)     Investments to the Serbian Subsidiary in an aggregate amount not to exceed $200,000 per month;

(i)     investments consisting of (i) travel advances, and employee relocation loans in the ordinary course of Borrower business, and (ii) loans made on and after the Closing Date to employees, officers or directors relating to the purchase of equity securities of Borrower pursuant to employee stock purchase plans or agreements, or otherwise pursuant to management programs, in each case approved by Borrower's Board of Directors (for clarity, this clause (ii) shall not include loans made prior to the Closing Date under the executive loan program which are covered under clause (a) of the definition of Permitted Investments); provided, that such amount does not exceed, in the aggregate, $50,000 at one time;

(j)     accounts receivable in the ordinary course of Borrower's business;

(k)     temporary advances to cover incidental expenses to be incurred in the ordinary course of business; provided, that such amount does not exceed, in the aggregate, $100,000; and

(l)     other investments not to exceed $25,000 in any fiscal year.

"Permitted Liens" means the following:

(a)     Any Liens existing on the Closing Date and disclosed in the Schedule or arising under this Agreement or the other Loan Documents;

(b)     Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Bank's security interests;

(c)     Liens (i) upon or in any equipment which was not financed by Bank acquired or held by Borrower or any of its Subsidiaries to secure the purchase price of such equipment or indebtedness incurred solely for the purpose of financing the acquisition of such equipment, or (ii) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment;

(d)     Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (c) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase;

(e)     Liens of carriers, warehousemen, suppliers, or other Persons that are possessory in nature arising in the ordinary course of business so long as such Liens attach only to Inventory, securing liabilities in the aggregate amount not to exceed Fifty Thousand Dollars ($50,000) and which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto;

(f)     Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than Liens imposed by ERISA);

7599015.13

(g)       leases or subleases of real property granted in the ordinary course of Borrower's business (or, if referring to another Person, in the ordinary course of such Person's business), and leases, subleases, non-exclusive licenses or sublicenses of personal property granted in the ordinary course of Borrower's business (or, if referring to another Person, in the ordinary course of such Person's business), if the leases, subleases, licenses and sublicenses do not prohibit granting Bank a security interest therein;

(h)       non-exclusive licenses of Intellectual Property granted to third parties in the ordinary course of business;

(i)       Liens in favor of other financial institutions arising in connection with a Borrower's deposit and/or securities accounts held at such institutions, provided that (i) Bank has a first priority perfected security interest in the amounts held in such deposit and/or securities accounts, and (ii) such accounts are permitted to be maintained pursuant to Section 6.8 of this Agreement;

(j)       Liens arising from attachments or judgments, orders or decrees in circumstances not constituting an Event of Default under Sections 8.4 and 8.7; and

(k)       Liens incurred or deposits made to secure the obligations (other than Liens arising under ERISA or environmental Liens), surety and appeal bonds, government contracts, performance and return-of money bonds, and other obligations of like nature, in each case, in the ordinary course of business.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Prime Rate" means the greater of (a) eight and a half percent (8.50%) or (b) the Prime Rate published in the Money Rates section of the Western Edition of The Wall Street Journal, or such other rate of interest publicly announced from time to time by Bank as its Prime Rate.  Bank may price loans to its customers at, above or below the Prime Rate.  Any change in the Prime Rate shall take effect at the opening of business on the day specified in the public announcement of a change in Prime Rate.

"Processing Accounts" has the meaning set forth in Section 6.8(a).

"Responsible Officer" means each of the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer and the Controller of Borrower.

"RML" means cash (including the Term Loan Amount) divided by the average (i) Net Income, plus (ii) Depreciation and Amortization expenses, plus (iii) stock-based compensation for the trailing three (3) month period immediately then ended, plus (iv) any other non-cash expense mutually agreed upon between Borrower and Bank for the trailing three (3) month period immediately then ended.

"Schedule" means the schedule of exceptions attached hereto and approved by Bank, if any.

"Serbian Subsidiary" means GOOTEN d.o.o. Novi Sad.

"Shares" means one hundred percent (100%) of the issued and outstanding capital stock, membership units or other securities owned or held of record by Borrower in any Subsidiary of Borrower.

"Subordinated Debt" means any debt incurred by Borrower that is subordinated to the debt owing by Borrower to Bank on terms acceptable to Bank (and identified as being such by Borrower and Bank), pursuant to a subordination agreement in form and substance satisfactory to Bank.

"Subsidiary" means any corporation, company or partnership in which (i) any general partnership interest or (ii) more than fifty percent (50%) of the stock or other units of ownership which by the terms thereof has the ordinary voting power to elect the Board of Directors, managers or trustees of the entity, at the time as of which any determination is being made, is owned by Borrower, either directly or through an Affiliate.

"Term Advance" has the meaning set forth in Section 2.1(b)(i).

"Term Loan Amount" means Three Million Five Hundred Thousand Dollars ($3,500,000).

"Term Loan Maturity Date" means September 26, 2027.

"Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"Transition Period" has the meaning set forth in Section 3.3(b).

"Warrant" means, collectively, that certain Warrant to Purchase Stock dated as of the Closing Date issued by Borrower in favor of Bank, and any other warrant issued by Borrower to Bank, in each case, as amended, restated and/or supplemented from time to time.

**1.2    Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with GAAP, and all calculations made hereunder shall be made in accordance with GAAP.  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

**2.    LOAN AND TERMS OF PAYMENT.**

**2.1    Credit Extensions**.

Borrower promises to pay to the order of Bank, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Bank to Borrower hereunder.  Borrower shall also pay interest on the unpaid principal amount of such Credit Extensions at rates in accordance with the terms hereof.

(a)    **[Reserved]**.

(b)    **Term Advance**.

(i)    Availability.  Subject to and upon the terms and conditions of this Agreement, on or about the Closing Date, Bank agrees to make a single advance to Borrower (the "Term Advance"), in an amount equal to the Term Loan Amount.

(ii)    Repayment.  For the Term Advance, Borrower shall pay interest-only payments with respect to the Term Advance in accordance with Section 2.3(c) through the eighteen (18) month anniversary of the Closing Date. Beginning on nineteenth (19th) month anniversary of the Closing Date, Borrower shall repay the outstanding Term Advance in accordance with Section 2.3(c) in thirty (30) equal installments of principal, plus monthly payments of accrued interest, in each case payable on the tenth (10th) day of each month.  Borrower's final payment for the Term Advance, due on the Term Loan Maturity Date, shall include all outstanding principal and accrued and unpaid interest under the Term Advance.  Once repaid, the Term Advance may not be reborrowed.

(iii)    Prepayment.

(A)    Voluntary Prepayment.  Borrower shall have the option to prepay all, but not less than all, of the Term Advance under this Agreement, provided Borrower (A) deliver written notice to Bank of its election to prepay the Term Advance at least ten (10) Business Days prior to such prepayment and (B) pay, on the date of such prepayment, (1) all outstanding principal with respect to the Term Advance, plus accrued but unpaid interest, plus (2) all fees (including any late fee), and other sums, including Bank Expenses, if any, that shall have become due and payable hereunder.

(B)    Mandatory Prepayment Upon an Acceleration.  If the Term Advance is accelerated after the occurrence of an Event of Default, Borrower shall immediately pay to Bank an amount equal to the sum of (A) all outstanding principal of the Term Advance, plus accrued but unpaid interest (including interest at the default rate), plus (B) all other fees, and other sums, including Bank Expenses, if any, that shall have become due and payable hereunder.

**2.2    [Reserved]**.

**2.3    Interest Rates, Payments, and Calculations**.

(a)    **Interest Rate**.  Except as set forth in Section 2.3(b), the outstanding Term Advance shall bear interest on the outstanding Daily Balance thereof, at a floating rate equal to one half of one percent (0.50%) above the Prime Rate.

(b)     **Late Fee; Default Rate**.  If any payment is not made within ten (10) days after the date such payment is due, Borrower shall pay Bank a late fee equal to the lesser of (i) five percent (5%) of the amount of such unpaid amount or (ii) the maximum permitted to be charged under applicable law, not in any case to be less than $25.00.  All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at a rate equal to five percent (5.0%) above the interest rate applicable immediately prior to the occurrence of the Event of Default.

(c)     **Payments**.  Interest hereunder shall be due and payable on the tenth (10ᵗʰ) calendar day of each month during the term hereof.  Bank shall, at its option, charge such interest, all Bank Expenses, and all Periodic Payments against any of Borrower's deposit accounts.  Any interest not paid when due shall be compounded by becoming a part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable hereunder.  All payments shall be free and clear of any taxes, withholdings, duties, impositions or other charges, to the end that Bank will receive the entire amount of any Obligations payable hereunder, regardless of source of payment.

(d)     **Computation**.  In the event the Prime Rate is changed from time to time hereafter, the applicable rate of interest hereunder shall be increased or decreased, effective as of the day the Prime Rate is changed, by an amount equal to such change in the Prime Rate.  All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

2.4     Crediting Payments.

(a)     Prior to the occurrence of an Event of Default, Bank shall credit a wire transfer of funds, check or other item of payment to such deposit account or Obligation as Borrower specifies.  After the occurrence of an Event of Default, the receipt by Bank of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such payment is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment.  Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Bank after 12:00 noon Pacific time shall be deemed to have been received by Bank as of the opening of business on the immediately following Business Day.  Whenever any payment to Bank under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

(b)     Borrower hereby authorizes Bank to automatically deduct from any deposit account(s) of Borrower with Bank, **including without limitation the deposit account ending in x5943** the amount of any loan payment. If the funds in the account(s) are insufficient to cover any payment, Bank shall not be obligated to advance funds to cover the payment and Borrower agrees to pay any applicable fees for this service disclosed in the Schedule of Fees and Charges applicable to Borrower's account(s).

2.5     **Fees**.  Borrower shall pay to Bank the following:

(a)     **Facility Fee**.  On the Closing Date, a facility fee equal to $8,750 in respect of the Term Loan Amount, which shall be deemed fully earned as of the Closing Date.

(b)     **Bank Expenses**.  On the Closing Date, all Bank Expenses incurred through the Closing Date, including reasonable attorneys' fees and expenses and, after the Closing Date, all Bank Expenses, including reasonable attorneys' fees and expenses, as and when they are incurred by Bank.

2.6     **Term**.  This Agreement shall become effective on the Closing Date and, subject to Section 13.7, shall continue in full force and effect for so long as any Obligations (other than inchoate indemnity obligations) remain outstanding or Bank has any obligation to make Credit Extensions under this Agreement.  Notwithstanding the foregoing, Bank shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default.  Notwithstanding termination, Bank's Lien on the Collateral shall remain in effect for so long as any Obligations (other than inchoate indemnity obligations) are outstanding.

3.     CONDITIONS OF LOANS.

3.1     **Conditions Precedent to Initial Credit Extension**.  The obligation of Bank to make the initial Credit Extension is subject to the condition precedent that Bank shall have received, in form and substance satisfactory to Bank, the following, duly executed by the applicable parties thereto:

(a)     this Agreement;

8

(b)      a certificate of the Secretary of Borrower with respect to incumbency and resolutions authorizing the execution and delivery of this Agreement;

(c)      UCC Financing Statement;

(d)      an intellectual property security agreement;

(e)      the Warrant, together with a current capitalization table and copies of Borrower's equity documents;

(f)      agreement to provide insurance and evidence satisfactory to Bank that the insurance policies and endorsements required by Section 6.7 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and/or additional insured clauses or endorsements in favor of Bank;

(g)      payment of the fees and Bank Expenses then due specified in Section 2.5 hereof;

(h)      current financial statements of Borrower;

(i)      duly executed original signature to a payoff letter from WTI Fund X, Inc. evidence that (i) the Liens securing Indebtedness owed by Borrower to WTI Fund X, Inc. will be terminated and (ii) the documents and/or filings evidencing the perfection of such Liens, including without limitation any financing statements, have or will, concurrently with the initial Credit Extension, be terminated;

(j)      certified copies, dated as of a recent date, of financing statement searches, as Bank may request, accompanied by written evidence (including any UCC termination statements) that the Liens indicated in any such financing statements either constitute Permitted Liens or have been or, in connection with the initial Credit Extension, will be terminated or released;

(k)      the Perfection Certificate of Borrower;

(l)      evidence that, as of the Closing Date, Borrower has RML of equal to or greater than nine (9); and

(m)      such other documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

**3.2      Conditions Precedent to All Credit Extensions**.  The obligation of Bank to make each Credit Extension, including the initial Credit Extension, is further subject to the following conditions:

(a)      timely receipt by Bank of the Credit Extension Advance Request Form or Term Advance Request, as provided in Section 2.1;

(b)      the absence of any circumstance or circumstances that could have a Material Adverse Effect; and

(c)      the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of such Credit Extension Advance Request Form and on the effective date of each Credit Extension; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further, that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date, and no Event of Default shall have occurred and be continuing, or would exist after giving effect to such Credit Extension. Each Credit Extension shall be deemed to be a representation and warranty by Borrower on the date of such Credit Extension that the representations and warranties in this Agreement remain true, accurate, and complete in all material respects; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

**3.3      Covenant to Deliver.**  Borrower agrees to deliver to Bank each item required to be delivered to Bank under this Agreement as a condition precedent to any Credit Extension.  Borrower expressly agrees that a Credit Extension made prior to the receipt by Bank of any such item shall not constitute a waiver by Bank of Borrower's obligation to deliver such item, and the making of any Credit Extension in the absence of a required item shall be in Bank's sole discretion.

      (a)     **FOR POST-CLOSING MATTERS** - Unless otherwise provided in writing:

          (i)     within ninety (90) days after the Closing Date (the "<u>Transition Period</u>"), Borrower shall (A) maintain all of its depository, operating, and investment accounts with Bank and (B) endeavor to utilize Bank's International Banking Division for any international banking services required by Borrower, including, but not limited to, foreign currency wires, hedges, and swaps; <u>provided, that</u>, such depository, operating, and investment accounts do not included Processing Accounts (as defined in Section 6.8(a)); <u>further provided, that</u>, Borrower will not permit greater than Five Hundred Thousand ($500,000) Dollars in cash to be held outside of an account with Bank for more than two (2) consecutive Business Days;

          (ii)     within thirty (30) days after the Closing Date (or such later date as Bank may agree to in its sole discretion in writing), Bank shall have received, evidence satisfactory to Bank that the insurance policies and endorsements required by Section 6.7 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and/or additional insured clauses or endorsements in favor of Bank;

          (iii)     within two (2) Business Days after the Closing Date, Borrower shall have executed a Control Agreement in respect of any deposit or securities accounts outside of Bank to the extent required by Section 6.8;

          (iv)     within two (2) Business Days after the Closing Date, Borrower shall have provided Bank with evidence, in a form and substance satisfactory to Bank, that any existing control agreements in favor of WTI Fund X, Inc. have been terminated; and

          (v)     within fifteen (15) days after the Closing Date (or such later date as Bank may agree to in its sole discretion in writing), Borrower shall have delivered to Bank evidence satisfactory to Bank that (A) all of the shares of stock of Borrower pledged to Borrower in connection with each of the promissory notes listed below (the "<u>Shares</u>") have been "locked" on the Carta platform with its "Collateralization Status" showing as "Collateralized" and (B) to the extent possible, all such Shares have been marked on the Carta platform as pledged to Bank:

      1.     Partial Recourse Promissory Note in favor of Brian Rainey dated December 14, 2020, in the amount of $336,000.00;

      2.     Partial Recourse Promissory Note in favor of Brian Rainey dated July 17, 2020, in the amount of $165,507.79;

      3.     Partial Recourse Promissory Note in favor of Greg Madormo dated December 30, 2020, in the amount of $1,843.75; and

      4.     Partial Recourse Promissory Note in favor of Madeline Alcala dated December 30, 2020, in the amount of $11,512.50.

**4.**     **CREATION OF SECURITY INTEREST.**

     **4.1**     **Grant of Security Interest**.  Borrower grants and pledges to Bank a continuing security interest in all presently existing and hereafter acquired or arising Collateral in order to secure prompt repayment of any and all Obligations and in order to secure prompt performance by Borrower of each of its covenants and duties under the Loan Documents.  Except as set forth in the Schedule, such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in Collateral acquired after the date hereof.

     **4.2**     **[Reserved].**

     **4.3**     **Delivery of Additional Documentation Required**.  Borrower shall from time to time execute and deliver to Bank, at the request of Bank, all Negotiable Collateral, all financing statements and other documents that Bank may reasonably request, in form satisfactory to Bank, to perfect and continue the perfection of Bank's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.  Borrower from time to time may deposit with Bank specific time deposit accounts to secure specific Obligations.  Borrower authorizes Bank to hold such balances in pledge and to decline to honor any drafts thereon or any request by Borrower or any other Person to pay or otherwise transfer any part of such balances for so long as the Obligations are outstanding.

     **4.4**     **Authorization to File Financing Statements.**  Borrower hereby authorizes Bank to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Bank's interest or rights hereunder,

including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Bank under the Code.

**4.5    Right to Inspect.** Bank (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours but no more than twice a year (unless an Event of Default has occurred and is continuing), to inspect Borrower's Books and to make copies thereof and to check, test, and appraise the Collateral in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral.

**5.    REPRESENTATIONS AND WARRANTIES.**

Borrower represents and warrants as follows:

**5.1    Due Organization and Qualification.** Borrower and each Subsidiary is a corporation duly existing and in good standing under the laws of its jurisdiction of organization and qualified and licensed to do business in any other jurisdiction in which the conduct of its business or its ownership of property requires that it be so qualified, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

**5.2    Due Authorization; No Conflict.** The execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in Borrower's Certificate of Incorporation or Bylaws, nor will they constitute an event of default under any material agreement to which Borrower is a party or by which Borrower is bound, nor will they contravene, conflict with or violate any applicable order, writ, judgment, injunction, decree, determination or award of any Governmental Authority by which Borrower or any of Borrower's property or assets may be bound or affected. Borrower is not in default under any material agreement to which it is a party or by which it is bound, except where such default would not reasonably be expected to have a Material Adverse Effect.

**5.3    No Prior Encumbrances.** Borrower has good and marketable title to its property, free and clear of Liens, except for Permitted Liens.

**5.4    [Reserved].**

**5.5    [Reserved].**

**5.6    Collateral and Intellectual Property Collateral.** Borrower is the sole owner of the Intellectual Property Collateral, except (i) as stated herein or on the Schedule, (ii) for non-exclusive licenses granted by Borrower to its customers in the ordinary course of business, (iii) shrink wrap software licenses, open source software licenses and (iv) similar software licenses and agreements which may be entered into by Borrower in the ordinary course of business. To the best of Borrower's knowledge, each of the Patents is valid and enforceable, and no part of the Intellectual Property Collateral has been judged invalid or unenforceable, in whole or in part, and no claim has been made that any part of the Intellectual Property Collateral violates the rights of any third party except to the extent such claim could reasonably be expected to cause a Material Adverse Effect. Except as set forth in the Schedule, Borrower's rights as a licensee of intellectual property do not give rise to more than five percent (5%) of its gross revenue in any given month, including without limitation revenue derived from the sale, licensing, rendering or disposition of any product or service. Except as set forth in the Schedule, Borrower is not a party to, or bound by, any agreement that restricts the grant by Borrower of a security interest in Borrower's rights under such agreement.

**5.7    Name; Location of Chief Executive Office.** Except as disclosed in the Schedule, Borrower has not done business under any name other than that specified on the signature page hereof. The chief executive office of Borrower is located at the address indicated in Section 10 hereof, as it may updated by Borrower from time to time in accordance with Section 10. All Borrower's Inventory and Equipment is located only at locations permitted under Section 7.10.

**5.8    Litigation.** Except as set forth in the Schedule, there are no actions or proceedings pending by or against Borrower or any Subsidiary before any court or administrative agency in which a likely adverse decision could reasonably be expected to have a Material Adverse Effect, or a material adverse effect on Borrower's interest or Bank's security interest in the Collateral.

**5.9    No Material Adverse Change in Financial Statements.** All consolidated and consolidating financial statements related to Borrower and any Subsidiary that Bank has received from Borrower fairly present in all material respects Borrower's financial condition as of the date thereof and Borrower's consolidated and consolidating results of operations for the period then ended (except that unaudited financial statements may not include footnotes and shall be subject to year-end adjustments). There has not been a material adverse change in the consolidated or the consolidating financial condition of Borrower since the date of the most recent of such financial statements submitted to Bank.

5.10    **Solvency, Payment of Debts**.  Borrower is solvent and able to pay its debts (including trade debts) as they mature.

5.11    **Regulatory Compliance**.  Borrower and each Subsidiary have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from Borrower's failure to comply with ERISA that could reasonably be likely to result in Borrower's incurring any liability reasonably expected to have a Material Adverse Effect.  Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940.  Borrower is not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).  Borrower has complied with all the provisions of the Federal Fair Labor Standards Act.  Borrower has not violated any statutes, laws, ordinances or rules applicable to it, violation of which could have a Material Adverse Effect.  Neither Borrower nor any of its Subsidiaries is in violation in any material respect of any applicable requirement of law relating to terrorism or money laundering, including Executive Order No. 13224, effective September 24, 2001, The Currency and Foreign Transactions Reporting Act (also known as the <u>Bank Secrecy Act</u>," 31 U.S.C. §§ 5311 5330), the Trading With the Enemy Act (50 U.S.C. §§1-44, as amended), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107 56, signed into law October 26, 2001, the Criminal Justice (Money Laundering and Terrorist Financing) Act 2010 as amended and the Criminal Justice (Terrorist Offences) Act 2005.

5.12    **Environmental Condition**.  Except as disclosed in the Schedule, none of Borrower's or any Subsidiary's properties or assets has ever been used by Borrower or any Subsidiary or, to the best of Borrower's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law; to the best of Borrower's knowledge, none of Borrower's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by Borrower or any Subsidiary; and neither Borrower nor any Subsidiary has received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any action or omission by Borrower or any Subsidiary resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

5.13    **Taxes**.  Borrower and each Subsidiary have filed or caused to be filed all tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein except those being contested in good faith with adequate reserves under GAAP or where the failure to file such returns or pay such taxes could not reasonably be expected to have a Material Adverse Effect; <u>provided, that</u> no Lien has arisen.

5.14    **Subsidiaries**.  Borrower does not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

5.15    **Government Consents**.  Borrower and each Subsidiary have obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary for the continued operation of Borrower's business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

5.16    **Accounts**.  Except for the Processor Accounts, none of Borrower's cash or cash equivalents is maintained or invested with a Person other than Bank.

5.17    **[Reserved]**.

5.18    **Full Disclosure**.  No representation, warranty or other statement made, as of the date of such representations, warranty or other statement, by Borrower in any certificate or written statement furnished to Bank taken together with all such certificates and written statements furnished to Bank contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading, it being recognized by Bank that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results.

6.    **AFFIRMATIVE COVENANTS.**

So long as the Obligations (other than inchoate indemnity obligations) remain outstanding, Borrower shall do all of the following:

12

**6.1    Good Standing**.  Borrower shall maintain its and each of its Subsidiaries' corporate existence and good standing in its jurisdiction of organization and maintain qualification in each jurisdiction in which it is required under applicable law except which the failure to do so with respect to such qualification of Borrower or such existence, good standing or qualification of such Subsidiary could not be reasonably be expected to have a Material Adverse Effect.  Borrower shall maintain, and shall cause each of its Subsidiaries to maintain, in force all licenses, approvals and agreements, the loss of which could have a Material Adverse Effect.

**6.2    Government Compliance**.  Borrower shall meet, and shall cause each Subsidiary to meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA.  Borrower shall comply, and shall cause each Subsidiary to comply, with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

**6.3    Financial Statements, Reports, Certificates**.  Borrower shall deliver the following to Bank:

(a)    as soon as available, but in any event within thirty (30) days after the end of each calendar month, (i) a company prepared consolidated and, if applicable, consolidating balance sheet, income statement, and cash flow statement covering Borrower's consolidated operations during such period, prepared in accordance with GAAP, consistently applied, in a form reasonably acceptable to Bank and certified by a Responsible Officer and (ii) a Compliance Certificate;

(b)    as soon as available, but in any event within one hundred eighty (180) days after the end of Borrower's fiscal year audited or reviewed financial statements, as applicable and as required, if at all, by Borrower's board of directors, which are consolidated and, if applicable, consolidating financial statements of Borrower prepared in accordance with GAAP, consistently applied, together with an unqualified opinion on such financial statements of an independent certified public accounting firm reasonably acceptable to Bank;

(c)    copies of all statements, reports and notices sent or made available generally by Borrower to its security holders or to any holders of Subordinated Debt and, if applicable, copies of the Form 10-K Annual Report, Form 10-Q Quarterly Report and Form 8-K Current Report for Borrower concurrent with the date of filing with the Securities and Exchange Commission;

(d)    promptly upon receipt of notice thereof, a report of any legal actions pending or threatened against Borrower or any Subsidiary that could reasonably be expected to result in damages or costs to Borrower or any Subsidiary of One Hundred Thousand Dollars ($100,000) or more or where the granting of the relief requested could reasonably be expected to have a Material Adverse Effect;

(e)    such budgets, sales projections, operating plans or other financial information as Bank may reasonably request from time to time;

(f)    within thirty (30) days after the last day of each month, Borrower shall deliver to Bank (i) a report of a pipeline report prepared on a Customer-by-Customer basis, (ii) a detailed aging of Borrower's Accounts by invoice date, (iii) a detailed aging of Borrower's accounts payable prepared by invoice date and (iv) such other matters as Bank may request;

(g)    as soon as available, but in any event no later than the earlier to occur of (i) forty five (45) days following the end of each fiscal year or (ii) the date of approval by Borrower's board of directors, an annual operating budget and financial projections (including income statements, balance sheets and cash flow statements) for such fiscal year, presented in a monthly format, approved by Borrower's board of directors, and in a form and substance acceptable to Bank (each, a "Financial Plan");

(h)    promptly, upon receipt, copies of any final management letters received by Borrower from Borrower's auditor;

(i)    as soon as possible, notice of the occurrence of any default or Event of Default; and

(j)    promptly upon Bank's request, such other books, records, statements, lists of property and accounts, budgets, forecasts or reports as to Borrower and as to each guarantor of Borrower's obligations to Bank as Bank may request.

**6.4    Audits**.  Bank shall have a right from time to time hereafter to audit Borrower's Accounts and appraise Collateral at Borrower's expense, provided that such audits will be conducted no more often than every twelve (12) months unless an Event of Default has occurred and is continuing.

13

**6.5**  **[Reserved].**

**6.6**  **Taxes**.  Borrower shall make, and shall cause each Subsidiary to make, due and timely payment or deposit of all material federal, state, and local taxes, assessments, or contributions required of it by law, and will execute and deliver to Bank, on demand, appropriate certificates attesting to the payment or deposit thereof; and Borrower will make, and will cause each Subsidiary to make, timely payment or deposit of all material tax payments and withholding taxes required of it by applicable laws, including, but not limited to, those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Bank with proof satisfactory to Bank indicating that Borrower or a Subsidiary has made such payments or deposits; provided that Borrower or a Subsidiary need not make any payment if the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrower or if the amount does not exceed $10,000 in the aggregate.

**6.7**  **Insurance**.

(a)  Borrower, at its expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks, and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where Borrower's business is conducted on the date hereof.  Borrower shall also maintain insurance relating to Borrower's business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to Borrower's.

(b)  All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Bank.  All such policies of property insurance shall contain a lender's loss payable endorsement, in a form satisfactory to Bank, showing Bank as a lender loss payee thereof, and all liability insurance policies shall show Bank as an additional insured and shall specify that the insurer must give at least twenty (20) days' notice (ten (10) days' notice for non-payment of premium) to Bank before canceling its policy for any reason.  Upon Bank's request, Borrower shall deliver to Bank certified copies of such policies of insurance and evidence of the payments of all premiums therefor.  All proceeds payable under any such policy shall, at the option of Bank, be payable to Bank to be applied on account of the Obligations; provided, that If no Event of Default has occurred and is continuing, proceeds payable under any casualty policy will, at Borrower's option, be payable to Borrower to replace the property subject to the claim, provided that any such replacement property shall be deemed Collateral in which Bank has been granted a first priority security interest.

**6.8**  **Accounts**.

(a)  Borrower shall maintain and shall cause each of its Subsidiaries to maintain all of its processing accounts with Braintree, PayPal and Stripe (individually and collectively, the "Processing Accounts"); provided, that the balance of each such account does not exceed $500,000 in the aggregate.

(b)  In addition to and without limiting the restrictions in (a), Borrower shall provide Bank five (5) days prior written notice before establishing any banking or investment account at or with any bank or financial institution other than Bank or Bank's Affiliates. Subject to Section 3.3(a)(iii), for each banking or investment account that Borrower at any time maintains, Borrower shall cause the applicable bank or financial institution (other than Bank) at or with which any such account is maintained to execute and deliver a Control Agreement or other appropriate instrument with respect to such account to perfect Bank's Lien in such account in accordance with the terms hereunder which Control Agreement may not be terminated without the prior written consent of Bank.  The provisions of the previous sentence shall not apply to deposit accounts exclusively used for payroll, payroll taxes, and other employee wage and benefit payments to or for the benefit of Borrower's employees and identified to Bank by Borrower as such.

**6.9**  **Financial Covenants**.  Maintain Borrower's financial condition as follows in accordance with GAAP and used consistently with prior practices (except to the extent modified by the definitions herein).

(a)  **Performance to Plan – EBITDA**.  At all times commencing on the Closing Date through and including the eighteenth (18) month anniversary of the closing date, Borrower's EBITDA, measured on a monthly basis as of the last day of each such month for the trailing three (3) month period then ended, as of any measurement date set forth below, shall not deviate from the corresponding amount set forth below for such measurement date:

| Month Ended | Projected T3M EBITDA | Allowed Variance | Required T3M Adjusted EBITDA |
|---|---|---|---|
| The last day of the fiscal month ending September 2023 | ($254,000) | $450,000 | ($700,000) |

| | | |
|---|---|---|
| The last day of the fiscal month ending October 2023 | ($200,000) | $450,000 | ($650,000) |
| The last day of the fiscal month ending November 2023 | $764,000 | $450,000 | $310,000 |
| The last day of the fiscal month ending December 2023 | $2,079,000 | $450,000 | $1,630,000 |
| The last day of the fiscal month ending January 2024 | $1,999,000 | $450,000 | $1,550,000 |
| The last day of the fiscal month ending February 2024 | $955,000 | $450,000 | $540,000 |
| The last day of the fiscal month ending March 2024 | ($314,000) | $450,000 | ($760,000) |
| The last day of the fiscal month ending April 2024 | ($199,000) | $450,000 | ($650,000) |
| The last day of the fiscal month ending May 2024 | $39,000 | $450,000 | ($410,000) |
| The last day of the fiscal month ending June 2024 | $474,000 | $450,000 | $20,000 |
| The last day of the fiscal month ending July 2024 | $750,000 | $450,000 | $300,000 |
| The last day of the fiscal month ending August 2024 | $923,000 | $450,000 | $470,000 |
| The last day of the fiscal month ending September 2024 | $919,000 | $450,000 | $470,000 |
| The last day of the fiscal month ending October 2024 | $1,103,000 | $450,000 | $650,000 |
| The last day of the fiscal month ending November 2024 | $2,665,000 | $450,000 | $2,220,000 |
| The last day of the fiscal month ending December 2024 | $4,248,000 | $450,000 | $3,800,000 |
| The last day of each fiscal month during the Borrower's fiscal year ending December 31, 2025 | TBD | $450,000 | To be set based on Borrower's 2025 Plan (in form and substance satisfactory to Bank) and with an allowance for a variance of $450,000 |

The Borrower's Financial Plan for the fiscal year ending December 31, 2024 for purposes of this Section 6.9(a) is attached hereto as **Exhibit E**.

(b)    **Minimum Debt Service Coverage Ratio**. At all times commencing on the nineteen (19) month anniversary of the Closing Date and continuing at all times thereafter, Borrower shall maintain a Debt Service Coverage Ratio of no less than 1.25 to 1.00, tested monthly as of the last day of each calendar month.

**6.10    Intellectual Property Rights**.

(a)      Together with the monthly compliance certificate, Borrower shall give Bank written notice of any applications or registrations of intellectual property rights filed with the United States Patent and Trademark Office, including the date of such filing and the registration or application numbers, if any.  Borrower shall (i) give Bank not less than thirty (30) days prior written notice of the filing of any applications or registrations with the United States Copyright Office, including the title of such intellectual property rights to be registered, as such title will appear on such applications or registrations, and the date such applications or registrations will be filed, and (ii) prior to the filing of any such applications or registrations, shall execute such documents as Bank may reasonably request for Bank to maintain its perfection in such intellectual property rights to be registered by Borrower, and upon the request of Bank, shall file such documents simultaneously with the filing of any such applications or registrations.  Upon filing any such applications or registrations with the United States Copyright Office, Borrower shall promptly provide Bank with (i) a copy of such applications or registrations, without the exhibits, if any, thereto, (ii) evidence of the filing of any documents requested by Bank to be filed for Bank to maintain the perfection and priority of its security interest in such intellectual property rights, and (iii) the date of such filing.

(b)      Bank may audit Borrower's Intellectual Property Collateral to confirm compliance with this Section, provided such audit may not occur more often than once per year, unless an Event of Default has occurred and is continuing. Bank shall have the right, but not the obligation, to take, at Borrower's sole expense, any actions that Borrower is required under this Section to take but which Borrower fails to take, after 15 days' notice to Borrower.  Borrower shall reimburse and indemnify Bank for all reasonable costs and reasonable expenses incurred in the reasonable exercise of its rights under this Section.

**6.11      Use of Proceeds**.  Borrower shall use the proceeds of the Advances to repay its existing indebtedness to WTI Fund X, Inc. and as growth capital to fund its general business requirements in accordance with the provisions of this Agreement, and not for personal, family, household or agricultural purposes.

**6.12      Landlord Waivers; Bailee Waivers**.  In the event that Borrower or any of its Subsidiaries, after the Closing Date, intends to add any new offices or business locations, including warehouses, or otherwise store any portion of the Collateral with, or deliver any portion of the Collateral to, a bailee, in each case pursuant to Section 7.2, then in the event that the Collateral at any new location is valued in excess of One Hundred Seventy-Five Thousand Dollars ($175,000) (per location), Borrower shall notify Bank of such location and shall use commercially reasonable efforts to have such bailee or landlord, as applicable, execute and deliver a bailee waiver or landlord waiver, as applicable, in form and substance reasonably satisfactory to Bank prior to the addition of such new offices or business locations, or any such storage with or delivery to any such bailee, as the case may be. Notwithstanding the foregoing or anything to the contrary herein, the requirements under this Section 6.12, shall not apply to foreign locations where Inventory or Equipment may be maintained.

**6.13      Formation or Acquisition of Subsidiaries.**  Notwithstanding and without limiting the negative covenants contained in Sections 7.3 and 7.7 hereof, at the time that Borrower or any Guarantor forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing Date, Borrower and such Guarantor shall (a) cause such new Subsidiary to provide to Bank a joinder to this Agreement to become a co-borrower hereunder, or a Guaranty to become a Guarantor hereunder, at Bank's discretion, together with such appropriate financing statements and/or Control Agreements, all in form and substance satisfactory to Bank (including being sufficient to grant Bank a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Bank appropriate certificates and powers and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Bank; and (c) provide to Bank all other documentation in form and substance satisfactory to Bank, including one or more opinions of counsel satisfactory to Bank, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above.  Any document, agreement, or instrument executed or issued pursuant to this Section 6.13 shall be a Loan Document.

**6.14      [Reserved]**.

**6.15      Further Assurances**.  At any time and from time to time Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Bank to effect the purposes of this Agreement.

**7.      NEGATIVE COVENANTS.**

So long as the Obligations (other than inchoate indemnity obligations) remain outstanding, Borrower will not do any of the following:

**7.1      Dispositions**.  Convey, sell, lease, transfer or otherwise dispose of (collectively, a "Transfer"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, other than:  (i) Transfers of Inventory in the ordinary course of business; (ii) Transfers of non-exclusive licenses and similar arrangements for the use of the property of Borrower or its Subsidiaries in the ordinary course of business; (iii) Transfers of worn-out or obsolete Equipment which was not financed by Bank;

(iv) Transfers consisting of the sale or issuance of any stock of Borrower permitted under Section 7.2 of this Agreement; (v) Transfers consisting of Borrower's use or transfer of money or cash equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents; (vi) Transfers constituting Permitted Liens and Permitted Investments; and (vii) other Transfers not in excess of $50,000 in any calendar year.

**7.2      Change in Business; Change in Control or Executive Office**.  Engage in any business, or permit any of its Subsidiaries to engage in any business, other than the businesses currently engaged in by Borrower and any business substantially similar or related thereto (or incidental thereto); or cease to conduct business in the manner conducted by Borrower as of the Closing Date; or suffer or permit a Change in Control; or without twenty (20) days prior written notification to Bank, relocate its chief executive office or state of organization or change its legal name; or without Bank's prior written consent, change the date on which its fiscal year ends.

**7.3      Mergers or Acquisitions**.  Merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with or into any other business organization, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock, equity securities, or property of another Person.

**7.4      Indebtedness**.  Create, incur, assume or be or remain liable with respect to any Indebtedness, or permit any Subsidiary so to do, other than Permitted Indebtedness.

**7.5      Encumbrances**.  Create, incur, assume or suffer to exist any Lien with respect to any of its property (including without limitation, its Intellectual Property Collateral), or assign or otherwise convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries to do so, except for Permitted Liens, or agree with any Person other than Bank not to grant a security interest in, or otherwise encumber, any of its property (including without limitation, its Intellectual Property Collateral), or permit any Subsidiary to do so, except for restrictions by reason of customary provisions restricting assignments, subletting, subleasing, pledging or other transfers contained in leases, subleases or licenses.

**7.6      Distributions**.  Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any capital stock, or permit any of its Subsidiaries to do so, except that Borrower may (i) repurchase the stock  of current or former employees, directors or consultants of Borrower pursuant to stock repurchase agreements in an aggregate amount not to exceed One Hundred Thousand Dollars ($100,000)] during any twelve (12) month period, as long as an Event of Default does not exist prior to such repurchase or would not exist after giving effect to such repurchase or in any amount where the consideration for the repurchase is the cancellation of indebtedness owed by such current or former employees, directors or consultants to Borrower regardless of whether an Event of Default exists, (ii) convert any of its convertible securities (including warrants) into other securities pursuant to the terms of such convertible securities, (iii) distribute securities to current or former employees, officers, consultants or directors upon the exercise of their warrants, options or similar instruments; and (iv) pay dividends or make distributions in the form of capital stock.

**7.7      Investments**.  Directly or indirectly acquire or own, or make any Investment in or to any Person, or permit any of its Subsidiaries so to do, other than Permitted Investments; or other than Processor Accounts maintain or invest any of Borrower's cash or cash equivalents with a Person other than Bank unless such Person has entered into a Control Agreement with Bank in form and substance satisfactory to Bank; or suffer or permit any Subsidiary to be a party to, or be bound by, an agreement that restricts such Subsidiary from paying dividends or otherwise distributing property to Borrower.

**7.8      Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower except for (i) transactions that are in the ordinary course of Borrower's business or permitted by this Agreement, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person, (ii) equity financing transactions and convertible note issuances that constitute Subordinated Debt with Borrower's existing investors and (iii) reasonable and customary employment arrangements with executive officers and reasonable and customary fees paid to members of the Board of Directors in the ordinary course of business.

**7.9      Subordinated Debt**.  Make any payment in respect of any Subordinated Debt, or permit any of its Subsidiaries to make any such payment, except in compliance with the terms of such Subordinated Debt, or amend any provision contained in any documentation relating to the Subordinated Debt without Bank's prior written consent.  For the abundance of caution, in no event shall Borrower make any payment under any Subordinated Debt if an Event of Default has occurred and is continuing or would occur as a result of such payment.

**7.10      Inventory and Equipment**.  Store the Inventory or the Equipment with a bailee, warehouseman, or other third party unless the third party has been notified of Bank's security interest and Bank (a) has received an acknowledgment from the third party that it is holding or will hold the Inventory or Equipment for Bank's benefit or (b) is in pledge possession of the warehouse receipt, where negotiable, covering such Inventory or Equipment.  Except for Inventory sold in the ordinary course of business and

except for such other locations as Bank may approve in writing or which otherwise comply with this Section 7.10, store or maintain any Equipment or Inventory at a location other than the locations set forth in Section 10 of this Agreement or on the Schedule or Perfection Certificate. Notwithstanding the foregoing or anything to the contrary herein, the requirements under this Section 7.10, shall not apply to (i) foreign locations where Inventory or Equipment may be maintained or (ii) domestic locations where Inventory or Equipment with an aggregate value of less than One Hundred Thousand Dollars ($100,000) (per location) is held.

**7.11    Compliance**.  Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose.  Fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, fail to comply with the Federal Fair Labor Standards Act or violate any law or regulation, which violation could have a Material Adverse Effect, or a material adverse effect on the Collateral or the priority of Bank's Lien on the Collateral, or permit any of its Subsidiaries to do any of the foregoing.

**7.12    Capital Expenditures.**    Make or contract to make, without Bank's prior written consent, capital expenditures, including leasehold improvements, in any fiscal year in excess of $250,000.

**8.    EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an Event of Default by Borrower under this Agreement:

**8.1    Payment Default**.  If Borrower fails to pay, when due, any of the Obligations;

**8.2    Covenant Default**.

(a)    If Borrower fails to perform any obligation under Section 3.3, Article 6 or violates any of the covenants contained in Article 7 of this Agreement; or

(b)    If Borrower fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Bank and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within ten (10) days after Borrower receives notice thereof or any officer of Borrower becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) day period or cannot after diligent attempts by Borrower be cured within such ten (10) day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional reasonable period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made.

**8.3    Material Adverse Effect**.  The occurrence of a Material Adverse Effect;

**8.4    Attachment**.  If any material portion of Borrower's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within ten (10) days, or if Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of Borrower's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any of Borrower's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten (10) days after Borrower receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by Borrower (provided that no Credit Extensions will be required to be made during such cure period);

**8.5    Insolvency**.  If Borrower becomes insolvent, or if an Insolvency Proceeding is commenced by Borrower, or if an Insolvency Proceeding is commenced against Borrower and is not dismissed or stayed within thirty (30) days (provided that no Credit Extensions will be made prior to the dismissal of such Insolvency Proceeding);

**8.6    Other Agreements**.  If there is a default or other failure to perform beyond any applicable period of grace or cure in any agreement involving the borrowing of money to which Borrower is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Seventy-Five Thousand Dollars ($175,000) or which could reasonably be expected to have a Material Adverse Effect;

18

**8.7**    **Judgments**.  If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Seventy-Five Thousand Dollars ($175,000) (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against Borrower and shall remain unsatisfied and unstayed for a period of ten (10) days (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

**8.8**    **Misrepresentations**.  Any representation or warranty made by Borrower in any Loan Document shall have been false or misleading in any material respect when made or when deemed made; or

**8.9**    **Subordinated Debt.**  Any document, instrument, or agreement evidencing the subordination of any Subordinated Debt shall for any reason be revoked or invalidated or otherwise cease to be in full force and effect, any Person shall be in breach thereof or contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations shall for any reason be subordinated or shall not have the priority contemplated by this Agreement or any applicable subordination or intercreditor agreement.

**9.**    **BANK'S RIGHTS AND REMEDIES.**

**9.1**    **Rights and Remedies**.  Upon the occurrence and during the continuance of an Event of Default, Bank may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Borrower:

(a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable (provided that upon the occurrence of an Event of Default described in Section 8.5, all Obligations shall become immediately due and payable without any action by Bank);

(b)    Cease advancing money or extending credit to or for the benefit of Borrower under this Agreement or under any other agreement between Borrower and Bank;

(c)    Settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that Bank reasonably considers advisable;

(d)    Make such payments and do such acts as Bank considers necessary or reasonable to protect its security interest in the Collateral.  Borrower agrees to assemble the Collateral if Bank so requires, and to make the Collateral available to Bank as Bank may designate.  Borrower authorizes Bank to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Bank's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to any of Borrower's owned premises, Borrower hereby grants Bank a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Bank's rights or remedies provided herein, at law, in equity, or otherwise;

(e)    Set off and apply to the Obligations any and all (i) balances and deposits of Borrower held by Bank, or (ii) indebtedness at any time owing to or for the credit or the account of Borrower held by Bank;

(f)    Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral.  Bank is hereby granted a license or other right, solely pursuant to the provisions of this Section 9.1, to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Bank's exercise of its rights under this Section 9.1, Borrower's rights under all licenses and all franchise agreements shall inure to Bank's benefit;

(g)    Dispose of the Collateral by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Bank determines is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Bank deems appropriate;

(h)    Bank may credit bid and purchase at any public sale; and

(i)    Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Borrower.

**9.2**     **Power of Attorney.** Effective only upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably appoints Bank (and any of Bank's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Bank's security interest in the Accounts; (b) endorse Borrower's name on any checks or other forms of payment or security that may come into Bank's possession; (c) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) dispose of any Collateral; (e) make, settle, and adjust all claims under and decisions with respect to Borrower's policies of insurance; (f) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Bank determines to be reasonable; and (g) to file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral. The appointment of Bank as Borrower's attorney in fact, and each and every one of Bank's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed and Bank's obligation to provide Credit Extensions hereunder is terminated.

**9.3**     **Accounts Collection**. At any time after the occurrence and during the continuance of an Event of Default, Bank may notify any Person owing funds to Borrower of Bank's security interest in such funds and verify the amount of such Account. Borrower shall collect all amounts owing to Borrower for Bank, receive in trust all payments as Bank's trustee, and immediately deliver such payments to Bank in their original form as received from the account debtor, with proper endorsements for deposit.

**9.4**     **Bank Expenses**. If Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Bank may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; (b) set up such reserves under a loan facility in Section 2.1 as Bank deems necessary to protect Bank from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type discussed in Section 6.7 of this Agreement, and take any action with respect to such policies as Bank deems prudent. Any amounts so paid or deposited by Bank shall constitute Bank Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Bank shall not constitute an agreement by Bank to make similar payments in the future or a waiver by Bank of any Event of Default under this Agreement.

**9.5**     **Bank's Liability for Collateral**. So long as Bank complies with reasonable banking practices, Bank shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

**9.6**     **Remedies Cumulative**. Bank's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Bank shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by Bank of one right or remedy shall be deemed an election, and no waiver by Bank of any Event of Default on Borrower's part shall be deemed a continuing waiver. No delay by Bank shall constitute a waiver, election, or acquiescence by it. No waiver by Bank shall be effective unless made in a written document signed on behalf of Bank and then shall be effective only in the specific instance and for the specific purpose for which it was given.

**9.7**     **Demand; Protest**. Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Bank on which Borrower may in any way be liable.

**10.**     **NOTICES.**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, or email address indicated below. Bank or Borrower may change its mailing or electronic mail address by giving the other party written notice thereof in accordance with the terms of this Section 10.

7599015.13

| If to Borrower: | BREAKOUT COMMERCE, INC. |
| | 228 Park Avenue S, Suite 21651 |
| | New York, NY 10003 |
| | Attn: Greg Madormo |
| | E-mail: greg@gooten.com |

| If to Bank: | WESTERN ALLIANCE BANK |
| | One East Washington St, Suite 1400 |
| | Phoenix, AZ 85004 |
| | Attn: Laurence Brent |
| | E-mail: lbrent@bridgebank.com |

| With a copy to: | OTTERBOURG P.C. |
| | 230 Park Avenue |
| | New York, NY 10169 |
| | Attn: Jason I. Miller, Esq. |
| | Fax: (212) 682-6104 |
| | E-mail: jmiller@otterbourg.com |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of California, without regard to principles of conflicts of law. Each of Borrower and Bank hereby submits to the exclusive jurisdiction of the state and Federal courts located in the County of Santa Clara, State of California. BORROWER AND BANK EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY RECOGNIZES AND AGREES THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS AGREEMENT. EACH PARTY REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

**12.    JUDICIAL REFERENCE PROVISION.**

**12.1**    In the event the Jury Trial Waiver set forth above is not enforceable, the parties elect to proceed under this Judicial Reference Provision.

**12.2**    With the exception of the items specified in Section 12.3, below, any controversy, dispute or claim (each, a "**Claim**") between the parties arising out of or relating to this Agreement or any other document, instrument or agreement between the undersigned parties (collectively in this Section, the "**Loan Documents**"), will be resolved by a reference proceeding in California in accordance with the provisions of Sections 638 et seq. of the California Code of Civil Procedure ("**CCP**"), or their successor sections, which shall constitute the exclusive remedy for the resolution of any Claim, including whether the Claim is subject to the reference proceeding. Except as otherwise provided in the Loan Documents, venue for the reference proceeding will be in the state or federal court in the county or district where the real property involved in the action, if any, is located or in the state or federal court in the county or district where venue is otherwise appropriate under applicable law (the "**Court**").

**12.3**    The matters that shall not be subject to a reference are the following: (i) nonjudicial foreclosure of any security interests in real or personal property, (ii) exercise of self-help remedies (including, without limitation, set-off), (iii) appointment of a receiver and (iv) temporary, provisional or ancillary remedies (including, without limitation, writs of attachment, writs of possession, temporary restraining orders or preliminary injunctions). This reference provision does not limit the right of any party to exercise or oppose any of the rights and remedies described in clauses (i) and (ii) or to seek or oppose from a court of competent jurisdiction any of the items described in clauses (iii) and (iv). The exercise of, or opposition to, any of those items does not waive the right of any party to a reference pursuant to this reference provision as provided herein.

12.4     The referee shall be a retired judge or justice selected by mutual written agreement of the parties.  If the parties do not agree within ten (10) days of a written request to do so by any party, then, upon request of any party, the referee shall be selected by the Presiding Judge of the Court (or his or her representative).  A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted.  Pursuant to CCP § 170.6, each party shall have one peremptory challenge to the referee selected by the Presiding Judge of the Court (or his or her representative).

12.5     The parties agree that time is of the essence in conducting the reference proceedings.  Accordingly, the referee shall be requested, subject to change in the time periods specified herein for good cause shown, to (i) set the matter for a status and trial-setting conference within fifteen (15) days after the date of selection of the referee, (ii) if practicable, try all issues of law or fact within one hundred twenty (120) days after the date of the conference and (iii) report a statement of decision within twenty (20) days after the matter has been submitted for decision.

12.6     The referee will have power to expand or limit the amount and duration of discovery.  The referee may set or extend discovery deadlines or cutoffs for good cause, including a party's failure to provide requested discovery for any reason whatsoever.  Unless otherwise ordered based upon good cause shown, no party shall be entitled to "priority" in conducting discovery, depositions may be taken by either party upon seven (7) days written notice, and all other discovery shall be responded to within fifteen (15) days after service.  All disputes relating to discovery which cannot be resolved by the parties shall be submitted to the referee whose decision shall be final and binding.

12.7     Except as expressly set forth herein, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding.  All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except that when any party so requests, a court reporter will be used at any hearing conducted before the referee, and the referee will be provided a courtesy copy of the transcript.  The party making such a request shall have the obligation to arrange for and pay the court reporter.  Subject to the referee's power to award costs to the prevailing party, the parties will equally share the cost of the referee and the court reporter at trial.

12.8     The referee shall be required to determine all issues in accordance with existing case law and the statutory laws of the State of California.  The rules of evidence applicable to proceedings at law in the State of California will be applicable to the reference proceeding.  The referee shall be empowered to enter equitable as well as legal relief, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication.  The referee shall issue a decision at the close of the reference proceeding which disposes of all claims of the parties that are the subject of the reference.  Pursuant to CCP § 644, such decision shall be entered by the Court as a judgment or an order in the same manner as if the action had been tried by the Court and any such decision will be final, binding and conclusive.  The parties reserve the right to appeal from the final judgment or order or from any appealable decision or order entered by the referee.  The parties reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a reference proceeding under this provision.

12.9     If the enabling legislation which provides for appointment of a referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by reference procedure will be resolved and determined by arbitration.  The arbitration will be conducted by a retired judge or justice, in accordance with the California Arbitration Act §1280 through §1294.2 of the CCP as amended from time to time.  The limitations with respect to discovery set forth above shall apply to any such arbitration proceeding.

12.10     THE PARTIES RECOGNIZE AND AGREE THAT ALL CONTROVERSIES, DISPUTES AND CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY.  AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CONTROVERSY, DISPUTE OR CLAIM BETWEEN OR AMONG THEM ARISING OUT OF OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

## 13.     GENERAL PROVISIONS.

13.1     **Successors and Assigns**.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by Borrower without Bank's prior written consent, which consent may be granted or withheld in Bank's sole discretion.  Bank shall

have the right without the consent of or notice to Borrower to sell, transfer, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights and benefits hereunder.

        **13.2    Indemnification**.  Borrower shall defend, indemnify and hold harmless Bank and its officers, employees, and agents against:  (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses or Bank Expenses in any way suffered, incurred, or paid by Bank as a result of or in any way arising out of, following, or consequential to transactions between Bank and Borrower whether under this Agreement, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by Bank's gross negligence or willful misconduct.

        **13.3    Time of Essence**.  Time is of the essence for the performance of all obligations set forth in this Agreement.

        **13.4    Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

        **13.5    Amendments in Writing, Integration**.  Neither this Agreement nor the Loan Documents can be amended or terminated orally.  All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

        **13.6    Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

        **13.7    Survival.  All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations (other than inchoate indemnity obligations) remain outstanding or Bank has any obligation to make Credit Extensions to Borrower.  The obligations of Borrower to indemnify Bank with respect to the expenses, damages, losses, costs and liabilities described in Section 13.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Bank have run.**

        **13.8    Confidentiality**.  In handling any confidential information Bank and all employees and agents of Bank, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to the subsidiaries or affiliates of Bank who are bound by similar confidentiality obligations in connection with their present or prospective business relations with Borrower, (ii) to prospective transferees or purchasers of any interest in the Loans, provided that Bank has entered into a confidentiality agreement with such prospective transferees, participants, or purchasers in favor of Borrower (iii) as required by law, regulations, rule or order, subpoena, judicial order or similar order, (iv) as may be required in connection with the examination, audit or similar investigation of Bank and (v) as Bank may determine in connection with the enforcement of any remedies hereunder.  Confidential information hereunder shall not include information that either:  (a) is in the public domain or in the knowledge or possession of Bank when disclosed to Bank, or becomes part of the public domain after disclosure to Bank through no fault of Bank; or (b) is disclosed to Bank by a third party, provided Bank does not have actual knowledge that such third party is prohibited from disclosing such information.

        **13.9    Patriot Act Notice**.  Bank notifies Borrower that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "<u>Patriot Act</u>"), it is required to obtain, verify and record information that identifies Borrower, which information includes names and addresses and other information that will allow Bank to identify Borrower in accordance with the Patriot Act.

**14.    NOTICE OF FINAL AGREEMENT.**

        **BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (C) THIS WRITTEN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

[Signature page follows]

7599015.13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**BREAKOUT COMMERCE, INC.**, a Delaware corporation

DocuSigned by:

*Brian Rainey*

By: _____
9C91B15719CE4ED

Name: Brian Rainey

Title: Chief Executive Officer

**WESTERN ALLIANCE BANK**, an Arizona corporation

DocuSigned by:

**Dave Dailey**

By: _____
851CF4FDBCD6416...

Name: Dave Dailey

Title: Senior Director

**EXHIBIT A**

| | |
|---|---|
| **DEBTOR:** | **BREAKOUT COMMERCE, INC.** a Delaware corporation |
| **SECURED PARTY:** | **WESTERN ALLIANCE BANK,** an Arizona corporation |

**COLLATERAL DESCRIPTION ATTACHMENT**
**TO LOAN AND SECURITY AGREEMENT**

All personal property of Borrower (herein referred to as "Borrower" or "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a)     all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), Intellectual Property Collateral and other general intangibles (including payment intangibles and software), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b)     any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.   All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time.

Notwithstanding the foregoing the term "Collateral" shall not include: (i) more than sixty-five percent (65%) of the issued and outstanding capital stock, membership units or other securities entitled to vote owned or held of record by Borrower in any Subsidiary that is a controlled foreign corporation (as defined in the Internal Revenue Code), provided that the Collateral shall include one hundred percent (100%) of the issued and outstanding non-voting capital stock of such Subsidiary; (ii) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise, but only to the extent the granting of a security interest in such "intent to use" trademarks would be contrary to applicable law; and (iii) any contract, Instrument or Chattel Paper in which Borrower has any right, title or interest if and to the extent such contract, Instrument or Chattel Paper includes a provision containing a restriction on assignment such that the creation of a security interest in the right, title or interest of Borrower therein would be prohibited and would, in and of itself, cause or result in a default thereunder enabling another person party to such contract, Instrument or Chattel Paper to enforce any remedy with respect thereto; provided, however, that the foregoing exclusion shall not apply if (A) such prohibition has been waived or such other person has otherwise consented to the creation hereunder of a security interest in such contract, Instrument or Chattel Paper, or (B) such prohibition would be rendered ineffective pursuant to Sections 9-407(a) or 9-408(a) of the UCC, as applicable and as then in effect in any relevant jurisdiction, or any other applicable law (including the United States Bankruptcy Code or principles of equity); provided further that immediately upon the ineffectiveness, lapse or termination of any such provision, the term "Collateral" shall include, and Borrower shall be deemed to have granted a security interest in, all its rights, title and interests in and to such contract, Instrument or Chattel Paper as if such provision had never been in effect; and provided further that the foregoing exclusion shall in no way be construed so as to limit, impair or otherwise affect Bank's unconditional continuing security interest in and to all rights, title and interests of Borrower in or to any payment obligations or other rights to receive monies due or to become due under any such contract, Instrument or Chattel Paper and in any such monies and other proceeds of such contract, Instrument or Chattel Paper.

**EXHIBIT B**

**CREDIT EXTENSION REQUEST FORM**

*(To be submitted no later than 3:00 PM to be considered for same day processing)*

To:    Western Alliance Bank, an Arizona corporation
_____

_____

Date:  _____

From:  **BREAKOUT COMMERCE, INC.**, a Delaware
corporation
_____
Borrower's Name

_____
Authorized Signature

_____
Authorized Signer's Name (please print)

_____
Phone Number

To Account #    _____

Borrower hereby requests funding in the amount of $ _____ in accordance with the Credit Extension as defined in the Loan and Security Agreement dated September 26, 2023.

All representations and warranties of Borrower stated in the Loan and Security Agreement are true, correct and complete in all material respects as of the date of this Credit Extension Request Form; <u>provided</u> that those representations and warranties expressly referring to another date shall be true, correct and complete in all material respects as of such date.

Capitalized terms used herein and not otherwise defined have the meanings set forth in the Loan and Security Agreement.

# EXHIBIT C

## COMPLIANCE CERTIFICATE

TO:           WESTERN ALLIANCE BANK, an Arizona corporation

FROM:       _____

        The undersigned authorized officer of **BREAKOUT COMMERCE, INC.**, a Delaware corporation hereby certifies that in accordance with the terms and conditions of the Loan and Security Agreement between Borrower and Bank (as amended, restated, supplemented and otherwise modified from time to time, the "Agreement"), (i) Borrower is in complete compliance for the period ending _____ with all required covenants except as noted below and (ii) all representations and warranties of Borrower stated in the Agreement are true and correct as of the date hereof.  Attached herewith are the required documents supporting the above certification.  The Officer further certifies that these are prepared in accordance with Generally Accepted Accounting Principles (GAAP) and are consistently applied from one period to the next except as explained in an accompanying letter or footnotes.

        **Please indicate compliance status by circling Yes/No under "Complies" column.**

| **Reporting Covenant** | **Required** | **Complies** | |
|---|---|---|---|
| Annual financial statements (CPA reviewed or audited, as applicable) | FYE within 180 days | Yes | No |
| Monthly financial statements and Compliance Certificate | Monthly within 30 days | Yes | No |
| 10K and 10Q | (as applicable) | Yes | No |
| Annual operating budget, sales projections and operating plans approved by board of directors | Annually no later than 45 days after the beginning of each fiscal year | Yes | No |
| Monthly A/R & A/P Agings, | Monthly within 30 days | Yes | No |
| Pipeline Report | Monthly within 30 days | Yes | No |
| Deposit balances with Bank | $ _____ | | |
| Deposit balance outside Bank | $ _____ | | |

| **Financial Covenant** | **Required** | **Actual** | **Complies** | |
|---|---|---|---|---|
| Debt Service Coverage Ratio | 1.25:1.00 | _____:1.00 | Yes | No |
| PTP – EBITDA | $_____ | $_____ | Yes | No |

1

**Comments Regarding Exceptions:** See Attached.

Sincerely,

_____
SIGNATURE

_____
TITLE

_____
DATE

| **BANK USE ONLY** |
|---|
| Received by: _____ |
| AUTHORIZED SIGNER |
| Date: _____ |
| Verified: _____ |
| AUTHORIZED SIGNER |
| Date: _____ |
| Compliance Status        Yes        No |

**SCHEDULE OF EXCEPTIONS**

<u>Permitted Indebtedness</u>  (Section 1.1)

None.

<u>Permitted Investments</u>  (Section 1.1)

Loans made to Brian Rainey, Greg Madormo, and Maddy Alcala pursuant to the Company's "Executive Loan Program" in connection with the exercise of certain vested share options.  The total outstanding balance of such loans as of 9/18/2023 is $586,738.62.

<u>Permitted Liens</u>  (Section 1.1)

None.

<u>Inbound Licenses</u>  (Section 5.6)

None.

<u>Prior Names</u>  (Section 5.7)

As indicated in the Perfection Certificate.

<u>Litigation</u>  (Section 5.8)

None.

Exhibit B

 Lien Solutions

a Wolters Kluwer Business

LEXUS WINGO
UCC Team 6
4400 Easton Commons Way
Suite 125
Columbus OH 43219
000000000
lexus.wingo@wolterskluwer.com

# Filing Results

MATTHEW CALLAHAN
Western Alliance Bank- Sub Acct#: 18041
One East Washington Street
5th Floor
Phoenix AZ 85004

Order #:      95248635 / 2
Customer #:   47681 / 11007128
Date:         10/04/2023
Reference 1:  26960.0126
Reference 2:  --

| | |
|---|---|
| **Target Name:** | Breakout Commerce, Inc. |

| | |
|---|---|
| **Jurisdiction:** | DE, Secretary of State |
| **Filing Type:** | UCC Financing Statement |

**UCC Financing Statement:**
**Results:** See attached filing acknowledgement

| File # | File Date | Type of Filing |
|---|---|---|
| 20236516891 | 09/26/2023 | Original Financing Statement |

**Disclaimers:**  --

**Comments:**  --

This report contains information compiled from sources which Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated.Lien Solutions does not(i) warrant or guarantee the accuracy, completion or timeliness of the information provided or(ii) accept any liability for delays, errors or omissions in the information provided.Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall Lien Solutions be liable for any loss of underlying collateral or loss(or decreased priority)of security interest in connection with this information or these services.Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)<br>Matthew T. Callahan | |
| B. E-MAIL CONTACT AT SUBMITTER (optional)<br>mcallahan@otterbourg.com | **Delaware Department of State**<br>**U.C.C. Filing Section**<br>Filed: 05:48 PM 09/26/2023<br>U.C.C. Initial Filing No: 2023 6516891 |
| C. SEND ACKNOWLEDGMENT TO:   (Name and Address)<br><br>Lien Solutions<br>PO Box 29071<br>Glendale, CA 91209-9071<br>Order 95253850 | **Service Request No:  20233585545** |
| **SEE BELOW FOR SECURED PARTY CONTACT INFORMATION** | **THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY** |

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if <u>any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME<br>Breakout Commerce, Inc. | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS<br>228 Park Ave S, Suite 21651 | CITY<br>New York | STATE<br>NY | POSTAL CODE<br>10003 | COUNTRY<br>USA |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if <u>any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME<br>Western Alliance Bank | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS<br>One East Washington St, Suite 1400 | CITY<br>Phoenix | STATE<br>AZ | POSTAL CODE<br>85004 | COUNTRY<br>USA |

4. COLLATERAL: This financing statement covers the following collateral:

All present and future assets of Debtor, wherever located, together with all proceeds and products thereof.

| 5. Check <u>only</u> if applicable and check <u>only</u> one box:   Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | | ☐ being administered by a Decedent's Personal Representative | |
|---|---|---|---|
| 6a. Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | | 6b. Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Agricultural Lien   ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable)   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor | | | |
| 8. OPTIONAL FILER REFERENCE DATA:<br>File with: Delaware - Secretary of State   26960.0126 | | | |

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

Exhibit C

# INTELLECTUAL PROPERTY SECURITY AGREEMENT

This **INTELLECTUAL PROPERTY SECURITY AGREEMENT**, dated as of September 26, 2023, (the "Agreement") between WESTERN ALLIANCE BANK, an Arizona corporation ("Lender") and BREAKOUT COMMERCE, INC., a Delaware corporation ("Grantor") is made with reference to the Loan and Security Agreement, dated as of the date hereof (as amended from time to time, the "Loan Agreement"), between Lender and Grantor.  Terms defined in the Loan Agreement have the same meaning when used in this Agreement.

For good and valuable consideration, receipt of which is hereby acknowledged, Grantor hereby covenants and agrees as follows:

To secure the Obligations under the Loan Agreement, Grantor grants to Lender a security interest in all right, title, and interest of Grantor in any and all of the following property, whether now existing or hereafter acquired or created (collectively, the "Intellectual Property Collateral"):

(a)  copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret, now or hereafter existing, created, acquired or held (collectively, the "Copyrights"), including the Copyrights described in Exhibit A;

(b)  trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Grantor connected with and symbolized by such trademarks (collectively, the "Trademarks"), including the Trademarks described in Exhibit B;

(c)  patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same (collectively, the "Patents"), including the Patents described in Exhibit C;

(d)  mask work or similar rights available for the protection of semiconductor chips or other products (collectively, the "Mask Works");

(e)  trade secrets, and any and all intellectual property rights in computer software and computer software products;

(f)  design rights;

(g)  claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above;

(h)  licenses or other rights to use any of the Copyrights, Patents, Trademarks, or Mask Works, and all license fees and royalties arising from such use to the extent permitted by such license or rights;

(i)  amendments, renewals and extensions of any of the Copyrights, Trademarks, Patents, or Mask Works; and

(j)  proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

Notwithstanding the foregoing the term "Intellectual Property Collateral" shall not include: (a) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise, but only to the extent the granting of a security interest in such "intent to use" trademarks would be contrary to applicable law or (b) any contract, instrument or chattel paper in which Grantor has any right, title or interest if and to the extent such contract, instrument or chattel paper includes a provision containing a restriction on assignment such that the creation of a security interest in the right, title or interest of Grantor therein would be prohibited and would, in and of itself, cause or result in a default thereunder enabling another person party to such contract, instrument or chattel paper to enforce any remedy with respect thereto;

provided, however, that the foregoing exclusion shall not apply if (i) such prohibition has been waived or such other person has otherwise consented to the creation hereunder of a security interest in such contract, instrument or chattel paper, or (ii) such prohibition would be rendered ineffective pursuant to Sections 9-407(a) or 9-408(a) of the UCC, as applicable and as then in effect in any relevant jurisdiction, or any other applicable law (including the Bankruptcy Code or principles of equity); provided further that immediately upon the ineffectiveness, lapse or termination of any such provision, the term "Intellectual Property Collateral" shall include, and Grantor shall be deemed to have granted a security interest in, all its rights, title and interests in and to such contract, instrument or chattel paper as if such provision had never been in effect; and provided further that the foregoing exclusion shall in no way be construed so as to limit, impair or otherwise affect Lender's unconditional continuing security interest in and to all rights, title and interests of Grantor in or to any payment obligations or other rights to receive monies due or to become due under any such contract, instrument or chattel paper and in any such monies and other proceeds of such contract, instrument or chattel paper.

The rights and remedies of Lender with respect to the security interests granted hereunder are in addition to those set forth in the Loan Agreement, and those which are now or hereafter available to Lender as a matter of law or equity. Each right, power and remedy of Lender provided for herein or in the Loan Agreement, or now or hereafter existing at law or in equity shall be cumulative and concurrent and shall be in addition to every right, power or remedy provided for herein, and the exercise by Lender of any one or more of such rights, powers or remedies does not preclude the simultaneous or later exercise by Lender of any other rights, powers or remedies.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**GRANTOR:**

**BREAKOUT COMMERCE, INC.** Delaware corporation

By: _Brian Rainey_
       9C91B15719CE4ED...

Name: Brian Rainey
Title:   Chief Executive Officer

Address for Notices:
Attn: 228 Park Ave S, Suite 21651
New York, NY 10003-1502
Fax: N/A

**LENDER:**

**WESTERN ALLIANCE BANK**, an Arizona corporation

By: _Dave Dailey_
       851CF4FDBCD6416...

Name:  Dave Dailey
Title:   Senior Director

Address for Notices:
Attn:  55 Almaden Boulevard, Suite 100
San Jose, California 95113
Tel: (408) 556-6501
Fax:(408) 282-1681

# EXHIBIT A

COPYRIGHTS

Please Check if No Copyrights Exist ☒

| Type of Work: | Title: | International Standard Serial Number (ISSN): | Registration Number: | Filing Date: | Pre - registered? |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**EXHIBIT B**

TRADEMARKS

Please Check if No Trademarks Exist    ☐

| Mark / Title: | U.S. Serial Number: | U.S. Registration Number: | USPTO Reference Number: | Filing Date: |
|---|---|---|---|---|
| Triplicate | 97406318 | | | 5/11/2022 |
| Triplicate | 97406286 | | | 5/11/2022 |
| Gooten | 86868137 | 5312131 | | 4/18/2017 |
| Gooten | 86868148 | 5187611 | | 4/18/2017 |
| Gooten | 86868142 | 5187610 | | 4/18/2017 |
| Gooten | 86868133 | 5177552 | | 4/18/2017 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT C**

PATENTS

Please Check if No Patents Exist ☒

| Title: | Patent Number: | Application Serial Number: | Issued or Published? | Issue Date: |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Exhibit D

 Lien Solutions

a Wolters Kluwer Business

LEXUS WINGO
UCC Team 6
4400 Easton Commons Way
Suite 125
Columbus OH 43219
000000000
lexus.wingo@wolterskluwer.com

# Filing Results

MATTHEW CALLAHAN
Western Alliance Bank- Sub Acct#: 18041
One East Washington Street
5th Floor
Phoenix AZ 85004

Order #:        95248635 / 1
Customer #:   47681 / 11007128
Date:           09/29/2023
Reference 1:   26960.0126
Reference 2:   --

| | |
|---|---|
| **Target Name:** | Breakout Commerce, Inc. |

| | |
|---|---|
| **Jurisdiction:** | United States Patent & Trademark Office |
| **Filing Type:** | Trademark Filing |

**Trademark Filing:**
**Results:** See attached filing acknowledgement

| File # | File Date | Type of Filing |
|---|---|---|
| REEL/FRAME: 8209/0974 | 09/26/2023 | Trademark Security Agreement |

**Disclaimers:**  --

**Comments:**  --

This report contains information compiled from sources which Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. Lien Solutions does not(i) warrant or guarantee the accuracy, completion or timeliness of the information provided or(ii) accept any liability for delays, errors or omissions in the information provided. Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall Lien Solutions be liable for any loss of underlying collateral or loss(or decreased priority)of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

SEPTEMBER 29, 2023

                        PTAS

CT CORPORATION                          **900802876**
4400 EASTON COMMONS WAY
SUITE 125
COLUMBUS, OH 43219


            UNITED STATES PATENT AND TRADEMARK OFFICE
            NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT RECORDATION BRANCH
OF THE U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE COPY IS AVAILABLE AT THE
ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE INFORMATION
CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA PRESENT IN THE PATENT
AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD FIND ANY ERRORS OR HAVE
QUESTIONS CONCERNING THIS NOTICE, YOU MAY CONTACT THE ASSIGNMENT RECORDATION
BRANCH AT 571-272-3350. PLEASE SEND REQUEST FOR CORRECTION TO: U.S. PATENT
AND TRADEMARK OFFICE, MAIL STOP: ASSIGNMENT RECORDATION BRANCH, P.O. BOX
1450, ALEXANDRIA, VA 22313.


RECORDATION DATE: 09/26/2023          REEL/FRAME: 8209/0974
                                      NUMBER OF PAGES: 9

BRIEF: SECURITY AGREEMENT

ASSIGNOR:
   BREAKOUT COMMERCE, INC.             DOC DATE: 09/26/2023
                                       CITIZENSHIP: DELAWARE
                                       ENTITY: CORPORATION

ASSIGNEE:
   WESTERN ALLIANCE BANK               CITIZENSHIP: ARIZONA
                                       ENTITY: CORPORATION
   ONE EAST WASHINGTON ST.
   SUITE 1400
   PHOENIX, ARIZONA 85004

SERIAL NUMBER: 86868133               FILING DATE: 01/07/2016
REGISTRATION NUMBER: 5177552          REGISTRATION DATE: 04/04/2017
MARK: GOOTEN
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 86868137               FILING DATE: 01/07/2016
REGISTRATION NUMBER: 5312131          REGISTRATION DATE: 10/17/2017
MARK: GOOTEN
DRAWING TYPE: STANDARD CHARACTER MARK

```
SERIAL NUMBER: 86868142              FILING DATE: 01/07/2016
REGISTRATION NUMBER: 5187610         REGISTRATION DATE: 04/18/2017
MARK: GOOTEN
DRAWING TYPE: STANDARD CHARACTER MARK


SERIAL NUMBER: 86868148              FILING DATE: 01/07/2016
REGISTRATION NUMBER: 5187611         REGISTRATION DATE: 04/18/2017
MARK: GOOTEN
DRAWING TYPE: STANDARD CHARACTER MARK


SERIAL NUMBER: 97406286              FILING DATE: 05/11/2022
REGISTRATION NUMBER:                 REGISTRATION DATE:
MARK: TRIPLICATE
DRAWING TYPE: STANDARD CHARACTER MARK


SERIAL NUMBER: 97406318              FILING DATE: 05/11/2022
REGISTRATION NUMBER:                 REGISTRATION DATE:
MARK: TRIPLICATE
DRAWING TYPE: AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)
              /NUMBER(S)



ASSIGNMENT RECORDATION BRANCH
PUBLIC RECORDS DIVISION
```

Exhibit E

DocuSign Envelope ID: 4F5F1399-6873-4434-A2B6-03DС613E3E39

**441 Lexington Avenue**
**New York, NY 10017**
D: 646-358-4596
dbalbera@c6capllc.com



**C6 CAPITAL**

**Breakout Commerce, Inc.**

Proposed Private Placement of $750,000.00

The following outlines the terms of a proposed transaction with Breakout Commerce, Inc. (the "Company" *or "Gooten"* or "Borrower") by C6 Capital, LLC. Or its affiliates or designees ("Investor" or "C6"). Until definitive documentation is executed by all parties, there shall not exist any binding obligation on any party. This term sheet does not constitute a contractual commitment of the Company or Investors but merely represents proposed terms for the proposed transaction.

| | |
|---|---|
| **Company:** | Gooten |
| **Issued:** | Junior Secured Loan |
| **Face Amount:** | $1,050,000.00 |
| **Funded Amount:** | $750,000.00 |
| **Maturity:** | 10 Months |
| **Use of Proceeds:** | Bridge- Working Capital |
| **Remittance:** | Straight line weekly ($26,250.00) |
| **Discounted Face:** | M1: $877,500 M2: $892,500 M3: $907,500 M4: $922,500 M5: $937,500 |
| **PG:** | Personal Guarantee against Fraud Only |
| **Expenses:** | No out of pocket expenses |
| **Fees:** | 2% Legal, 2% Origination |
| **Expiration:** | Offer expires March 28th, 2024 |

| | | | | |
|---|---|---|---|---|
| **By:** | C6 Capital, LLC. | | **By:** | Gooten |
| **Name:** | David Cooper | | **Name:** | Brian Rainey |
| **Title:** | Managing Partner | | **Title:** | CEO |
| **Signature:** | *[signature]* | | **Signature:** | *Brian Rainey* |
| | DEF486586190483... | | | 9C91B15719CE4ED... |
| **Date:** | 3/25/2024 | | **Date:** | 3/25/2024 |

Exhibit F

## SUBORDINATION AGREEMENT

| | | | |
|---|---|---|---|
| **Borrower:** | **Breakout Commerce, Inc.** | **Bank:** | **Western Alliance Bank** |
| | **228 Park Avenue S, Suite 21651** | | **One East Washington St., Suite 1400** |
| | **New York, NY 10003** | | **Phoenix, AZ 85004** |
| **Creditor** | **C6 Capital, LLC** | | |
| | **8 Hunters Lane** | | |
| | **Roslyn, NY 11576** | | |

This SUBORDINATION AGREEMENT, dated as of April 12, 2024, is between C6 Capital, LLC ("Creditor"), and Western Alliance Bank, an Arizona corporation ("Bank").

R E C I T A L S

A.      Breakout Commerce, Inc. ("Borrower") has requested and/or obtained certain credit accommodations from Bank which are or may be from time to time secured by assets and property of Borrower.

B.      Creditor has extended loans or other credit accommodations to Borrower, and/or may extend loans or other credit accommodations to Borrower from time to time.

C.      In order to induce Bank to extend credit to Borrower and, at any time or from time to time, at Bank's option, to make such further loans, extensions of credit, or other accommodations to or for the account of Borrower, or to extend credit upon any instrument or writing in respect of which Borrower may be liable in any capacity, or to grant such renewals or extension of any such loan, extension of credit, or other accommodation as Bank may deem advisable, Creditor is willing to subordinate: (i) all of Borrower's indebtedness and obligations to Creditor, whether presently existing or arising in the future (the "Subordinated Debt") to all of Borrower's indebtedness and obligations to Bank; and (ii) all of Creditor's security interests, if any, to all of Bank's security interests in the property of Borrower.

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1.      Creditor subordinates to Bank any security interest or lien that Creditor may have in any property of Borrower. Notwithstanding the respective dates of attachment or perfection of the security interest of Creditor and the security interest of Bank, the security interest of Bank in the accounts, including health care receivables, chattel paper, general intangibles, inventory, equipment, instruments, including promissory notes, deposit accounts, investment property, documents, letter of credit rights, any commercial tort claim of Borrower which is now or hereafter identified by Borrower or Bank, and other property of the Borrower (the "Collateral") shall at all times be prior to the security interest of Creditor.

2.      All Subordinated Debt is subordinated in right of payment to all obligations of Borrower to Bank now existing or hereafter arising, together with all costs of collecting such obligations (including attorneys' fees), including, without limitation, all interest accruing after the commencement by or against Borrower of any bankruptcy, reorganization or similar proceeding (the "Senior Debt").

3.      Creditor will not demand or receive from Borrower (and Borrower will not pay to Creditor) all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, lawsuit or otherwise, nor will Creditor exercise any remedy with respect to the Collateral or any other collateral securing the Subordinated Debt, nor will Creditor accelerate the Subordinated Debt, or commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower, until such time as all the Senior Debt is fully paid in cash, and all of Bank's obligations owing to Borrower have been terminated. The foregoing notwithstanding, Creditor shall be entitled to receive each regularly scheduled payment of interest or principal that constitutes Subordinated Debt, provided that a default under the Senior Debt has not occurred and is not continuing and would not exist immediately after such payment. Nothing in the foregoing paragraph shall prohibit Creditor from converting all or any part of the Subordinated Debt into equity securities of Borrower.

1

4.      Creditor shall promptly deliver to Bank in the form received (except for endorsement or assignment by Creditor where required by Bank) for application to the Senior Debt any payment, distribution, security or proceeds received by Creditor with respect to the Subordinated Debt other than in accordance with this Agreement.

5.      In the event of Borrower's insolvency, reorganization or any case or proceeding under any bankruptcy or insolvency law or laws relating to the relief of debtors, these provisions shall remain in full force and effect, and Bank's claims against Borrower and the estate of Borrower shall be paid in full before any payment is made to Creditor. For the avoidance of any doubt, Senior Debt includes, without limitation, any Bank's claims against Borrower and the estate of Borrower arising from the granting of credit under Section 364 or the use of cash collateral under Section 363 of the United States Bankruptcy Code, and Creditor agrees that it will raise no objection thereto.

6.      Until the Senior Debt is fully paid in cash, and all of Bank's obligations owing to Borrower have been terminated, Creditor agrees that it will not object to or oppose (i) the sale of the Borrower, or (ii) the sale or other disposition of any property of the Borrower or the estate of Borrower, if Bank has consented to such sale of the Borrower or sale or disposition of any property of the Borrower or the estate of Borrower. If requested by Bank, Creditor shall affirmatively consent to such sale or disposition and shall take all necessary actions and execute such documents and instruments as Bank may reasonably request in connection with and to facilitate such sale or disposition.

7.      Until the Senior Debt is fully paid in cash, and all of Bank's obligations owing to Borrower have been terminated, Creditor irrevocably appoints Bank as Creditor's attorney-in-fact, and grants to Bank a power of attorney with full power of substitution, in the name of Creditor or in the name of Bank, for the use and benefit of Bank, without notice to Creditor, to perform at Bank's option the following acts in any bankruptcy, insolvency or similar proceeding involving Borrower: (i) to file the appropriate claim or claims in respect of the Subordinated Debt on behalf of Creditor if Creditor does not do so prior to 30 days before the expiration of the time to file claims in such proceeding and if Bank elects, in its sole discretion, to file such claim or claims; and (ii) to accept or reject any plan of reorganization or arrangement on behalf of Creditor and to otherwise vote Creditor's claims in respect of any Subordinated Debt in any manner that Bank deems appropriate for the enforcement of its rights hereunder.

8.      Creditor shall immediately affix a legend to the instruments evidencing the Subordinated Debt stating that the instruments are subject to the terms of this Agreement. No amendment of the documents evidencing or relating to the Subordinated Debt shall directly or indirectly modify the provisions of this Agreement in any manner which might terminate or impair the subordination of the Subordinated Debt or the subordination of the security interest or lien that Creditor may have in any property of Borrower. By way of example, such instruments shall not be amended to (i) increase the rate of interest with respect to the Subordinated Debt, or (ii) accelerate the payment of the principal or interest or any other portion of the Subordinated Debt.

9.      This Agreement shall remain effective for so long as Borrower owes any amounts to Bank. If, at any time after payment in full of the Senior Debt, any payments of the Senior Debt must be disgorged by Bank for any reason (including, without limitation, the bankruptcy of Borrower), this Agreement and the relative rights and priorities set forth herein shall be reinstated as to all such disgorged payments as though such payments had not been made and Creditor shall immediately pay over to Bank all payments received with respect to the Subordinated Debt to the extent that such payments would have been prohibited hereunder. At any time and from time to time, without notice to Creditor, Bank may take such actions with respect to the Senior Debt and the Collateral as Bank, in its sole discretion, may deem appropriate, including, without limitation, terminating advances to Borrower, increasing the principal amount, extending the time of payment, increasing applicable interest rates, renewing, compromising or otherwise amending the terms of any documents affecting the Senior Debt and any Collateral, judicial foreclosure, nonjudicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any of the Collateral, and enforcing or failing to enforce any rights against Borrower or any other person. No such action or inaction shall impair or otherwise affect Bank's rights hereunder. Creditor agrees not to assert against Bank (a) any rights which a guarantor or surety could exercise; but nothing in this Agreement shall constitute Creditor a guarantor or surety; (b) the right, if any, to require Bank to marshal or otherwise require Bank to proceed to dispose of or foreclose upon any of the Collateral in any manner or order; and (c) any right of subrogation,

contribution, reimbursement, or indemnity which it may have against Borrower arising directly or indirectly out of this Agreement. Creditor waives the benefits, if any, of California Civil Code Sections 2799, 2808, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2839, 2845, 2847, 2848, 2849, 2850, 2899 and 3433. Pursuant to Section 2856 of the California Civil Code, Creditor waives all rights and defenses that Creditor may have because the Senior Debt may be secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

10.     This Agreement shall bind any successors or assignees of Creditor and shall benefit any successors or assigns of Bank. This Agreement is solely for the benefit of Creditor and Bank and not for the benefit of Borrower or any other party. Creditor further agrees that if Borrower is in the process of refinancing a portion of the Senior Debt with a new lender, and if Bank makes a request of Creditor, Creditor shall agree to enter into a new subordination agreement with the new lender on substantially the terms and conditions of this Agreement.

11.     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

12.     This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflicts of law principles. Creditor and Bank submit to the exclusive jurisdiction of the state and federal courts located in Santa Clara County, California. CREDITOR AND BANK WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

13.     <u>REFERENCE PROVISION</u>.

a.      In the event the Jury Trial waiver is not enforceable, the parties elect to proceed under this Judicial Reference Provision.

b.      With the exception of the items specified in the subsection (c) below, any controversy, dispute or claim (each, a "Claim") between the parties arising out of or relating to this Agreement or any other document, instrument or agreement between the undersigned parties (collectively in this Section, the "Loan Documents"), will be resolved by a reference proceeding in California in accordance with the provisions of Sections 638 et seq. of the California Code of Civil Procedure ("CCP"), or their successor sections, which shall constitute the exclusive remedy for the resolution of any Claim, including whether the Claim is subject to the reference proceeding. Except as otherwise provided in the Loan Documents, venue for the reference proceeding will be in the state or federal court in the county or district where the real property involved in the action, if any, is located or in the state or federal court in the county or district where venue is otherwise appropriate under applicable law (the "Court").

c.      The matters that shall not be subject to a reference are the following: (i) nonjudicial foreclosure of any security interests in real or personal property, (ii) exercise of self-help remedies (including, without limitation, set-off), (iii) appointment of a receiver and (iv) temporary, provisional or ancillary remedies (including, without limitation, writs of attachment, writs of possession, temporary restraining orders or preliminary injunctions). This reference provision does not limit the right of any party to exercise or oppose any of the rights and remedies described in clauses (i) and (ii) or to seek or oppose from a court of competent jurisdiction any of the items described in clauses (iii) and (iv). The exercise of, or opposition to, any of those items does not waive the right of any party to a reference pursuant to this reference provision as provided herein.

d.      The referee shall be a retired judge or justice selected by mutual written agreement of the parties. If the parties do not agree within ten (10) days of a written request to do so by any party, then, upon request of any party, the referee shall be selected by the Presiding Judge of the Court (or his or her representative). A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted. Pursuant to CCP § 170.6, each party shall have one peremptory challenge to the referee selected by the Presiding Judge of the Court (or his or her representative).

e.      The parties agree that time is of the essence in conducting the reference proceedings. Accordingly,

the referee shall be requested, subject to change in the time periods specified herein for good cause shown, to (i) set the matter for a status and trial-setting conference within fifteen (15) days after the date of selection of the referee, (ii) if practicable, try all issues of law or fact within one hundred twenty (120) days after the date of the conference and (iii) report a statement of decision within twenty (20) days after the matter has been submitted for decision.

        f.       The referee will have power to expand or limit the amount and duration of discovery. The referee may set or extend discovery deadlines or cutoffs for good cause, including a party's failure to provide requested discovery for any reason whatsoever. Unless otherwise ordered based upon good cause shown, no party shall be entitled to "priority" in conducting discovery, depositions may be taken by either party upon seven (7) days written notice, and all other discovery shall be responded to within fifteen (15) days after service. All disputes relating to discovery which cannot be resolved by the parties shall be submitted to the referee whose decision shall be final and binding.

        g.       Except as expressly set forth herein, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding. All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except that when any party so requests, a court reporter will be used at any hearing conducted before the referee, and the referee will be provided a courtesy copy of the transcript. The party making such a request shall have the obligation to arrange for and pay the court reporter. Subject to the referee's power to award costs to the prevailing party, the parties will equally share the cost of the referee and the court reporter at trial.

        h.       The referee shall be required to determine all issues in accordance with existing case law and the statutory laws of the State of California. The rules of evidence applicable to proceedings at law in the State of California will be applicable to the reference proceeding. The referee shall be empowered to enter equitable as well as legal relief, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication. The referee shall issue a decision at the close of the reference proceeding which disposes of all claims of the parties that are the subject of the reference. Pursuant to CCP § 644, such decision shall be entered by the Court as a judgment or an order in the same manner as if the action had been tried by the Court and any such decision will be final, binding and conclusive. The parties reserve the right to appeal from the final judgment or order or from any appealable decision or order entered by the referee. The parties reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a reference proceeding under this provision.

        i.       If the enabling legislation which provides for appointment of a referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by reference procedure will be resolved and determined by arbitration. The arbitration will be conducted by a retired judge or justice, in accordance with the California Arbitration Act §1280 through §1294.2 of the CCP as amended from time to time. The limitations with respect to discovery set forth above shall apply to any such arbitration proceeding.

        j.       THE PARTIES RECOGNIZE AND AGREE THAT ALL CONTROVERSIES, DISPUTES AND CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CONTROVERSY, DISPUTE OR CLAIM BETWEEN OR AMONG THEM ARISING OUT OF OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

14.     This Agreement represents the entire agreement with respect to the subject matter hereof, and supersedes all prior negotiations, agreements and commitments. Creditor is not relying on any representations by Bank or Borrower in entering into this Agreement, and Creditor has kept and will continue to keep itself fully apprised of the financial and other condition of Borrower. This Agreement may be amended only by written instrument signed by Creditor and Bank.

15.     In the event of any legal action to enforce the rights of a party under this Agreement, the party prevailing in such action shall be entitled, in addition to such other relief as may be granted, all reasonable costs and expenses, including reasonable attorneys' fees, incurred in such action.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**CREDITOR:**                                          **BANK:**

C6 CAPITAL, LLC                                   WESTERN ALLIANCE BANK, an Arizona corporation

By: _ANDREW FELLUS_____          By: _Christine Egitto_____
    73EBA1ECA4654DB                                    526764B7F0214BA...

Name:   Andrew Fellus                              Name:   Christine Egitto

Title:     Chief Executive Officer                  Title:    Director

<u>Address for Notices</u>:                          <u>Address for Notices</u>:

C6 Capital, LLC                                     Western Alliance Bank
8 Hunters Lane                                      55 Almaden Blvd
Roslyn, NY 11576                                    San Jose, CA 95113
Attn:  Andrew Fellus                                Attn: Laurence Brent
Email: afellus@tvtcapital.com                        Email: lbrent@bridgebank.com

The undersigned approves of the terms of this Agreement.

**BORROWER:**

BREAKOUT COMMERCE, INC.

By: _Brian Rainey_____
    9C91B15719CE4ED...

Name:   Brian Rainey

Title:    Chief Executive Officer

Exhibit G

## ** PLEASE READ CAREFULLY **

Dear Borrower, we are glad to welcome you to our unique financing program. The program will go into effect immediately after you return a signed agreement and will continue to be in effect until we receive the full loan repayment Amount according to this agreement.

After we receive the full agreed upon loan repayment amount, we will close off your account and deliver to you a $0 balance letter.
In order to assure the maintenance and servicing of your account, please keep our contact information in your contacts for any service or maintenance request:

Please note due to the large number of loan accounts we service; administrative errors may occasionally result in our daily ACH debits. If you believe your account was erroneously debited, you agree to contact us immediately to notify us about the erroneous debits.

We also require an active point of contact during the duration of the agreement. By providing your contact information below you agree to be contacted in regard to your account during the duration of the agreement.

| REFERRAL/AFFILIATE DISCLOSURE | | | |
|---|---|---|---|
| Name(s) of Affiliate(s) who arranged this transaction for you:<br><br>n/a | Business Name(s):<br><br>n/a | Email Address(es):<br><br>n/a | Phone Number(s):<br><br>n/a |
| Have there been any other financial products offered to you in conjunction with this financing agreement? Yes or No?<br><br>n/a | | | |
| If yes, please describe those other financial products (some examples may include but may not be limited to SBA loans, term loans, lines of credit, cash advance, equipment financing, real estate loans, etc.):<br><br>n/a | | | |
| By signing below, you certify that the above information is true and correct. | | | |

| Owner 1 Signature:<br><br>*BRIAN THOMAS RAINEY* | Print name:<br><br>Brian Rainey | Date:<br><br>04 / 12 / 2024 |
|---|---|---|

### Please contact us to update if your contact information changes.

Contact Name: _____Cell (for text messages): _____

Email: _____

Emergency secondary contact (*required): _____
_____

Please note all necessary information in regards to reaching you or your staff, in case of a problem:

If we experience any issues with your account and we cannot reach you or your point of contact, we will enforce all legal remedies available to us, under the Agreement. We are always available to assist you with any service request that you may need. In order to prevent any unnecessary interruptions please make sure to call us as soon as any problems with your business arise.

### ** WE WILL NOT PROCEED WITH FUNDING IF THIS DOCUMENT IS LEFT BLANK **

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

**INFORMATION DISCLOSURE FORM**
*(All information must be provided in order to release funds)*

| CONTRACTUAL FUNDING INFORMATION | |
|---|---|
| Loan Amount<br>750,000.00 | |

| BUSINESS INFORMATION | |
|---|---|
| Legal Business Name:<br>BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM | Business DBA:<br>Gooten |

| Address:<br>Corporation Trust Center 1209 Orange St | City:<br>Wilmington | State:<br>DE | Zip:<br>19801 |
|---|---|---|---|

| Business Phone:<br>201.421.5088 | Business E-Mail:<br>billing@gooten.com | Use of Funds:<br>Working Capital | Time in Business:<br>10 years | Tax ID:<br>453535837 |
|---|---|---|---|---|

| Emergency Contact Info: Name: Greg Madormo | Number: 201.421.5088 |
|---|---|

List all additional locations associated to business.
228 Park Ave S, Suite 21651, New York, New York 10003

Does the company currently have any open/unsatisfied advances? List which companies/balances.
Bridge Bank, $3.5mm

Does the company have any active or pending litigation/ judgements/ liens/ tax obligations?
N/A

| Landlord Contact Info: Name: N/A | Number: N/A |
|---|---|

| BANK ACCOUNT INFORMATION (list all accounts below) | | |
|---|---|---|
| Bank name: | Account Number: | Routing Number: |
| Bridge Bank | 8710221316 | 121143260 |
| | | |
| | | |
| | | |

| OFFICERS INFORMATION | | | |
|---|---|---|---|
| Owner 1 - Full Name:<br>BRIAN THOMAS RAINEY | DOB:<br>11/24/1981 | Social Security #:<br>228512807 | Cell Phone #:<br>7037850703 |
| Address:<br>214 Ellington Ave W | City:<br>Garden City | State:<br>NY | Zip:<br>11530 |
| Personal E-mail Address:<br>brian@gooten.com | Ownership %:<br>12 | Signature: *BRIAN THOMAS RAINEY* | Date:<br>04 / 12 / 2024 |

| CREDIT DISCLOSURE |
|---|
| The above information is warranted to be true and correct. We hereby authorize C6 CAPITAL FUNDING, LLC its assigns, agents, bank, **servicer** or financial institution to verify and collect information on us, included but not limited to bank references, trade credit references, and/or commercial credit reports. In compliance with the FAIR CREDIT REPORTING ACT, this is to inform you that you are authorizing this organization and/or its suppliers to obtain a consume and/or business profile credit report. |

| Owner 1 Signature:<br>*BRIAN THOMAS RAINEY* | Print Name:<br>BRIAN THOMAS RAINEY | Date:<br>04 / 12 / 2024 |
|---|---|---|

**C6 CAPITAL**

This Business Loan and Security Agreement (as amended, modified or restated, the "**Agreement**"), together with the attached Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) (as amended, modified or restated, "**Authorization Agreement**"), as amended, modified or restated (collectively the "**Agreement**") governs your business loan ("**Loan**") made by the Borrower as of the Effective Date (defined below). Please read this Agreement and keep it for your reference. In this Agreement, the words "**you**", "**your**" and "**Borrower**" each mean the Borrower identified on the signature page of this Agreement. Each Person identified on the signature page of this Business Loan and Security Agreement as a "**Guarantor**" (including any Secured Guarantor as herein defined) shall be referred to individually as "**Guarantor**" and collectively as "**Guarantors**" in this Agreement. The words "**Lender**", "**we**", "**us**", and "**our**" each mean C6 Captial Funding, LLC, and its successors and assigns. "**Person**" means an individual, corporation, association, partnership, an estate, a trust and any other entity or organization. Each disbursement of the Loan is an "**Advance.**"

If you have any questions, please call us at 385-444-7518
(we have support available Monday - Friday 9am - 6pm ET) or email info@achcapital.com.

| YOUR LOAN DETAILS | |
|---|---|
| **Borrower:** | BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
| **Borrower's Address:** | Corporation Trust Center1209 Orange St Wilmington, DE 19801 |
| **Lender:** | C6 CAPITAL FUNDING, LLC |
| **Address for Lender:** | 8791 South Redwood Road, Suite 200, West Jordan, UT 84088 Email (info@achcapital.com) |
| **Guarantor(s):** | **BRIAN THOMAS RAINEY** |
| **Address(es) for Guarantor(s):** | **214 ELLINGTON AVE WEST, Garden City, NY, 11530** |
| **Secured Guarantor(s):** | **BRIAN THOMAS RAINEY** |
| **Address(es) for Secured Guarantor(s):** | **214 ELLINGTON AVE WEST, Garden City, NY, 11530** |
| **Loan Amount:** | **$ 750,000.00** |
| **Origination Fee:** (Deducted at time of disbursement) | **$ 30,000.00** |
| **Advance Amount:** (Loan Amount less Origination Fee) Note that the Advance Amount may not be the amount deposited to your Designated Checking Account. The amount that will be deposited to your Designated Checking Account will be reduced by any amounts owed to Lender from any prior Advance, indebtedness, or loan, or may be used to pay off an amount owed to a third-party creditor. | **$ 720,000.00** |
| **Maturity Date:** | **1/31/2025** |
| **Weekly Payment Amount:** (Business Days only) | **$ 26,250.00** |
| **Payment Schedule:** The term "**Business Day**" means any Monday through Friday, except for Federal Reserve holidays. | 40 payments of **$ 26,250.00** due each Business Day immediately following the date disbursement of the Advance Amount is initiated by Lender (in the case of any Advance or loan with a Daily Payment Amount) or the same day each week as the day of the week disbursement of the Advance Amount is initiated by Lender beginning seven (7) days after the Advance Amount is initiated (in the case of any Advance or loan with a Weekday Payment Amount). |
| **Total Interest Expense:** (Does not include any costs, expenses or Fees) | **$ 300,000.00** |
| **Total Repayment Amount:** (Loan Amount plus Total Interest Expense) | **$ 1,050,000.00** |

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

**C6 CAPITAL**

| PREPAYMENT, RENEWAL, AND OTHER FEES | |
|---|---|
| **Prepayment:**<br>(See <u>Section 9</u> of this Agreement for details) | A "**Prepayment Interest Reduction Percentage** " of 25% (with respect to unpaid interest remaining on this Loan) will be applied to the extent that the Borrower prepays this Loan in whole in accordance with, and subject to, <u>Section 9</u> of this Agreement. Note that 75% of the remaining unpaid interest will still be due upon any prepayment in whole. Partial prepayments will not reduce the Total Interest Expense. |
| **Renewals:** | Remaining unpaid interest on this Loan will be eligible to be forgiven by Lender in Lender's sole discretion if: (a) Borrower is current on its scheduled payments with respect to this Loan (including payment of any fees or expenses), and (b) while this Loan is outstanding, Borrower enters into a business loan and security agreement for a new qualifying term loan with Lender, a portion of the proceeds of which are used to repay this Loan in whole. |
| **Other Fees:**<br>(with the Origination Fee collectively the "**Fees**") | Underwriting Fee: 0.00<br><br>Processing Fee: $ 30,000.00<br><br>Professional Service Fee: $<br><br>Returned Payment Fee: $ 35.00<br><br>Funding Fee: $ 0.00<br><br>Bank Change Fee: $ 50.00<br><br>Non-Sufficient Funds (NSF) Fee: $ 35.00<br><br>Stopped Payment Fee: $ 150.00<br><br>Default Fee: 15%<br><br>UCC Filing Fee: $ 150.00<br><br>Late Fee: $ 35.00<br><br>Stacking Fee: 75,000.00 |

| CERTAIN DISCLOSURES | |
|---|---|
| **Loan Pricing Disclosure** | Lender uses a system of risk-based pricing to determine interest charges and fees. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the interest rate up or down based on this risk evaluation. This loan may be a higher cost loan than loans that may be available through other lenders. Borrower understands that Lender may make loans at other amounts, interest rates and with other fees to other Persons as well. |
| **Loan For Specific Purposes Only** | The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification of the Business Loan and Security Agreement. IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to this transaction. |

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |



**C6 CAPITAL**

*The calculations below involve certain key assumptions about this Loan, including that the Loan is paid off in its entirety according to the agreed Payment Schedule and that no repayments are missed. This is provided as a convenience only, and Lender's records will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and Lender. To the extent the Lender's records differ from the below metric calculations and metric explanations, the Lender's records shall control. The amounts below may vary from the actual amounts.*

| Loan Amount $ 750,000.00 | Advance Amount (minus fees withheld)[1] $ 720,000.00 | Repayment Amount $ 1,050,000.00 | Term 10 Months (repaid Weekly) |
|---|---|---|---|

| METRIC | METRIC CALCULATION | METRIC EXPLANATION |
|---|---|---|
| **Total Cost of Capital $ 330,000.00** | Interest Expense: **$ 300,000.00** Loan Fee: **$** Origination Fee: **$ 30,000.00** Other Fees: **$** **Total Cost of Capital: $ 330,000.00** | This is the total amount that you will pay in interest and fees for the Loan, but this amount does not include fees and other charges you can avoid, such as late payment fees, returned payment fees, and the default fee.[2] |
| **Annual Percentage Rate (APR)[3] 103.32 %** | Your Loan will have **$ 26,250.00** Weekly payments of: **APR:** 103.32 % | This is the cost of the Loan, including total interest or Loan Fees and other fees, expressed[3] as a yearly rate. APR takes into account the amount and timing of capital you receive, fees you pay, and the periodic payments you make. This is provided as a convenience only. While APR can be used for comparison purposes, it is not an interest rate and is not used to calculate your interest expense or Loan Fee. |
| **Average Monthly Payment $ 105,000.00** | Repayment Amount: **$ 1,050,000.00** Term (in months): ÷ 10 **Months** **Average Monthly Payment: $ 105,000.00** | This is the average monthly repayment amount of the Loan, which does not include fees and other charges you can avoid, such as late payment fees, returned payment fees and the default fee.[2] The actual repayment frequency for the Loan will be weekly. This is an estimate for comparison purposes only. |
| **Cents on the Dollar (excluding fees) 40 ¢** | Interest Expense or **$ 300,000.00** Loan Fee: Loan Amount: ÷ **$ 750,000.00** **Cents on the Dollar 40 ¢ (excluding fees):** | This is the total amount of interest or Loan Fee paid per dollar borrowed. This amount is exclusive of fees. This is provided as a convenience only. |
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges? | **No** (see "Prepayment" above) |
| | Does prepayment of this Loan decrease the total interest or Loan Fees owed? | **Yes** (see "Prepayment" above for the interest or fee reduction amount) |

[1] The Advance Amount is the amount of capital that a business receives and may be different from the Loan Amount. The Advance Amount is net of fees withheld from the Loan Amount. A portion of the Advance Amount may be used to pay off any amounts owed to Lender from a prior Advance, indebtedness, loan, or used to pay an amount owed to a third party creditor. [2] Your business may incur other fees that are not a condition of borrowing, such as late payment fees, returned payment fees, default fees, or monthly maintenance fees. Those fees are not reflected here. See the agreement for details on these fees (see "Other Fees" above). Further, your business may incur other third-party fees associated with any Advance, borrowing, non-payment or otherwise. [3] APR should be considered in conjunction with the Total Cost of Capital. APR may be most useful when comparing financing solutions of similar expected duration. APR is calculated here according to the principles of 12 C.F.R. § 1026 (Regulation Z), using 52 payment periods of equal length and 52 payment dates per year for weekly pay products, and 252 payment dates per year for daily pay products.

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

Page 5


**C6 CAPITAL**

**1. EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in Utah and signed by Lender ("**Effective Date**"). Borrower understands and agrees that Lender may postpone, without penalty, the Advance of Loan amounts to Borrower until Lender has determined in its sole discretion that all required security interests for the Loan have been perfected and Lender has received all required personal guarantees or other documentation for the Loan.

**2. AUTHORIZATION.** Borrower agrees that the Loan shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**3.** <u>**LOAN FOR SPECIFIC PURPOSES ONLY. THE PROCEEDS OF THE LOAN MAY BE USED ONLY FOR THE SPECIFIC PURPOSES AS SET FORTH IN THE USE OF PROCEEDS CERTIFICATION CONTAINED IN SECTION 48 BELOW, AND NOT FOR ANY OTHER PURPOSES**</u>**. In addition, the Loan will not be used for personal, family or household purposes, and Borrower and Guarantors agree they each are forever estopped from taking the position that such Loan (including Advances) are or were used for such personal, family or household purposes. Borrower understands that Borrower's covenant not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon Persons making loans for personal, family or household purposes, and certain important rights conferred upon such Persons, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower understands that Lender will be unable to confirm whether the use of the Loan conforms to this Section. Borrower agrees that a breach by Borrower of the provisions of this Section shall not affect Lender's right to (a) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of (i) the purpose for which the Loan is obtained or (ii) how the Loan proceeds are used by Borrower, and (b) use any remedy legally available to Lender, even if that remedy would normally not have been available had the Loan been made by Lender to Borrower for personal, family or household purposes.**

**4. ADVANCE OF LOAN PROCEEDS AND MAINTENANCE OF BORROWER'S BANK ACCOUNT.** If Borrower applied and was approved for the Loan, then the Loan will be disbursed as provided in the attached Authorization Agreement. Borrower shall maintain Direct Payments (ACH Debits) in its Designated Checking Account, including keeping such account open until the "**Total Repayment Amount** " as defined in this Agreement has been completely repaid.

**5. PROMISE TO PAY.** Borrower shall pay Lender the Total Repayment Amount in accordance with the Payment

Schedule above. As provided in the attached Authorization Agreement, Borrower shall enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required Loan payments. If required by Lender, Borrower agrees and authorizes Lender (or its servicer or any agent of Lender thereof) to collect Loan payments from a transfer account established pursuant to this Agreement.

**6. ALTERNATIVE PAYMENT METHODS.** If Borrower for any reason knows that Lender will be unable to process a Loan payment under Lender's Automatic Payment Plan, then Borrower must either transfer sufficient funds into its Designated Checking Account such that the missed payment can be collected as provided in the attached Authorization Agreement, or promptly mail or deliver a check to Lender in an amount equal to the missed payment or, if offered to Borrower by Lender, make the missed payment by any pay-by-phone or on-line service that Lender may make available to Borrower from time to time. If Borrower elects to send payments to Lender for the Loan by postal mail, then Borrower agrees to send such payments to Lender's address on the first page of this Agreement or some other place as designated by Lender from time to time in writing. All alternative payments contemplated in this Section shall be made in immediately available funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified in this Section may result in a delay in processing and/or crediting such payment, and may result in late fees, interest, or charges.

If Borrower makes an alternative payment as contemplated by this Section on Borrower's Loan by mail or by any pay-by-phone or on-line service that Lender makes available while Borrower is enrolled in the Automatic Payment Plan, Lender may treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

**7. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments received on Borrower's Loan between principal, interest and fees in any manner Lender chooses in its sole discretion, with such discretion performed with Lender's reference to its records for the Loan, it being understood and agreed by Borrower that Loan payments generally will be allocated and applied against any fees and interest incurred on the Loan before principal. At Lender's discretion, if there are any fees, costs or other expenses due and owing under this Agreement, including, without limitation, any Fees, Lender may unilaterally adjust Borrower's amortized or principal payments due under this Agreement in an amount to pay such fees, costs or other



expenses; Lender, at its discretion, may charge such adjusted amount on a single amortized or principal payment, or over multiple amortized or principal payments.

**8. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender may accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor. **Borrower shall not send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement or applicable law. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to the Lender's address on the first page of this Agreement or some other place as designated by Lender from time to time in writing.**

**9. PREPAYMENT.** Borrower agrees that all fees and other prepaid finance charges are earned by Lender fully as of the date of this Agreement and will not be subject to refund upon early payment of the Total Repayment Amount (whether voluntary or as a result of an Event of Default), except as otherwise required by law. Borrower may prepay Borrower's Loan in whole on any Business Day by paying Lender the sum total of the Total Repayment Amount, including without limit any Returned Payment Fees and any Late Fees (if any), in each case as described in the attached in this Agreement less (a) the amount of any principal Loan payments made prior to such prepayment and (b) the product of (i) the percentage identified as the applicable Prepayment Interest Reduction Percentage in this Agreement; and (ii) the aggregate amount of unpaid interest remaining on the Borrower's Loan as of such date as determined by Lender's records in accordance with Section 7. Borrower may prepay Borrower's Loan in part on any Business Day and such payment shall be applied in accordance with Section 7.

**10. SECURITY INTEREST.** Borrower and each Guarantor hereunder each a "**Secured Guarantor**", provided, however, that each reference to "Guarantor" in this Agreement shall include each "Secured Guarantor") hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all Collateral as defined and described below to

secure the prompt and complete payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder, and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, relating to the Loan described in this Agreement, the preceding being true whether or not contemplated by the parties hereto at the time of the granting of this security interest, regardless of how such debts, liabilities and obligations arise or by what agreement or instrument they may be evidenced by, and the preceding includes Borrower's obligations to perform acts and refrain from taking action as well as all obligations to pay Lender money including, without limitation, all interest, other fees and expenses under or related to the Loan (all of the preceding being the "**Obligations**"). The "**Collateral**" means all of Borrower's, and all of each Secured Guarantor's (defined in Section 10), assets and personal property, whether now owned by or owing to, or hereafter acquired by or arising in favor of Borrower and each Secured Guarantor, and whether owned or consigned by or to, or leased from or to Borrower and each Secured Guarantor, regardless of where located, which shall include, without limitation: (a) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card or debit card transactions; (b) cash and cash equivalents, (c) inventory, (d) equipment, (e) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (f) instruments, including promissory notes, (g) chattel paper, including tangible chattel paper and electronic chattel paper, (h) documents, (i) letter of credit rights, (j) accounts, including health-care insurance receivables, (k) deposit accounts with any bank or other financial institution, (l) commercial tort claims as disclosed on Schedule 1, (m) general intangibles, including payment intangibles and software, (n) copyrights, patents and trademarks and all other intellectual property, (o) fixtures, (p) goods, (q) letters of credit, letter-of-credit rights, and supporting obligations, and (r) as-extracted collateral. The preceding terms used in defining the term "Collateral" not otherwise defined in this Agreement shall have the meaning as such terms may from time to time be defined in the Uniform Commercial Code in effect in the State of Utah ("**UCC**"). The security interest Borrower and each Secured Guarantor grants herein includes all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing subsections (a) through (r), together with all books and records, customers lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any general intangibles (as defined in the UCC) at any time evidencing or relating to any of the foregoing. Lender

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
| --- | --- |


**C6 CAPITAL**

disclaims any security interest in household goods in which Lender is forbidden by applicable law from taking a security interest.

**11. PROTECTING THE SECURITY INTEREST.** Borrower and each Secured Guarantor (as applicable) agrees that Lender and/or Lender's agent or representative may file any financing statement, lien entry form or other document that is necessary or desirable in order to perfect, amend or continue Lender's security interest in the Collateral, including, without limitation, any fixture filings or other filings in the real property records, and Borrower, and each Secured Guarantor as applicable, shall cooperate with Lender and Lender's agent or representative to accomplish said filing(s), and shall do whatever else Lender and Lender's agent or representative deems necessary to protect Lender's security interest in the C o l l a t e r a l. **BORROWER AND EACH SECURED GUARANTOR EACH EXPRESSLY ACKNOWLEDGE AND AGREE BY SIGNING THIS AGREEMENT THAT, LENDER'S COLLATERAL AS DESCRIBED IN <u>SECTION 10</u> INCLUDES ALL OF BORROWER'S AND EACH SECURED GUARANTOR'S PERSONAL PROPERTY AND ASSETS.**

**12.**               [Intentionally omitted]

**13. TAXES, ASSESSMENTS AND LIENS.** Borrower shall complete, timely file and pay when due all necessary federal, state and local taxes and shall pay when due all taxes, assessments, levies and liens upon the Collateral and, upon Lender's request, provide evidence of such payments to Lender.

**14. INSURANCE.** Borrower, and each Secured Guarantor as applicable, shall procure and maintain insurance policies and coverage as Lender may require with respect to the Collateral, including without limit flood insurance if the location of any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", in the form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender, which shall be a minimum amount equal to the Total Repayment Amount. Borrower, and each Secured Guarantor as applicable, shall ensure that all of Borrower's and each Secured Guarantor's insurance policies name Lender as loss payee, and Borrower and each Secured Guarantor shall deliver to Lender endorsements demonstrating the same in form and substance satisfactory to Lender. If Borrower or any Secured Guarantor at any time fails to obtain or maintain any insurance as required under this Section, Lender may obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense. Borrower and/or each Secured Guarantor shall promptly notify Lender of any loss of or damage to the Collateral. Upon any insurable loss to any Collateral, the

proceeds shall be paid to Lender to apply to the Total Repayment Amount

**15. REPAIRS AND MAINTENANCE.** Borrower and each Secured Guarantor shall keep and maintain, and shall cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect, normal wear and tear excepted. Borrower and each Secured Guarantor further agrees to pay when due all claims made by third party Persons for work done on, or services rendered to, or material furnished in connection with the Collateral so that no lien or encumbrance of any kind may ever attach to or be filed against the Collateral.

**16. [ i n t e n t i o n a l l y   o m i t t e d ]**



**17. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower or a Guarantor fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge, pay or perform when due any Obligations, then Lender on Borrower's or any Secured Guarantor's behalf (as applicable) may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, any expenses, costs or fees incurred in connection therewith (including attorneys' and other advisory or third-party fees) will become a part of the Obligations and, at Lender's option, shall: (a) be payable on demand; (b) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (c) be treated as a balloon payment that will be due and payable at the 12/31/2024. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**18. BORROWER'S AND EACH SECURED GUARANTOR'S REPRESENTATIONS AND WARRANTIES; CERTAIN COVENANTS. In all material respects,** Borrower and each Secured Guarantor represents and warrants that: (a) Borrower and each Secured Guarantor will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of its business and the Collateral, including without limitation any law relating to the use, sale, possession, cultivation, manufacture, distribution, or marketing of any controlled substances or other contraband (whether for commercial, medical, or personal purposes), or any law relating to the medicinal use or distribution of marijuana; (b) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property is that shown of the first page of this Agreement; (c) Borrower and each Secured Guarantor is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and Borrower and each Secured Guarantor is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business; (d) the true and correct legal name of the Borrower and each Secured Guarantor is set forth in the first page of this Agreement; (e) [intentionally omitted] (f) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's and each Secured Guarantor's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's or any Secured Guarantor's charter, operating agreement, bylaws or other constituting documents, or of any indenture, agreement or undertaking to which Borrower or any Secured Guarantor is a party; (g) all constituting documents and all amendments thereto of Borrower and each Secured Guarantor have been duly filed and are in proper order and any capital stock or other membership or equity interests issued by Borrower and each Secured Guarantor and



outstanding was and is properly issued and all books and records of Borrower and each Secured Guarantor are accurate and up to date and will be so maintained; (h) Borrower and each Secured Guarantor (i) is not subject to any charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (ii) is in compliance with its charter, operating agreement, bylaws and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect Borrower's or any Secured Guarantor's financial condition, business or prospects or the value of the Collateral, each taken individually and as a whole; (i) there is no action, suit, proceeding or investigation pending or, to Borrower's or any Secured Guarantor's or Signatory's knowledge, threatened against or affecting it or any of Borrower's or any Secured Guarantor's assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on Borrower's or any Secured Guarantor's financial condition, business or prospects or the value of the Collateral, each taken individually and as a whole; (j) all information provided by Borrower and/or each Guarantor as part of the application process for the Loan was true and complete; (k) neither Borrower nor any Secured Guarantor intends to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within six (6) months of the Effective Date; (l) neither Borrower nor any each Secured Guarantor is presently insolvent within the meaning of the UCC as well as the United States Bankruptcy Code and neither will become insolvent upon the making of the Loan; (m) Borrower and each Secured Guarantor shall maintain in full force and effect and in good standing all material rights, licenses and leases necessary to carry on its business, and all material permits, licenses, leases consents and approvals necessary for the construction, maintenance and operation of its business; (n) Borrower shall make all payments of interest and principal as and when due, and Borrower and each Guarantor shall keep and comply with all terms, conditions and provisions of this Agreement; (o) the proceeds of any Advance shall not be used for personal, family, household or agricultural purposes; (p) Borrower shall not use the proceeds of any Advance, directly or indirectly, in violation of any applicable law or regulation, including without limitation Regulations T, U or X of the Federal Reserve Board as from time to time in effect (and any successor regulation or official interpretation of such Board), or to purchase or carry any "margin stock", as defined in Regulations U and X, or any "margin security", "marginable OTC stock" or "foreign margin

stock" within the meaning of Regulation T, U or X; and (q) Borrower and each Secured Guarantor shall not effect any material change in their ownership or organizational structure (acknowledging that any change in ownership shall be deemed material when ownership is closely held and any change that would be adverse to Lender or adversely affect the Loan shall be deemed material).

**19. INTEREST AND FEES.** Borrower shall pay in full the "Total Interest Expense" as set forth at the beginning of this Agreement and all other fees and costs set forth in this Agreement, including, without limitation, those set forth on Pages 1 and 2 of this Agreement. Borrower shall also pay the following fees:

A. "**Origination Fee**": A one-time origination fee in the amount set forth at the beginning of this Agreement. Borrower agrees that this fee shall be immediately deducted from the proceeds of Borrower's Loan prior to the Loan's initial Advance.

B. "**Returned Payment Fee**": A returned payment fee in the amount set forth in the beginning of this Agreement if any Loan payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

C. "**Late Fee**": A late fee in the amount set forth in the beginning of this Agreement if a scheduled Loan payment is not received by Lender as provided in the Payment Schedule set forth in the beginning of this Agreement.

D. **Exit Fee:** Upon the earlier to occur of
(a) the date on which the Loan has been accelerated following an Event of Default, Borrower shall pay to the Lender a fee of 3% of the original Loan Amount.

E. "**Default Interest**": Upon the occurrence and during the continuance of an Event of Default, the balance of the remaining unpaid principal and interest accrued on the Loan shall thereafter bear interest at a rate equal to the lesser of (i) Annual Percentage Rate (APR) as provided in this Agreement per annum or (ii) the maximum rate allowed by applicable law, as a default interest rate until the Event of Default has been cured as determined in Lender's sole discretion.

Payments made on the Loan by Borrower shall be applied and allocated between Loan principal, interest and fees in the manner set forth in <u>Section 7</u>.

**20. INTEREST AND FEES EXCEEDING PERMITTED LIMIT.** If the Loan is subject to applicable law that sets maximum interest or charges, and such applicable law is interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits under such applicable law, then (a) any interest or charge shall

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|



**C6 CAPITAL**

be automatically reduced by the amount necessary to reduce such charge to the permitted limit under applicable law, and (b) if required by applicable law, any sums already collected from Borrower that exceed such permitted limits will be refunded or credited to Borrower.

**21. ONLINE CUSTOMER PORTAL.** When Borrower signs in with Borrower's valid username and password at https://1workforce.com, Borrower may obtain information about the Loan, such as the outstanding balance, daily transactions and fees. No additional paper statement will be mailed to Borrower. Borrower shall not share Borrower's username and password to https://1workforce.com with any third-party Person. The information provided through this online portal is provided as a convenience only for Borrower and Lender's internal records will be determinative of information about the Loan, absent manifest error. To the extent there is a conflict between the Borrower's online portal reference in this Section and Lender's internal records, Lenter's internal records will control.

**22. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each Guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any Guarantor's name, respectively, at any time and from time to time for the purpose of deciding whether to initially approve the requested Loan, or to approve any update, renewal, extension of credit, or for any otherwise applicable and lawful purpose. Upon Borrower's or any Guarantor's request, Lender shall advise Borrower or Guarantor (as applicable) if Lender obtained a credit report and Lender shall give Borrower or Guarantor the credit bureau's name and address. Borrower and each Guarantor (if any) shall submit current financial information, a new credit application, or both, in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may report Lender's credit experiences with Borrower and any Guarantor in relation to the Loan to third party Persons as permitted by applicable law, including with respect to any Guarantor to consumer credit reporting agencies. Lender may share the information contemplated under this Section for the purpose of Lender complying with governmental reporting or legal processes that Lender believes may be required, whether or not such sharing of information is in fact required or may otherwise do the same when necessary or helpful in completing a transaction, when investigating a loss or Event of Default or potential loss or Event of Default, or in connection with the sale or syndication of the Loan or any Advance. Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower's and/or any

Guarantor's credit record may be submitted to a credit reporting agency (including with respect to any Guarantor to consumer credit reporting agencies) if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder. Guarantor acknowledges that any credit reporting on the Loan shall be at the sole discretion of Lender (subject to applicable law) and that Lender has the right to report the Loan to Guarantor's personal credit file should Guarantor not pay any Obligation pursuant to the Guaranty set forth in this Agreement.

**23. FEES, EXPENSES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all fees, expenses and costs incurred by Lender in enforcing the terms of this Agreement or pursuing Lender's remedies provided herein or under applicable law, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower, any Guarantor, or any other guarantor or surety of Borrower, or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any attorneys' fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on the Collateral, whether such security was granted by Borrower, a Secured Guarantor, or by any other Person primarily or secondarily liable (with or without recourse) with respect to the Obligations, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby. To the extent permitted by applicable law, all of the expenses and costs contemplated in this Section shall become a part of the Obligations and, at Lender's option, shall: (a) be payable on demand; (b) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (c) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such rights shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**24. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each Guarantor shall provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also shall promptly

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |



**C6 CAPITAL**

upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

**25. TELEPHONE COMMUNICATIONS.** Borrower and each Guarantor hereby expressly consents to receiving calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, marketing partners, agents, representatives, and any others calling at Lender's request or on its behalf, at any telephone numbers that Borrower and/or the Guarantors have provided or may provide in the future or otherwise in Lender's possession (including any cellular or mobile telephone numbers). Borrower and each Guarantor agree that such communications may be initiated using an automated telephone dialing system. Borrower and each Guarantor agree that he, she or it is responsible for any fees or charges associated therewith from their wireless carrier.

**26. INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower and each Guarantor shall indemnify and hold Lender harmless from all losses, costs, damage, liabilities or expenses (including, without limitation, court costs and reasonable attorneys' fees and expenses) that Lender may sustain or incur by reason of it (a) defending or protecting Lender's security interests contemplated in this Agreement, or the priority thereof; (b) enforcing the Obligations; (c) the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the complete repayment and performance of the Obligations and the termination of this Agreement.

With respect to any Borrower and each Guarantor residing or incorporated in California, Borrower and each Guarantor acknowledges and agrees that all their rights that may relate to the release and waiver of claims contemplated by this Agreement under Section 1542 of the California Civil Code, as amended, are expressly waived. Section 1542 of the California Civil Code provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Borrower and each Guarantor waives any right which it has or

may have under Section 1542 of the California Civil Code, as amended, to the fullest extent that Borrower and the Guarantors may lawfully waive such rights pertaining to the release of the claims contemplated by Agreement.

**27. MERGERS, CONSOLIDATIONS OR SALES.** No Borrower, Guarantor or any grantor of any Collateral shall (a) merge or consolidate with or into any other Person or (b) enter into any joint venture or partnership with any other Person without prior written consent.

**28. CHANGE IN LEGAL STATUS.** Without Lender's consent, no Borrower or Secured Guarantor shall (a) change its name, its place of business or, if more than one, chief executive office, its mailing address, or organizational identification number if it has one, or (b) change its type of organization, jurisdiction of organization or other legal structure. If Borrower or any Secured Guarantor does not have an organizational identification number and later obtains one, Borrower or such Secured Guarantor, as applicable, shall promptly notify Lender of such taxpayer identification number.

**29. DEFAULT.** The occurrence of any one or more of the following events (each an "**Event of Default**") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower, or any Guarantor or grantor of any Collateral, whether such agreements, instruments, or papers now exist or hereafter arise: (a) Lender is unable to collect any Automatic Payment Plan payment on two consecutive dates due and/or, Borrower fails to pay any Obligations on three (3) consecutive dates when payments are due daily or one (1) payment during any monthly period if payments are due and payable monthly; (b) Borrower fails to comply with, promptly, punctually and faithfully, to perform or observe any term, condition or promise within this Agreement; (c) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower or any Secured Guarantor to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (d) the occurrence of any event that would cause a "lien creditor", as that term is defined in Section 9a−102 of the UCC (other than Lender) to obtain higher priority in any of the Collateral over Lender's security interest created by this Agreement; (e) a material filing against or relating to Borrower (unless consented to in writing by Lender) of (i) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (ii) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (f) the occurrence of any event of default under any other agreement between Lender and Borrower, whether such agreement, instrument, or paper now exists or hereafter

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|



**C6 CAPITAL**

arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (g) any act by, against, or relating to Borrower or Guarantor, or any of their property or assets, whereby such act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of any of the Collateral; (h) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower or any Guarantor, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower or any Guarantor; (i) in all material respects, the failure by Borrower or any Guarantor to generally pay the debts of Borrower or Guarantor as they mature; (j) adjudication of bankruptcy or insolvency relative to Borrower or any Guarantor; (k) the entry of an order for relief or similar order with respect to Borrower or any Guarantor in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "**Bankruptcy Code**") or any other federal bankruptcy law; (l) the filing of any complaint, application or petition by or against Borrower or any Guarantor initiating any matter in which Borrower or any Guarantor is or may be granted any relief from the debts of Borrower or any Guarantor pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (m) the calling or sufferance of a meeting of creditors of Borrower or any Guarantor; (n) the meeting by Borrower or any Guarantor with a formal or informal creditor's committee; (o) the offering by or entering into by Borrower or any Guarantor of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower or any Guarantor that seeks or intends to accomplish a reorganization or arrangement with creditors; (p) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (q) the occurrence of any event or circumstance with respect to Borrower or any Guarantor or grantor of Collateral such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company or an additional working capital loan without the prior written consent of Lender); (r) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (s) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower or any Secured Guarantor; (t) any act by or against,

or relating to Borrower, a Secured Guarantor or any of their assets pursuant to which any creditor of Borrower or a Secured Guarantor seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's or a Secured Guarantor's assets; (u) the termination of existence, dissolution or liquidation of Borrower or any Secured Guarantor or the ceasing to carry on actively any substantial part of Borrower's or any Secured Guarantor's current business; (v) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any Guarantor denies it has any further liability or obligation hereunder; (w) any guarantor or person signing a support agreement in favor of Lender (including without limit the Guarantor(s) and the Guaranty) shall repudiate, purport to revoke or fail to perform his, her, or its obligations under his, her or its guaranty or support agreement in favor of Lender, or any such guarantor either die or dissolve (as applicable); (x) any material change of more than 50% occurs in Borrower's or any Secured Guarantor's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (y) if any of the following result in a 50% change in control of Borrower: if Borrower or any Guarantor or grantor of Collateral is a sole proprietorship, the owner dies; if Borrower or any Guarantor or grantor of Collateral is a trust, a trustor dies; if Borrower or any Guarantor or grantor of Collateral is a partnership, any general or managing partner dies or dissolves; if Borrower or any Guarantor or grantor of Collateral is a corporation, any principal officer or 50% or greater shareholder dies; if Borrower or any Guarantor or grantor of Collateral is a limited liability company, any managing member dies or dissolves; if Borrower or any Guarantor or grantor of Collateral is any other form of business entity, any Person(s) directly or indirectly controlling 50% or more of the ownership interests of such entity dies or dissolves; (z) Borrower terminates the Authorization Agreement in accordance with its terms and another agreement is not immediately and in no less than two (2) days put in place in a form and substance satisfactory to Lender.

**30. RIGHTS AND REMEDIES UPON DEFAULT.** Unless prohibited by applicable law, if an Event of Default occurs under this Agreement, then at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. Refrain from Disbursing Loan Proceeds: Refrain from making an Advance of Borrower's Loan proceeds to the Designated Checking Account.

B. Debit Amounts Due from Borrower's Account: Debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|



C. Accelerate Indebtedness: Declare the entire Obligations immediately due and payable, without notice to Borrower.

D. Assemble Collateral: Require Borrower and/or any Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or any Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Except as limited or prohibited under applicable law, Lender also shall have full power to enter upon the property of Borrower and/or any Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and/or each Guarantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and/or Guarantor after such repossession.

E. Sell the Collateral: Have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or any Secured Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give Borrower, each Secured Guarantor and other Persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any Person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limit the expenses, costs and fees (including third-party costs and fees payable by Lender) of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (a) be payable on demand; (b) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (c) be treated as a balloon payment that will be due and payable at the Loan's maturity.

F. Appoint Receiver: Have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and

above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by applicable law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a Person from serving as a receiver.

G. Collect Revenues, Apply Accounts : Lender, either by itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or any Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

H. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or any Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

I. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the UCC, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

J. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and



an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**31. CONSENT TO JURISDICTION AND VENUE.** Borrower, each Guarantor and Lender each consent to and agree that venue for all actions arising from or related to this Agreement or the Loan shall be in the District Court in and for Salt Lake County, State of Utah. The parties hereto waive any objection which either may have based on lack of jurisdiction or improper venue or forum non conveniens to any suit or proceeding instituted by either party under this Agreement in any state or federal court with jurisdiction over Salt Lake County, State of Utah, and consent to the granting of such legal or equitable relief as is deemed appropriate by such court.

**32. NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty (including without limit the Guaranty) or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**33. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower and each Guarantor may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any such assignment without Lender's written consent shall be absolutely null and void. Lender's consent to an assignment by Borrower shall not release Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM (in its capacity as Servicer) or a successor servicer (if any) shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain at one of its offices in the United States a copy of each assignment agreement delivered

to it with respect to this Loan and a register for the recordation of the name of each assignee of this Loan, and principal and interest amount of this Loan owing to, such assignee pursuant to the terms hereof. The entries in such register shall be conclusive, and Borrower, Lender and each such assignee may treat each person whose name is recorded therein pursuant to the terms hereof as a "Lender" hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The register maintained for this Loan shall be available for inspection by Borrower and any such assignee of this Loan, at any reasonable time upon reasonable prior notice to BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM (in its capacity as Servicer) or the applicable successor servicer (if any). This Section shall be construed so that this Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related Treasury regulations (or any other relevant or successor provisions of the Internal Revenue Code or of such Treasury regulations).

**34. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only and shall not affect the construction or interpretation of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties hereto, having had the opportunity to consult legal counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**35. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**36. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notice to Lender shall be deemed received by Lender at the address sent forth on the first page of this Agreement by U.S. mail, postage prepaid, first-class mail; in person; by registered mail; by certified mail; by nationally recognized overnight courier; or when sent by electronic mail. Any notice directed to a party to this Agreement shall become effective upon the earliest of the following: (a) actual receipt by that party; (b) delivery on a business day to the designated address of that party, addressed to that party; (c) if given by postage prepaid and registered or certified, return receipt requested, three (3) days after deposit with the United States Postal Service, postage prepaid and registered or certified, return receipt requested, addressed to that party at its designated address;

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|



**C6 CAPITAL**

or (d) electronic mail address in Lender's records. The designated address of a party described in the beginning of this Agreement shall be the address of that party, or such other address as that party, from time to time, may specify by notice to the other parties.

**37. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by applicable law. Borrower shall at all times keep accurate and complete records of Borrower's financial records, accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (a) schedules of accounts and general intangibles; and (b) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents or representatives, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers), at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's Collateral or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third party, then Borrower consents to Lender sharing certain reasonable information about Borrower with such referring party for the purpose of such referring party verifying and/or auditing loans made through such referring party's referrals.

**38. GOVERNING LAW.** The relationship between Borrower, Lender and any Guarantor, and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with the laws of the State of Utah without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Borrower understands and agrees that (a) Lender is located in Utah, (b) Lender makes all credit decisions from Lender's office in Utah, (c) the Loan is made in Utah (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in Utah) and (d) Borrower's payments are not accepted until received by Lender in Utah. Parties agree that whenever Torah law requires, a Heter Iska should govern. Heter Iska documents are available upon request, at Business Halacha Institute 1937 Ocean Ave. Brooklyn NY 11230.

**39. WAIVER OF NOTICES AND OTHER TERMS.** Except for

any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., each Guarantor), to the extent not prohibited by applicable law, hereby waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower, each Guarantor, and any other Person who has obligations pursuant to this Agreement also agrees to the following: (a) Lender is not required to file suit or show diligence in collecting the Obligations against Borrower, any Guarantor or any other Person who has obligations pursuant to this Agreement, and Lender is not required to proceed against any specific Collateral at any specific time; (b) Lender may, but shall not be obligated to, substitute, exchange or release any Collateral; (c) Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; (d) Lender may, but will not be obligated to, sue one or more Persons without joining or suing others; and (e) Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any Person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made). In connection with such amendment, modification or renewal, Lender may require that Borrower and Guarantor each execute an Amendment and Modification Agreement to the Business Loan and Security Agreement, in the form to be provided by Lender.

**40. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** To ensure a high quality of service for Lender's customers, Borrower acknowledges and agrees that Lender may (a) monitor and/or record telephone calls between Borrower and Lender's employees, representatives or agents, and (b) communicate with Borrower electronically by e-mail.

**41. JURY TRIAL WAIVER AND CLASS ACTION WAIVER. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, BORROWER, EACH GUARANTOR AND LENDER WAIVE THEIR RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THE AGREEMENT AND ALL OTHER DOCUMENTATION EVIDENCING THE OBLIGATIONS, IN ANY LEGAL ACTION OR PROCEEDING. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY COURT SITTING WITHOUT A JURY. IF PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES THE RIGHT TO LITIGATE IN ANY COURT PROCEEDING ANY CLAIM BY EITHER PARTY AGAINST THE OTHER PARTY RELATED TO THIS AGREEMENT OR THE LOAN AS A CLASS ACTION, EITHER AS A MEMBER OF A CLASS OR AS A REPRESENTATIVE, OR TO ACT AS A PRIVATE ATTORNEY IN GENERAL. THIS PROVISION SHALL SURVIVE ANY TERMINATION, AMENDMENT OR EXPIRATION OF THIS AGREEMENT OR THE LOAN, OR**

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |



**C6 CAPITAL**

**ANY OTHER RELATIONSHIP BETWEEN THE PARTIES.**

**42. CONFIDENTIALITY. Lender,** Borrower and each Guarantor shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or make any public statement or description of the terms of this Agreement, except to (a) Borrower's or any Guarantor's subsidiaries or affiliates, or potential investors in Lender or Lender's subsidiaries, affiliates or related funds, and their respective employees, directors, agents, attorneys, accountants and other professional advisors (collectively, "Representatives"); (b) to prospective transferees, assignees, credit providers or purchasers of Lender's interests under or in connection with this Agreement or any transactions contemplated hereby; (c) as required by law, regulation, subpoena, or other order; (d) to Lender's, Guarantor's, Borrower's or Lender's, Guarantor's or Borrower's subsidiaries or affiliates regulators or as otherwise required or requested in connection with Lender's, Guarantor's, Borrower's or any subsidiary of Borrower's financial examination or audit; (e) in connection with the exercise of remedies under the Agreement or any action or proceeding relating to this Agreement or the enforcement of rights hereunder or thereunder; and (f) to third-party service providers of Lender.

**43. ENTIRE AGREEMENT.** This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**44. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement and any amendment hereof may be executed in several counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be an original, and all of which together shall constitute one (1) instrument. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought. All parties to this Agreement agree that Lender may (but shall have no obligation to) accept any signature, contract formation or record-keeping through electronic means, which shall have the same legal validity and enforceability as manual or paper-based methods, to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Utah Uniform Electronic Transactions Act, or any similar state law based on the Uniform Electronic Transactions Act. Signatures and/or initials made through DocuSign or similar technologies shall be deemed of acceptable form for manifesting such party's affirmative assent.

**45. CUSTOMER SERVICE CONTACT INFORMATION.** If you have questions or comments about your Loan, you may contact us at the address on the first page of this Agreement.

**46. GRANT OF LICENSE TO USE 1WORKFORCE PLATFORM.** Subject to Borrower's compliance with this Agreement and the Terms of Use for the 1Workforce Platform, Lender grants Borrower a nonexclusive, revocable, non-transferable, non-sublicensable, limited and royalty-free license to use the 1Workforce Platform (the "**License**"). The License is effective solely for so long as any portion of the Loan is outstanding and remaining due, and so long as an Event of Default has not occurred. The License is personal to Borrower, and no rights hereunder may be transferred or assigned by Borrower to any Person without Lender's express written consent. Lender may terminate the License in its sole discretion without notice to Borrower or any other Person at any time after an Event of Default has occurred.

**47. THE GUARANTY.** Each Guarantor, including each Secured Guarantor, personally, jointly and severally (if more than one), absolutely and unconditionally guarantee the prompt payment and performance to Lender (including its successors and assignees) of any and all Obligations incurred by Borrower (the "**Guaranty**"). Each Guarantor shall repay the Obligations on Lender's demand, without requiring Lender to first to enforce or pursue of the Obligations payment against Borrower or any specific Guarantor if more than one. The Guaranty is a guarantee of payment and not of collection. The Guaranty is an absolute, unconditional, primary, and continuing obligation for each Guarantor, and will remain in full force and effect until the first to occur of the following: all of the Obligations have been indefeasibly paid and performed in full, and Lender has expressly terminated this Guaranty writing. Each Guarantor represents and warrants that (a) it is a legal resident of the United States of America, or if a non-natural Person an entity formed, incorporated or organized in the United States of America, and (b) neither Borrower, nor itself individually as Guarantor, intends to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within 6 months of the date hereof. Each Guarantor waives all notices to which the Guarantor might otherwise be entitled to by applicable law, and each Guarantor also waives all defenses, legal or equitable, otherwise available to such Guarantor. This Guaranty shall be construed in accordance with the laws of the State of Utah, and shall inure to the benefit of Lender, its successors and assigns. In accordance with Section 41 and to the extent not prohibited by applicable law, each of the undersigned Guarantors waives its right to a trial by jury of any claim or cause of action based upon, arising out of or related to this Guaranty, the Agreement and all other documentation evidencing the Obligations, in any and all legal actions or proceedings. For each Guarantor that resides in a community property state, including, without limitation Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin, or as otherwise requested by Lender, the spouse of such Guarantor shall execute and agree to the Spousal Consent to Loan, attached as <u>Exhibit B</u>. So long as any of the Obligations remain unpaid or undischarged

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

Page 17

DocuSign Envelope ID: 8CA31B4B-CB9A-4F92-BBB7-34723F00958



**C6 CAPITAL**

or Lender has any obligation to make the Loan, (i) Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by Lender) or by any means or on any other ground, claim any set off or counterclaim against Borrower in respect of any liability of Guarantor to Borrower, or (ii) in proceedings under federal bankruptcy law or insolvency proceedings of any nature, prove in competition with Lender in respect of any payment hereunder, or be entitled to have the benefit of, any counterclaim or proof of claim or dividend or payment by or on behalf of Borrower or the benefit of any other security for any of the Obligations which, now or hereafter, Lender may hold or in which it may have any share. Each Guarantor hereby expressly waives any right of contribution or reimbursement from or indemnity against Borrower or any other guarantor, whether at law or in equity, arising from any payments made by any Guarantor, and each Guarantor acknowledges that each Guarantor has no right whatsoever to proceed against Borrower or any other guarantor for reimbursement of any such payments for so long as any of the Obligations remain unpaid or undischarged or Lender has any obligation to make the Loan. In the event any Guarantor shall receive any payment under or on account of such rights while any of the Obligations are outstanding, it shall hold such payment as trustee for Lender, to be paid over to Lender on account of the Obligations but without reducing or affecting in any manner the liability of Guarantor under the provisions of this Agreement, except to the extent the principal amount or other portion of such outstanding Obligations shall have been reduced by such payment.

**48. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the individual signing or affirming below to execute on its behalf, Borrower and each Guarantor certifies that Borrower and each Guarantor has received a copy of this Agreement and Borrower and each Guarantor has read, understood and agreed to be bound by the Agreement's terms. Each Person signing or affirming below certifies that each Person is signing on behalf of the Borrower, the Guarantor(s), and/or in their individual capacity as indicated in the Signature Page for Borrower and each Guarantor (and if Borrower is a sole proprietorship, in the capacity of the owner of such sole proprietorship), and each individual executing this Agreement is authorized to execute this Agreement on behalf of Borrower and each Guarantor (as applicable). Use of Proceeds Certification: As referred to in Section 3, by signing or affirming below, the Borrower certifies, acknowledges and understands that the Loan proceeds shall be used solely for purchasing or acquiring specific products or services, for the general working capital needs of the business of the Borrower. The

Loan shall not be used for personal, family, household or agricultural purposes.

**49. CONFESSIONS OF JUDGMENT.** Borrower and Guarantor(s) shall, upon execution of this Agreement, deliver to Lender an executed stipulation and confession of judgment ("**Stipulation and Confession of Judgment**") in favor of Lender in the amount of the Total Repayment Amount of the Loan. Upon the occurrence of an Event of Default, Borrower and each Guarantor consent to the filing of the Stipulation and Confession of Judgment in any court in the State of Utah, and Borrower and each Guarantor further consent to the entering, docketing, or domestication of any such judgment arising from or related to the Stipulation and Confession of Judgment in any court in the State of Utah or any other court (state or federal) for the purpose of collecting any such judgment.

**50. PATRIOT Act.** To the undersigned's knowledge, neither Borrower nor any Guarantor nor any of its respective constituents or affiliates, is in violation of any laws relating to terrorism or money laundering, including without limitation, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (as the same has been, or may hereafter be, renewed, extended, amended or replaced, the "**Executive Order**")' and the Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56, as the same has been, or may hereafter be, renewed, extended, amended or replaced, the "**PATRIOT Act** "). As used herein, "**Anti-Terrorism Laws**" means any laws relating to terrorism or money laundering, including the Executive Order, the PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing laws may from time to time be renewed, extended, amended, or replaced).

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

Document Ref: KPFGO-QPAJD-YB7QM-MRDZI



**C6 CAPITAL**

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBIT)

**This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) ("Authorization Agreement") is part of (and incorporated by reference into) the Business Loan and Security Agreement ("Loan Agreement"). Borrower should keep this important legal document for Borrower's records. Capitalized terms not otherwise defined herein shall have the same meaning as defined in the Loan Agreement.**

**ADVANCE OF LOAN PROCEEDS.** By executing this Authorization Agreement, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Lender approving the Loan by Lender initiating an ACH credit, wire transfer or similar means to the checking account indicated on <u>Exhibit A</u> hereto (or a substitute checking account Borrower later identifies and is acceptable to Lender, hereinafter referred to as the "**Designated Checking Account**") in the Advance Amount set forth in the Agreement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination of this Authorization Agreement in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it, which in no event will be less than five (5) Business Days.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan (defined below) is required for Loan approval. By executing this Authorization Agreement, Borrower agrees to, and hereby, enrolls in an automatic payment plan and authorizes Lender to collect payments required under the terms of the Loan Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the Payment Schedule set forth in the attached <u>Exhibit A</u> (the "**Automatic Payment Plan**"). Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits in an amount equal to the total amount of previously scheduled payment(s) (as scheduled in the Payment Schedule) that was not paid inclusive of any and all unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination of this Authorization Agreement in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it, which in no event will be less than five (5) Business Days. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's Designated Checking Account in good standing or if there are insufficient funds in Borrower's Designated Checking Account to process any payment (or if Lender is otherwise unable to collect any amounts by ACH debit owed to Lender under the Loan or under any other loan or extension of credit by Lender to Borrower). **If Borrower revokes the authorization contemplated in this Authorization Agreement or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, then Borrower shall still be responsible for making timely payments of the Loan pursuant to the alternative payment methods described in <u>Section 6</u> of the Loan Agreement.**

**Provisional Payment.** Any credit given by us to you with respect to an automated clearing house ("**ACH**") credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that you shall refund Lender in an amount equal to the amount credited to you in connection with such entry, and the underlying originator of such entry shall not be deemed to have paid you in the amount of such entry.

**Notice of Receipt of Entry.** Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving your Designated Checking Account, we are not required to give next day notice to you of Lender's receipt of an ACH item and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statement we provide to you.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization Agreement, Borrower agrees and certifies that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower shall promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under the Loan Agreement or this Authorization Agreement. The origination of ACH transactions to Borrower's account shall comply with the provisions of the laws of the State of Utah. Borrower agrees to be bound by NACHA rules of the Electronic Payments Association. Borrower shall provide Lender at all times, real time, view only access to any and all banking, accounting and inventory systems of Borrower, in each case in a form and substance.

[Exhibit A Follows]

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

Page 19

**C6**
**C6 CAPITAL**

**Exhibit A**

AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBIT)

The following bank accounts are subject to the Authorization Agreement:

Bank Account:

| | |
|---|---|
| Bank Name: | Bridge Bank |
| Bank City and State: | San Jose, CA |
| Legal Title of Account: | Breakout Commerce, Inc. |
| Bank ABA#: | 121143260 |
| Account Number: | 8514695943 |
| Type of Account: | Checking |

Bank Account:

| | |
|---|---|
| Bank Name: | |
| Bank City and State: | |
| Legal Title of Account: | |
| Bank ABA#: | |
| Account Number: | |
| Type of Account: | |

Bank Account:

| | |
|---|---|
| Bank Name: | |
| Bank City and State: | |
| Legal Title of Account: | |
| Bank ABA#: | |
| Account Number: | |
| Type of Account: | |

_BRIAN THOMAS RAINEY_
Signature of Authorized Officer of Borrower

04 / 12 / 2024
Date

BRIAN THOMAS RAINEY
Printed Name of Signer

CEO
Title of Signer

453535837
Tax ID of Borrower

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

**C6** CAPITAL

Signature **Page**

The undersigned hereby, as a duly and appointed authorized agent of Borrower and each Secured Guarantor, and in each's individual and personal capacity as a Guarantor, affirm that each has read and understand the terms and conditions of, consent to, and agree to be bound by, the attached Agreement and the attached Authorization Agreement.

**Borrower:**

*BRIAN THOMAS RAINEY*
_____
Signature of Authorized Officer of Borrower

04 / 12 / 2024
_____
Date

BRIAN THOMAS RAINEY
_____
Printed Name of Signer

CEO
_____
Title of Signer

453535837
_____
Tax ID of Borrower

**Guarantor:**

*BRIAN THOMAS RAINEY*
_____
Signature of Guarantor, individually

04 / 12 / 2024
_____
Date

BRIAN THOMAS RAINEY
_____
Printed Name of Signer

**Secured Guarantor:**

*BRIAN THOMAS RAINEY*
_____
Signature of Authorized Officer of Borrower

04 / 12 / 2024
_____
Date

BRIAN THOMAS RAINEY
_____
Printed Name of Signer

CEO
_____
Title of Signer

453535837
_____
Tax ID of Borrower

[Notary Page Follows]

For Lenders Use Only: This Agreement has been received and accepted by Lender in Utah after being signed by Borrower and any Guarantor(s) (including any Secured Guarantor(s)).

**Lender:**

DocuSigned by:
*Andrew Fellus*
0AD4PDPAP3254HE...
_____
Signature of Authorized Officer of Lender

4/12/2024
_____
Date

C6 CAPITAL FUNDING, LLC
_____
Printed Name of Signer

CEO
_____
Title of Signer

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

# ADDENDUM TO THE BUSINESS LOAN AND SECURITY AGREEMENT

This Addendum, dated ___03/25/2024___ (the "Addendum") to the Business Loan and Security Agreement, effective ___03/25/2024___ (the "Agreement"), between C6 CAPITAL FUNDING, LLC ("Lender") and ___BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM___ ("Borrower"), hereby amends and restates the Agreement as follows, all sections and provisions to the agreement that reference Guarantor shall have no effect. In lieu thereof, only the following provisions in this addendum shall apply to the Guarantor. Guarantor hereby guarantees in a personal capacity the liability under the agreement in the event of the occurrence of any one of the following:

1) Borrower interferes with Lender's right to collect the weekly amount due pursuant to the Agreement; if in the normal business operations the company does not have sufficient funds it is not an event of default
2) Borrower uses multiple depository accounts without the prior written consent of Lender;
3) Borrower changes its depositing account or its payment card processor without the prior written consent of Lender;
4) Borrower sells future receivables to another financing firm without the prior written consent of Lender; or
5) Borrower fails to provide timely notice to Lender such that: i) within any 30-day period two or more ACH transactions attempted by Lender are rejected by Borrower's bank; or ii) two or more consecutive ACH transactions attempted by Lender are rejected by Borrower's bank.

IN WITNESS WHEREOF, each of the undersigned has executed this Addendum as of the date first written above.

Borrower: ___BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM___

Agreed to by: *BRIAN THOMAS RAINEY* (Signature), its _____(Title)

Print Name: BRIAN THOMAS RAINEY_____

Guarantor (1) : BRIAN THOMAS RAINEY_____

Agreed to by: *BRIAN THOMAS RAINEY* (Signature), Its _____(Title)

Guarantor (2): _____

Agreed to by: _____(Signature), Its _____(Title)

Lender:  C6 CAPITAL FUNDING, LLC

Agreed to by: _____*Andrew Fellus*_____ (Signature), Its _____(Title)

**ADDENDUM TO MERCHANT AGREEMENT**

In association with the Business loan and security agreement dated 03/25/2024, I BRIAN THOMAS RAINEY, the _____ of BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM d/b/a Gooten located at Corporation Trust Center 1209 Orange St do hereby attest and agree to the following terms and conditions.

- Notwithstanding anything herein to the contrary, no Event of Default shall be deemed to have occurred and be continuing if cured by the Borrower within seven (7) business days after receipt of written notice of the breach from the Lender.

I hereby represent this statement to be true and accurate:

AGREED AND ACHNOWLEDGED:


Signature: _*BRIAN THOMAS RAINEY*_   Date: _____

Print Name:   BRIAN THOMAS RAINEY


Signature: _____   Date: _____

Print Name: _____



Company Name:   BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Company Address:   Corporation Trust Center 1209 Orange St

Office Phone: _____



**C6 CAPITAL**

**Borrower Definition Addendum to the Business Loan and Security Agreement dated: 03/25/2024.**

**Lender and Borrower hereby agree that "Borrower" is defined as follows:**

Business Name:  BREAKOUT COMMERCE, INC.

Address:   228 Park Ave S, Suite 21651, New York, New York 10003

Tax ID: 453535837

State of Incorporation:   DE

Borrower:  BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Agreed to by:  *BRIAN THOMAS RAINEY* (Signature), its: _____ (Title)

Print Owner's Name:  BRIAN THOMAS RAINEY

LENDER:  C6 CAPITAL FUNDING, LLC

Agreed to by:  _Andrew Fellus_ (Signature), its: _____ (Title)



**C6 CAPITAL**
**Early Discount Addendum**

This addendum is made as of 03/25/2024 (the "Addendum") to the Business Loan and Security Agreement between C6 CAPITAL FUNDING, LLC (the "Lender") and BREAKOUT COMMERCE, INC. ET AL SEE (the "Borrower") dated 03/25/2024 (the "Agreement").

Lender and Borrower are sometimes referred to herein collectively as the "Parties" and each as a "Party". Whereas, the Parties desire to add certain terms to the Agreement.

In consideration of the above promises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, do hereby agree and add terms to the Agreement as follows:

Total Repayment Amount shall be defined as: $ 877,500.00    if Borrower delivers the Total Repayment Amount within 30    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Total Repayment Amount shall be defined as: $ 892,500.00    if Borrower delivers the Total Repayment Amount within 60    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Total Repayment Amount shall be defined as: $ 907,500.00    if Borrower delivers the Total Repayment Amount within 90    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Total Repayment Amount shall be defined as: $ 922,500.00    if Borrower delivers the Total Repayment Amount within 120    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Total Repayment Amount shall be defined as: $ 937,500.00    if Borrower delivers the Total Repayment Amount within 150    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Notwithstanding the above, if an Event of Default occurs pursuant to the Agreement, Borrower forfeits Borrower's rights pursuant to this Addendum.

IN WITNESS WHEREOF, each of the undersigned has executed, or has caused to be executed, this Addendum as of the date first written above.

Borrower:  BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Agreed to by:  *BRIAN THOMAS RAINEY* (Signature), its: _____ (Title)

Print Owner's Name:  BRIAN THOMAS RAINEY

Lender:  C6 CAPITAL FUNDING, LLC

Agreed to by:  *Andrew Fellin* (Signature), its: _____ (Title)



**C6 CAPITAL**
**Stacking Prohibited Addendum**

This addendum is made as of 03/25/2024 (the "Addendum") to the Business Loan and Security Agreement between C6 CAPITAL FUNDING, LLC (the "Lender") and BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM (the "Borrower") dated 03/25/2024 (the "Agreement").

Whereas, Lender desires to add a Stacking Prohibited as follows; Borrower shall not enter into any cash advance that relates to or involves its Future Receipts, or any loan agreement, with any party other than Lender where the interest rate on such loan is greater than ten percent (10%) for the duration of this Agreement; notwithstanding the foregoing, the following shall be excluded from the foregoing prohibition in all events: (a) bank loans; (b) bank financing arrangements; and (c) any other financing arrangement, that enables Borrower to pay the Total Repayment Amount to Lender and the Total Repayment Amount is paid to Lender in conjunction with the closing of such financing prior to the release of any funds to the Borrower. Lender may share information regarding this Agreement with any third party in order to determine whether Borrower is in compliance with this provision.

Borrower agrees to this Stacking Prohibited addendum to the Agreement, and fully understands that breach of the Stacking Prohibited provision shall constitute an Event of Default.

By signing this Addendum, Borrower agrees and fully understands that in the event Borrower breaches the Stacking Prohibited provision, Lender fully reserves its rights to immediately exercise its rights at law and equity as provided in the Agreement and impose an additional fee equaling ten (10) percent of the Loan Amount.

IN WITNESS WHEREOF, each of the undersigned has executed, or has caused to be executed, this Addendum as of the date first written above.

Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Agreed to by: *BRIAN THOMAS RAINEY* (Signature), its: _____ (Title)

Print Owner's Name: BRIAN THOMAS RAINEY

Lender: C6 CAPITAL FUNDING, LLC

Agreed to by: _____ *Andrew Fellus* (Signature), its: _____ (Title)

# Signature Certificate

Reference number: KPFGO-QPAJD-YB7QM-MRDZI

| Signer | Timestamp | Signature |
|---|---|---|
| **BRIAN THOMAS RAINEY**<br>Email: brian@gooten.com | | *BRIAN THOMAS RAINEY* |
| Sent:<br>Viewed:<br>Signed: | 12 Apr 2024 14:36:39 UTC<br>12 Apr 2024 14:46:25 UTC<br>12 Apr 2024 15:47:36 UTC | |
| **Recipient Verification:** | | IP address: 72.89.39.127<br>Location: Rockville Centre, United States |
| ✔Email verified | 12 Apr 2024 14:46:25 UTC | |

Document completed by all parties on:
12 Apr 2024 15:47:36 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 50,000+ companies worldwide.



**DocuSign**

## Certificate Of Completion

Envelope Id: 8CA31B4BCB9A4F92BBB734723F009581                                    Status: Completed
Subject: Complete with DocuSign: Gooten Loan Countersign.pdf
Source Envelope:
Document Pages: 28                    Signatures: 5                    Envelope Originator:
Certificate Pages: 1                  Initials: 0                      Contracts Team
AutoNav: Enabled                                                       881 Baxter Drive STE 100
EnvelopeId Stamping: Enabled                                           SOUTH JORDAN , UT  84095
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                      contracts@tvtcapital.com
                                                                       IP Address: 71.183.53.194

## Record Tracking

Status: Original                      Holder: Contracts Team           Location: DocuSign
        4/12/2024 9:01:02 AM                  contracts@tvtcapital.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Andrew Fellus<br>contracts@tvtcapital.com<br>CEO<br>CBR CAPITAL LLC<br>Security Level: Email, Account Authentication<br>(None) | *DocuSigned by:*<br>Andrew Fellus<br>0AC4FD7A73254AE...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 71.183.53.194 | Sent: 4/12/2024 9:09:21 AM<br>Viewed: 4/12/2024 9:11:32 AM<br>Signed: 4/12/2024 9:12:04 AM |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/12/2024 9:09:21 AM |
| Certified Delivered | Security Checked | 4/12/2024 9:11:32 AM |
| Signing Complete | Security Checked | 4/12/2024 9:12:04 AM |
| Completed | Security Checked | 4/12/2024 9:12:04 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

Exhibit H

# RECOVERY OF JUDGMENT

1407 Broadway 29th Floor, New York, NY 10018

E-mail: Support@RecoveryofJudgment.com                    TEL: 646-863-9783

9/25/2025

**TO: Taylor Corporation**

### NOTICE OF UCC LIEN

*RE: Breakout Commerce, Inc.; Breakout Commerce Inc d/b/a Gooten; Breakout Commerce Inc d/b/a OrderMesh; Gooten Inc, Brian Thomas Rainey*
*EIN:* 45-3535837
*Balance:* $1,908,117.85

Dear Sir/Madam:

The undersigned represents C6 Capital Funding, LLC regarding the above-captioned account. This notice is being sent pursuant to Uniform Commercial Code ("UCC") §9-607 and §9-406 as it has come to our attention that **Taylor Corporation** ("Account Debtor") is an account debtor (as defined by UCC §9-102) of Breakout Commerce, Inc.; Breakout Commerce Inc d/b/a Gooten; Breakout Commerce Inc d/b/a OrderMesh; Gooten Inc (the "Merchant").

This letter shall serve to advise you that effective immediately, pursuant to the above referenced UCC provisions, C6 Capital Funding, LLC is the assignee of all of the now owned or hereafter arising accounts receivable of Breakout Commerce, Inc.; Breakout Commerce Inc d/b/a Gooten; Breakout Commerce Inc d/b/a OrderMesh; Gooten Inc. Accordingly, all accounts payable now or hereafter due from your company to Breakout Commerce, Inc.; Breakout Commerce Inc d/b/a Gooten; Breakout Commerce Inc d/b/a OrderMesh; Gooten Inc are payable only to C6 Capital Funding, LLC and should be remitted directly to C6 Capital Funding, LLC. If payment is to be wired, use the wiring instructions provided for in Schedule A below. If payment is to be made by check, it shall be payable to Recovery of Judgment at: 1407 Broadway, 29th Floor, New York, NY 10018.

Moreover, a copy of C6 Capital Funding, LLC's UCC-1 financing statement is attached to corroborate its security interest in Breakout Commerce, Inc.; Breakout Commerce Inc d/b/a Gooten; Breakout Commerce Inc d/b/a OrderMesh; Gooten Inc's accounts receivable. You should be advised that until such time as you receive written instructions from us to the contrary, pursuant to UCC §9-406, you may only discharge your obligations with respect to your accounts payable to Breakout Commerce, Inc.; Breakout Commerce Inc d/b/a Gooten; Breakout Commerce Inc d/b/a OrderMesh; Gooten Inc by making payment to C6 Capital Funding, LLC (through Recovery of Judgment). Should you continue to make payments to Breakout Commerce, Inc.; Breakout Commerce Inc d/b/a Gooten; Breakout Commerce Inc d/b/a OrderMesh; Gooten Inc or otherwise, contrary to the directions contained in this notice, such payments may result in your failure to discharge your obligations with respect to such accounts payable and expose you to liability.

Thank you for your prompt attention to this matter. If you have any questions related to this notice, please don't hesitate to contact me at (646) 863-9783 or at support@recoveryofjudgment.com.

Sincerely,

*Alex Pesochin*

General Counsel to Recovery of Judgment, Servicer for  C6 Capital Funding, LLC

**Schedule A**

ROJ Wiring Instructions:

Name on Account: **Recovery of Judgment**
Address: **1407 Broadway 29th Floor, New York, NY 10018**
Routing: **021000021**
Account: **736328011**
**J.P. Morgan Chase Bank**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**Lien Solutions**
Representation of filing

A. NAME & PHONE OF CONTACT AT FILER [optional]
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. SEND ACKNOWLEDGMENT TO: (Name and Address)     25426 - ACH Capital UT LLC

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

98487024

NYNY

File with: Secretary of State, NY

**This filing is Completed**
File Number : 202404195580444
File Date   : 19-Apr-2024

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| BREAKOUT COMMERCE, INC | | | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | | COUNTRY |
| 228 Park Avenue South, Suite 21651 | | New York | NY | 10003 | | USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION CORPORATION | 1f. JURISDICTION OF ORGANIZATION NY | 1g. ORGANIZATIONAL ID #, if any | | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| Breakout Commerce Inc d/b/a Gooten | | | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | | COUNTRY |
| 228 Park Avenue South, Suite 21651 | | new york | NY | 10003 | | USA |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION CORPORATION | 2f. JURISDICTION OF ORGANIZATION NY | 2g. ORGANIZATIONAL ID #, if any | | ☒ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| C T Corporation System, as representative | | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | | USA |

4. This FINANCING STATEMENT covers the following collateral:
"Debtor and Secured Party also hereby agree that the security pledged by Debtor as collateral for the underlying obligation includes the following: All current assets of the Debtor as of the enforcement date of this Security Instrument, including but not limited to cash, accounts receivable, other receivables, equipment, inventory, along with all trade fixtures belonging to the Debtor; all inclusive of after acquired property."

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
98487024

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1)  (REV. 05/22/02)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| 9a. ORGANIZATION'S NAME |
|---|
| BREAKOUT COMMERCE, INC |

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

| 10. MISCELLANEOUS: | 99487024-NY-0   25426 - ACH Capital UT LLC |
|---|---|
| | C T Corporation System, as representative |

File with: Secretary of State, NY

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only <u>one</u> name (11a or 11b) - do not abbreviate or combine names

| 11a. ORGANIZATION'S NAME |
|---|
| Breakout Commerce Inc d/b/a OrderMesh |

OR

| 11b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 228 Park Avenue South, Suite 21651 | New York | NY | 10003 | USA |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE: ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | CORPORATION | NY | ☒ NONE |

**12.** ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME—insert only <u>one</u> name (12a or 12b)

| 12a. ORGANIZATION'S NAME |
|---|
| |

OR

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14.** Description of real estate:

**16.** Additional Collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check <u>only</u> if applicable and check <u>only</u> one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18.** Check <u>only</u> if applicable and check <u>only</u> one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction

☐ Filed in connection with a Public-Finance Transaction

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/21/09)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**19. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | |
|---|---|
| 19a. ORGANIZATION'S NAME | |
| | BREAKOUT COMMERCE, INC |
| OR 19b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

**20. MISCELLANEOUS:**     98487024-NY-0

File with: Secretary of State, NY

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**21. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (21a or 21b) - do not abbreviate or combine names

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Gooten Inc. | | | | |
| OR 21b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | SUFFIX |
| 21c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 228 Park Avenue South, Suite 21651 | | New York | NY | 10003 | USA |

| 21d. **SEE INSTRUCTIONS** | ADD'L INFO RE ORGANIZATION DEBTOR | 21e. TYPE OF ORGANIZATION | 21f. JURISDICTION OF ORGANIZATION | 21g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | CORPORATION | NY | ☒ NONE |

**22. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (22a or 22b) - do not abbreviate or combine names

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 22b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | SUFFIX |
| 22c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

| 22d. **SEE INSTRUCTIONS** | ADD'L INFO RE ORGANIZATION DEBTOR | 22e. TYPE OF ORGANIZATION | 22f. JURISDICTION OF ORGANIZATION | 22g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | NONE |

**23. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (23a or 23b) - do not abbreviate or combine names

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 23b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | SUFFIX |
| 23c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

| 23d. **SEE INSTRUCTIONS** | ADD'L INFO RE ORGANIZATION DEBTOR | 23e. TYPE OF ORGANIZATION | 23f. JURISDICTION OF ORGANIZATION | 23g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | NONE |

**24. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE)** - insert only one name (24a or 24b)

| 24a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 24b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | SUFFIX |
| 24c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

**25. ADDITIONAL SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE)** - insert only one name (25a or 25b)

| 25a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 25b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | SUFFIX |
| 25c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

FILING OFFICE COPY - UCC FINANCING STATEMENT ADDITIONAL PARTY (FORM UCC1AP) (REV. 05/22/02)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| WK LIEN SOLUTIONS 800-331-3282 |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |
| UCCFILINGRETURN@WOLTERSKLUWER.COM |

| C. SEND ACKNOWLEDGMENT TO:　(Name and Address) |
| --- |

```
P.O. BOX 29071

GLENDALE, CA 91209-9071

US
```

**Delaware Department of State**
**U.C.C. Filing Section**
Filed: 03:51 PM 04/19/2024
U.C.C. Initial Filing No: 2024 2631701

Service Request No: 20241540518

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| BREAKOUT COMMERCE, INC. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1209 ORANGE STREET, CORPORATION TRUST CENTER | WILMINGTON | DE | 19801 | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| BREAKOUT COMMERCE INC D/B/A GOOTEN | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 228 PARK AVENUE SOUTH, SUITE 21651 | NEW YORK | NY | 10003 | US |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| C T CORPORATION SYSTEM, AS REPRESENTATIVE | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 330 N BRAND BLVD, SUITE 700; ATTN: SPRS | GLENDALE | CA | 91203 | US |

4. **COLLATERAL:** This financing statement covers the following collateral:
"Debtor and Secured Party also hereby agree that the security pledged by Debtor as collateral for the underlying obligation includes the following: All current assets of the Debtor as of the enforcement date of this Security Instrument, including but not limited to cash, accounts receivable, other receivables, equipment, inventory, along with all trade fixtures belonging to the Debtor; all inclusive of after acquired property."

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative | | |
| --- | --- | --- |
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction　☐ Manufactured-Home Transaction　☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien　☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor　☐ Consignee/Consignor　☐ Seller/Buyer | | ☐ Bailee/Bailor　☐ Licensee/Licensor |

8. OPTIONAL FILER REFERENCE DATA:
DE-0-98486872-69013060

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)　　　International Association of Commercial Administrators

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

| 18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐ | | |
|---|---|---|
| 18a. ORGANIZATION'S NAME | | |
| BREAKOUT COMMERCE, INC. | | |
| **OR** 18b. INDIVIDUAL'S SURNAME | | |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME  Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BREAKOUT COMMERCE, INC. | | | | |
| **OR** 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 228 PARK AVENUE SOUTH, SUITE 21651 | NEW YORK | NY | 10003 | US |

20. ADDITIONAL DEBTOR'S NAME  Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BREAKOUT COMMERCE INC D/B/A ORDERMESH | | | | |
| **OR** 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 228 PARK AVENUE SOUTH, SUITE 21651 | NEW YORK | NY | 10003 | US |

21. ADDITIONAL DEBTOR'S NAME  Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| GOOTEN INC | | | | |
| **OR** 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 228 PARK AVENUE SOUTH, SUITE 21651 | NEW YORK | NY | 10003 | US |

22. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

23. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

24. MISCELLANEOUS:

**Commercial Financing Disclosure for Loans**

| | | |
|---|---|---|
| **The Total Amount of Funds Provided to the Business Under the Terms of this Commercial Financing Transaction** | $ 1,000,000.00 | This is how much funding C6 CAPITAL FUNDING, LLC ("Lender") will provide. |
| **The Total Amount of Funds Disbursed to the Business Under the Terms of this Commercial Financing Transaction** | $ 979,737.50 | This is how much money Lender will deposit into your account after deducting fees and any amounts owed to Lender. |
| **The Total Amount to be Paid Under the Terms of this Commercial Financing Transaction** | $ 1,420,000.00 | This is the total dollar amount you will pay to Lender under the agreement. |
| **The Total Dollar Cost of this Commercial Financing Transaction** | $ 420,000.00 | This is the dollar cost of your financing. |
| **The Manner, Frequency, and Estimated Amount of Each Payment** | Lender will ACH debit the designated bank account in the amount of $ 54,615.39 per week. This periodic payment will periodically increase pursuant to the schedule set forth on the Weekly Deliveries Addendum. | |
| **Prepayment** | There are no costs associated with early remittance (prepayment) under this transaction. If applicable, subject to the conditions of the early pay addendum to your agreement, you may be eligible for an early performance discount. | |

Receipt acknowledged by:

DocuSigned by:

*Brian Rainey*

9C94B15719CEAED...

3/27/2025

BRIAN THOMAS RAINEY, as a representative of BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Date

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |

4861-9113-7893.v10

This Business Loan and Security Agreement (as amended, modified or restated, the "**Agreement**"), together with the attached Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) (as amended, modified or restated, "**Authorization Agreement**"), as amended, modified or restated (collectively the "**Agreement**") governs your business loan ("**Loan**") made by the Borrower as of the Effective Date (defined below). Please read this Agreement and keep it for your reference. In this Agreement, the words "**you**", "**your**" and "**Borrower**" each mean the Borrower identified on the signature page of this Agreement. Each Person identified on the signature page of this Business Loan and Security Agreement as a "**Guarantor**" (including any Secured Guarantor as herein defined) shall be referred to individually as "**Guarantor**" and collectively as "**Guarantors**" in this Agreement. The words "**Lender**", "**we**", "**us**", and "**our**" each mean C6 CAPITAL FUNDING, LLC, and its successors and assigns. "**Person**" means an individual, corporation, association, partnership, an estate, a trust and any other entity or organization. Each disbursement of the Loan is an "**Advance.**"

If you have any questions, please call us at 385-444-7518
(we have support available Monday - Friday 9am - 6pm ET) or email info@achcapital.com.

| YOUR LOAN DETAILS | |
|---|---|
| **Borrower:** | BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
| **Borrower's Address:** | Corporation Trust Center 1209 Orange St, Wilmington,, DE, 19801 |
| **Lender:** | C6 CAPITAL FUNDING, LLC |
| **Address for Lender:** | 375 W 200 S, Suite 225, Salt Lake City, UT 84101 Email (info@achcapital.com) |
| **Guarantor(s):** | **BRIAN THOMAS RAINEY** |
| **Address(es) for Guarantor(s):** | **241 Bedford Ave, Rockville Centre, NY 11570** |
| **Secured Guarantor(s):** | **BRIAN THOMAS RAINEY** |
| **Address(es) for Secured Guarantor(s):** | **41 Bedford Ave, Rockville Centre, NY 11570** |
| **Loan Amount:** | **$ 1,000,000.00** |
| **Origination Fee:** (Deducted at time of disbursement) | **$ 20,262.50** |
| **Advance Amount:** (Loan Amount less Origination Fee) Note that the Advance Amount may not be the amount deposited to your Designated Checking Account. The amount that will be deposited to your Designated Checking Account will be reduced by any amounts owed to Lender from any prior Advance, indebtedness, or loan, or may be used to pay off an amount owed to a third-party creditor. | **$ 979,737.50** |
| **Maturity Date:** | **09/24/2025** |
| **Weekly Payment Amount:** (Business Days only) | **$ 54,615.39** |
| **Payment Schedule:** The term "**Business Day**" means any Monday through Friday, except for Federal Reserve holidays. | 26 payments of **$ 54,615.39** due on Monday each Week immediately following the date of disbursement of the Advance Amount from the lender. |
| **Total Interest Expense:** (Does not include any costs, expenses or Fees) | **$ 420,000.00** |
| **Total Repayment Amount:** (Loan Amount plus Total Interest Expense) | **$ 1,420,000.00** |

| RENEWAL, AND OTHER FEES | |
|---|---|
| **Renewals:** | Remaining unpaid interest on this Loan will be eligible to be forgiven by Lender in Lender's sole discretion if: (a) Borrower is current on its scheduled payments with respect to this Loan (including payment of any fees or expenses), and (b) while this Loan is outstanding, Borrower enters into a business loan and security agreement for a new qualifying term loan with Lender, a portion of the proceeds of which are used to repay this Loan in whole. |
| **Other Fees:** (with the Origination Fee collectively the "**Fees**") | Underwriting Fee: $  Processing Fee: $ 20,262.50  Professional Service Fee: $  Returned Payment Fee: $ 35.00  Funding Fee: $ 0.00  Bank Change Fee: $ 50.00  Non-Sufficient Funds (NSF) Fee: $ 35.00  Stopped Payment Fee: $ 150.00  Default Fee: 15%  UCC Filing Fee: $ 150.00  Late Fee: $ 35.00  Stacking Fee: 10% of the Loan Amount for each incidence of stacking. |

| CERTAIN DISCLOSURES | |
|---|---|
| **Loan Pricing Disclosure** | Lender uses a system of risk-based pricing to determine interest charges and fees. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the interest rate up or down based on this risk evaluation. This loan may be a higher cost loan than loans that may be available through other lenders. Borrower understands that Lender may make loans at other amounts, interest rates and with other fees to other Persons as well. |
| **Loan For Specific Purposes Only** | The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification of the Business Loan and Security Agreement. IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to this transaction. |

| | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE |
|---|---|
| Loan # 1005055484 | ADDENDUM |

*The calculations below involve certain key assumptions about this Loan, including that the Loan is paid off in its entirety according to the agreed Payment Schedule and that no repayments are missed. This is provided as a convenience only, and Lender's records will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and Lender. To the extent the Lender's records differ from the below metric calculations and metric explanations, the Lender's records shall control. The amounts below may vary from the actual amounts.*

| Loan Amount $ 1,000,000.00 | Advance Amount (minus fees withheld)[1] $ 979,737.50 | Repayment Amount $ 1,420,000.00 | Term 7 Months (repaid Weekly) |
|---|---|---|---|
| **METRIC** | **METRIC CALCULATION** | **METRIC EXPLANATION** | |
| **Total Cost of Capital** $ 440,262.50 | Interest Expense: $ 420,000.00 Loan Fee: $ Origination Fee: $ 20,262.50 Other Fees: $ **Total Cost of Capital: $ 440,262.50** | This is the total amount that you will pay in interest and fees for the Loan, but this amount does not include fees and other charges you can avoid, such as late payment fees, returned payment fees, and the default fee.[2] | |
| **Annual Percentage Rate (APR)[3]** 145.26 % | Your Loan will have **26** Weekly payments of: $54,615.38 **APR: 145.26 %** | This is the cost of the Loan, including total interest or Loan Fees and other fees, expressed as a yearly rate. APR takes into account the amount and timing of capital you receive, fees you pay, and the periodic payments you make. This is provided as a convenience only. While APR can be used for comparison purposes, it is not an interest rate and is not used to calculate your interest expense or Loan Fee. | |
| **Average Monthly Payment** $ 218,461.56 | Repayment Amount: $ 1,420,000.00 Term (in months): ÷ 7 **Months** **Average Monthly Payment: $ 218,461.56** | This is the average monthly repayment amount of the Loan, which does not include fees and other charges you can avoid, such as late payment fees, returned payment fees and the default fee.[2] The actual repayment frequency for the Loan will be weekly. This is an estimate for comparison purposes only. | |
| **Cents on the Dollar** *(excluding fees)* 42 ¢ | Interest Expense or $ 420,000.00 Loan Fee: Loan Amount: ÷ $ 1,000,000.00 **Cents on the Dollar 42 ¢** *(excluding fees):* | This is the total amount of interest or Loan Fee paid per dollar borrowed. This amount is exclusive of fees. This is provided as a convenience only. | |
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges? | **No** (see "Prepayment" above) | |
| | Does prepayment of this Loan decrease the total interest or Loan Fees owed? | **Yes** (see "Prepayment" above for the interest or fee reduction amount) | |

[1] The Advance Amount is the amount of capital that a business receives and may be different from the Loan Amount. The Advance Amount is net of fees withheld from the Loan Amount. A portion of the Advance Amount may be used to pay off any amounts owed to Lender from a prior Advance, indebtedness, loan, or used to pay an amount owed to a third party creditor. [2] Your business may incur other fees that are not a condition of borrowing, such as late payment fees, returned payment fees, default fees, or monthly maintenance fees. Those fees are not reflected here. See the agreement for details on these fees (see "Other Fees" above). Further, your business may incur other third-party fees associated with any Advance, borrowing, non-payment or otherwise. [3] APR should be considered in conjunction with the Total Cost of Capital. APR may be most useful when comparing financing solutions of similar expected duration. APR is calculated here according to the principles of 12 C.F.R. § 1026 (Regulation Z), using 52 payment periods of equal length and 52 payment dates per year for weekly pay products, and 252 payment dates per year for daily pay products.

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

4861-9113-7893.v10



**1. EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in Utah and signed by Lender ("**Effective Date**"). Borrower understands and agrees that Lender may postpone, without penalty, the Advance of Loan amounts to Borrower until Lender has determined in its sole discretion that all required security interests for the Loan have been perfected and Lender has received all required personal guarantees or other documentation for the Loan.

**2. AUTHORIZATION.** Borrower agrees that the Loan shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**3.** <u>**LOAN FOR SPECIFIC PURPOSES ONLY. THE PROCEEDS OF THE LOAN MAY BE USED ONLY FOR THE SPECIFIC PURPOSES AS SET FORTH IN THE USE OF PROCEEDS CERTIFICATION CONTAINED IN SECTION 48 BELOW, AND NOT FOR ANY OTHER PURPOSES**</u>**. In addition, the Loan will not be used for personal, family or household purposes, and Borrower and Guarantors agree they each are forever estopped from taking the position that such Loan (including Advances) are or were used for such personal, family or household purposes. Borrower understands that Borrower's covenant not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon Persons making loans for personal, family or household purposes, and certain important rights conferred upon such Persons, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower understands that Lender will be unable to confirm whether the use of the Loan conforms to this Section. Borrower agrees that a breach by Borrower of the provisions of this Section shall not affect Lender's right to (a) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of (i) the purpose for which the Loan is obtained or (ii) how the Loan proceeds are used by Borrower, and (b) use any remedy legally available to Lender, even if that remedy would normally not have been available had the Loan been made by Lender to Borrower for personal, family or household purposes.**

**4. ADVANCE OF LOAN PROCEEDS AND MAINTENANCE OF BORROWER'S BANK ACCOUNT.** If Borrower applied and was approved for the Loan, then the Loan will be disbursed as provided in the attached Authorization Agreement. Borrower shall maintain Direct Payments (ACH Debits) in its Designated Checking Account, including keeping such account open until the "**Total Repayment Amount** " as defined in this Agreement has been completely repaid.

**5. PROMISE TO PAY.** Borrower shall pay Lender the Total Repayment Amount in accordance with the Payment Schedule above. As provided in the attached Authorization Agreement, Borrower shall enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required Loan payments. If required by Lender, Borrower agrees and authorizes Lender (or its servicer or any agent of Lender thereof) to collect Loan payments from a transfer account established pursuant to this Agreement.

**6. ALTERNATIVE PAYMENT METHODS.** If Borrower for any reason knows that Lender will be unable to process a Loan payment under Lender's Automatic Payment Plan, then Borrower must either transfer sufficient funds into its Designated Checking Account such that the missed payment can be collected as provided in the attached Authorization Agreement, or promptly mail or deliver a check to Lender in an amount equal to the missed payment or, if offered to Borrower by Lender, make the missed payment by any pay-by-phone or on-line service that Lender may make available to Borrower from time to time. If Borrower elects to send payments to Lender for the Loan by postal mail, then Borrower agrees to send such payments to Lender's address on the first page of this Agreement or some other place as designated by Lender from time to time in writing. All alternative payments contemplated in this Section shall be made in immediately available funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified in this Section may result in a delay in processing and/or crediting such payment, and may result in late fees, interest, or charges.

If Borrower makes an alternative payment as contemplated by this Section on Borrower's Loan by mail or by any pay-by-phone or on-line service that Lender makes available while Borrower is enrolled in the Automatic Payment Plan, Lender may treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

**7. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments received on Borrower's Loan between principal, interest and fees in any manner Lender chooses in its sole discretion, with such discretion performed with Lender's reference to its records for the Loan, it being understood and agreed by Borrower that Loan payments generally will be allocated and applied against any fees and interest incurred on the Loan before principal. At Lender's discretion, if there are any fees, costs or other expenses due and owing under this Agreement, including, without limitation, any Fees, Lender may unilaterally adjust Borrower's amortized or principal payments due under this Agreement in an amount to pay such fees, costs or other

---

Loan # 1005055484

Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

**C6**
**C6 CAPITAL**

expenses; Lender, at its discretion, may charge such adjusted amount on a single amortized or principal payment, or over multiple amortized or principal payments.

**8. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender may accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor. **Borrower shall not send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement or applicable law. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to the Lender's address on the first page of this Agreement or some other place as designated by Lender from time to time in writing.**

**9. PREPAYMENT.** Borrower agrees that all fees and other prepaid finance charges are earned by Lender fully as of the date of this Agreement and will not be subject to refund upon early payment of the Total Repayment Amount (whether voluntary or as a result of an Event of Default), except as otherwise required by law. Borrower may prepay Borrower's Loan in whole on any Business Day by paying Lender the sum total of the Total Repayment Amount, including without limit any Returned Payment Fees and any Late Fees (if any), in each case as described in the attached in this Agreement less (a) the amount of any principal Loan payments made prior to such prepayment and (b) the product of (i) the percentage identified as the applicable Prepayment Interest Reduction Percentage in this Agreement; and (ii) the aggregate amount of unpaid interest remaining on the Borrower's Loan as of such date as determined by Lender's records in accordance with Section 7. Borrower may prepay Borrower's Loan in part on any Business Day and such payment shall be applied in accordance with Section 7.

**10. SECURITY INTEREST.** Borrower and each Guarantor hereunder each a "**Secured Guarantor**", provided, however, that each reference to "Guarantor" in this Agreement shall include each "Secured Guarantor") hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all Collateral as defined and described below to

secure the prompt and complete payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder, and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, relating to the Loan described in this Agreement, the preceding being true whether or not contemplated by the parties hereto at the time of the granting of this security interest, regardless of how such debts, liabilities and obligations arise or by what agreement or instrument they may be evidenced by, and the preceding includes Borrower's obligations to perform acts and refrain from taking action as well as all obligations to pay Lender money including, without limitation, all interest, other fees and expenses under or related to the Loan (all of the preceding being the "**Obligations**"). The "**Collateral**" means all of Borrower's, and all of each Secured Guarantor's (defined in Section 10), assets and personal property, whether now owned by or owing to, or hereafter acquired by or arising in favor of Borrower and each Secured Guarantor, and whether owned or consigned by or to, or leased from or to Borrower and each Secured Guarantor, regardless of where located, which shall include, without limitation: (a) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card or debit card transactions; (b) cash and cash equivalents, (c) inventory, (d) equipment, (e) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (f) instruments, including promissory notes, (g) chattel paper, including tangible chattel paper and electronic chattel paper, (h) documents, (i) letter of credit rights, (j) accounts, including health-care insurance receivables, (k) deposit accounts with any bank or other financial institution, (l) commercial tort claims as disclosed on Schedule 1, (m) general intangibles, including payment intangibles and software, (n) copyrights, patents and trademarks and all other intellectual property, (o) fixtures, (p) goods, (q) letters of credit, letter-of-credit rights, and supporting obligations, and (r) as-extracted collateral. The preceding terms used in defining the term "Collateral" not otherwise defined in this Agreement shall have the meaning as such terms may from time to time be defined in the Uniform Commercial Code in effect in the State of Utah ("**UCC**"). The security interest Borrower and each Secured Guarantor grants herein includes all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing subsections (a) through (r), together with all books and records, customers lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any general intangibles (as defined in the UCC) at any time evidencing or relating to any of the foregoing. Lender



**C6 CAPITAL**

disclaims any security interest in household goods in which Lender is forbidden by applicable law from taking a security interest.

**11. PROTECTING THE SECURITY INTEREST.** Borrower and each Secured Guarantor (as applicable) agrees that Lender and/or Lender's agent or representative may file any financing statement, lien entry form or other document that is necessary or desirable in order to perfect, amend or continue Lender's security interest in the Collateral, including, without limitation, any fixture filings or other filings in the real property records, and Borrower, and each Secured Guarantor as applicable, shall cooperate with Lender and Lender's agent or representative to accomplish said filing(s), and shall do whatever else Lender and Lender's agent or representative deems necessary to protect Lender's security interest in the Collateral. **BORROWER AND EACH SECURED GUARANTOR EACH EXPRESSLY ACKNOWLEDGE AND AGREE BY SIGNING THIS AGREEMENT THAT, LENDER'S COLLATERAL AS DESCRIBED IN <u>SECTION 10</u> INCLUDES ALL OF BORROWER'S AND EACH SECURED GUARANTOR'S PERSONAL PROPERTY AND ASSETS.**

**12.**                    [Intentionally omitted]

**13. TAXES, ASSESSMENTS AND LIENS.** Borrower shall complete, timely file and pay when due all necessary federal, state and local taxes and shall pay when due all taxes, assessments, levies and liens upon the Collateral and, upon Lender's request, provide evidence of such payments to Lender.

**14. INSURANCE.** Borrower, and each Secured Guarantor as applicable, shall procure and maintain insurance policies and coverage as Lender may require with respect to the Collateral, including without limit flood insurance if the location of any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", in the form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender, which shall be a minimum amount equal to the Total Repayment Amount. Borrower, and each Secured Guarantor as applicable, shall ensure that all of Borrower's and each Secured Guarantor's insurance policies name Lender as loss payee, and Borrower and each Secured Guarantor shall deliver to Lender endorsements demonstrating the same in form and substance satisfactory to Lender. If Borrower or any Secured Guarantor at any time fails to obtain or maintain any insurance as required under this Section, Lender may obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense. Borrower and/or each Secured Guarantor shall promptly notify Lender of any loss of or damage to the Collateral. Upon any insurable loss to any Collateral, the

proceeds shall be paid to Lender to apply to the Total Repayment Amount

**15. REPAIRS AND MAINTENANCE.** Borrower and each Secured Guarantor shall keep and maintain, and shall cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect, normal wear and tear excepted. Borrower and each Secured Guarantor further agrees to pay when due all claims made by third party Persons for work done on, or services rendered to, or material furnished in connection with the Collateral so that no lien or encumbrance of any kind may ever attach to or be filed against the Collateral.

**16. [ i n t e n t i o n a l l y   o m i t t e d ]**

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|



**17. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower or a Guarantor fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge, pay or perform when due any Obligations, then Lender on Borrower's or any Secured Guarantor's behalf (as applicable) may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, any expenses, costs or fees incurred in connection therewith (including attorneys' and other advisory or third-party fees) will become a part of the Obligations and, at Lender's option, shall: (a) be payable on demand; (b) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (c) be treated as a balloon payment that will be due and payable at the 12/31/2024. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**18. BORROWER'S AND EACH SECURED GUARANTOR'S REPRESENTATIONS AND WARRANTIES; CERTAIN COVENANTS. In all material respects,** Borrower and each Secured Guarantor represents and warrants that: (a) Borrower and each Secured Guarantor will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of its business and the Collateral, including without limitation any law relating to the use, sale, possession, cultivation, manufacture, distribution, or marketing of any controlled substances or other contraband (whether for commercial, medical, or personal purposes), or any law relating to the medicinal use or distribution of marijuana; (b) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property is that shown of the first page of this Agreement; (c) Borrower and each Secured Guarantor is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and Borrower and each Secured Guarantor is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business; (d) the true and correct legal name of the Borrower and each Secured Guarantor is set forth in the first page of this Agreement; (e) [intentionally omitted] (f) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's and each Secured Guarantor's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's or any Secured Guarantor's charter, operating agreement, bylaws or other constituting documents, or of any indenture, agreement or undertaking to which Borrower or any Secured Guarantor is a party; (g) all constituting documents and all amendments thereto of Borrower and each Secured Guarantor have been duly filed and are in proper order and any capital stock or other membership or equity interests issued by Borrower and each Secured Guarantor and

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |



**C6 CAPITAL**

outstanding was and is properly issued and all books and records of Borrower and each Secured Guarantor are accurate and up to date and will be so maintained; (h) Borrower and each Secured Guarantor (i) is not subject to any charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (ii) is in compliance with its charter, operating agreement, bylaws and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect Borrower's or any Secured Guarantor's financial condition, business or prospects or the value of the Collateral, each taken individually and as a whole; (i) there is no action, suit, proceeding or investigation pending or, to Borrower's or any Secured Guarantor's or Signatory's knowledge, threatened against or affecting it or any of Borrower's or any Secured Guarantor's assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on Borrower's or any Secured Guarantor's financial condition, business or prospects or the value of the Collateral, each taken individually and as a whole; (j) all information provided by Borrower and/or each Guarantor as part of the application process for the Loan was true and complete; (k) neither Borrower nor any Secured Guarantor intends to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within six (6) months of the Effective Date; (l) neither Borrower nor any each Secured Guarantor is presently insolvent within the meaning of the UCC as well as the United States Bankruptcy Code and neither will become insolvent upon the making of the Loan; (m) Borrower and each Secured Guarantor shall maintain in full force and effect and in good standing all material rights, licenses and leases necessary to carry on its business, and all material permits, licenses, leases consents and approvals necessary for the construction, maintenance and operation of its business; (n) Borrower shall make all payments of interest and principal as and when due, and Borrower and each Guarantor shall keep and comply with all terms, conditions and provisions of this Agreement; (o) the proceeds of any Advance shall not be used for personal, family, household or agricultural purposes; (p) Borrower shall not use the proceeds of any Advance, directly or indirectly, in violation of any applicable law or regulation, including without limitation Regulations T, U or X of the Federal Reserve Board as from time to time in effect (and any successor regulation or official interpretation of such Board), or to purchase or carry any "margin stock", as defined in Regulations U and X, or any "margin security", "marginable OTC stock" or "foreign margin

stock" within the meaning of Regulation T, U or X; and (q) Borrower and each Secured Guarantor shall not effect any material change in their ownership or organizational structure (acknowledging that any change in ownership shall be deemed material when ownership is closely held and any change that would be adverse to Lender or adversely affect the Loan shall be deemed material).

**19. INTEREST AND FEES.** Borrower shall pay in full the "Total Interest Expense" as set forth at the beginning of this Agreement and all other fees and costs set forth in this Agreement, including, without limitation, those set forth on Pages 1 and 2 of this Agreement. Borrower shall also pay the following fees:

A. "**Origination Fee**": A one-time origination fee in the amount set forth at the beginning of this Agreement. Borrower agrees that this fee shall be immediately deducted from the proceeds of Borrower's Loan prior to the Loan's initial Advance.

B. "**Returned Payment Fee**": A returned payment fee in the amount set forth in the beginning of this Agreement if any Loan payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

C. "**Late Fee**": A late fee in the amount set forth in the beginning of this Agreement if a scheduled Loan payment is not received by Lender as provided in the Payment Schedule set forth in the beginning of this Agreement.

D. **Exit Fee:** Upon the earlier to occur of
(a) the date on which the Loan has been accelerated following an Event of Default, Borrower shall pay to the Lender a fee of 3% of the original Loan Amount.

E. "**Default Interest**": Upon the occurrence and during the continuance of an Event of Default, the balance of the remaining unpaid principal and interest accrued on the Loan shall thereafter bear interest at a rate equal to the lesser of (i) Annual Percentage Rate (APR) as provided in this Agreement per annum or (ii) the maximum rate allowed by applicable law, as a default interest rate until the Event of Default has been cured as determined in Lender's sole discretion.

Payments made on the Loan by Borrower shall be applied and allocated between Loan principal, interest and fees in the manner set forth in <u>Section 7</u>.

**20. INTEREST AND FEES EXCEEDING PERMITTED LIMIT.** If the Loan is subject to applicable law that sets maximum interest or charges, and such applicable law is interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits under such applicable law, then (a) any interest or charge shall

---

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |



be automatically reduced by the amount necessary to reduce such charge to the permitted limit under applicable law, and (b) if required by applicable law, any sums already collected from Borrower that exceed such permitted limits will be refunded or credited to Borrower.

**21. ONLINE CUSTOMER PORTAL.** When Borrower signs in with Borrower's valid username and password at https://1workforce.com, Borrower may obtain information about the Loan, such as the outstanding balance, daily transactions and fees. No additional paper statement will be mailed to Borrower. Borrower shall not share Borrower's username and password to https://1workforce.com with any third-party Person. The information provided through this online portal is provided as a convenience only for Borrower and Lender's internal records will be determinative of information about the Loan, absent manifest error. To the extent there is a conflict between the Borrower's online portal reference in this Section and Lender's internal records, Lender's internal records will control.

**22. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each Guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any Guarantor's name, respectively, at any time and from time to time for the purpose of deciding whether to initially approve the requested Loan, or to approve any update, renewal, extension of credit, or for any otherwise applicable and lawful purpose. Upon Borrower's or any Guarantor's request, Lender shall advise Borrower or Guarantor (as applicable) if Lender obtained a credit report and Lender shall give Borrower or Guarantor the credit bureau's name and address. Borrower and each Guarantor (if any) shall submit current financial information, a new credit application, or both, in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may report Lender's credit experiences with Borrower and any Guarantor in relation to the Loan to third party Persons as permitted by applicable law, including with respect to any Guarantor to consumer credit reporting agencies. Lender may share the information contemplated under this Section for the purpose of Lender complying with governmental reporting or legal processes that Lender believes may be required, whether or not such sharing of information is in fact required or may otherwise do the same when necessary or helpful in completing a transaction, when investigating a loss or Event of Default or potential loss or Event of Default, or in connection with the sale or syndication of the Loan or any Advance. Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower's and/or any

Guarantor's credit record may be submitted to a credit reporting agency (including with respect to any Guarantor to consumer credit reporting agencies) if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder. Guarantor acknowledges that any credit reporting on the Loan shall be at the sole discretion of Lender (subject to applicable law) and that Lender has the right to report the Loan to Guarantor's personal credit file should Guarantor not pay any Obligation pursuant to the Guaranty set forth in this Agreement.

**23. FEES, EXPENSES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all fees, expenses and costs incurred by Lender in enforcing the terms of this Agreement or pursuing Lender's remedies provided herein or under applicable law, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower, any Guarantor, or any other guarantor or surety of Borrower, or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any attorneys' fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on the Collateral, whether such security was granted by Borrower, a Secured Guarantor, or by any other Person primarily or secondarily liable (with or without recourse) with respect to the Obligations, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby. To the extent permitted by applicable law, all of the expenses and costs contemplated in this Section shall become a part of the Obligations and, at Lender's option, shall: (a) be payable on demand; (b) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (c) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such rights shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**24. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each Guarantor shall provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also shall promptly

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |



**C6 CAPITAL**

upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

**25. TELEPHONE COMMUNICATIONS.** Borrower and each Guarantor hereby expressly consents to receiving calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, marketing partners, agents, representatives, and any others calling at Lender's request or on its behalf, at any telephone numbers that Borrower and/or the Guarantors have provided or may provide in the future or otherwise in Lender's possession (including any cellular or mobile telephone numbers). Borrower and each Guarantor agree that such communications may be initiated using an automated telephone dialing system. Borrower and each Guarantor agree that he, she or it is responsible for any fees or charges associated therewith from their wireless carrier.

**26. INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower and each Guarantor shall indemnify and hold Lender harmless from all losses, costs, damage, liabilities or expenses (including, without limitation, court costs and reasonable attorneys' fees and expenses) that Lender may sustain or incur by reason of it (a) defending or protecting Lender's security interests contemplated in this Agreement, or the priority thereof; (b) enforcing the Obligations; (c) the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the complete repayment and performance of the Obligations and the termination of this Agreement.

With respect to any Borrower and each Guarantor residing or incorporated in California, Borrower and each Guarantor acknowledges and agrees that all their rights that may relate to the release and waiver of claims contemplated by this Agreement under Section 1542 of the California Civil Code, as amended, are expressly waived. Section 1542 of the California Civil Code provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Borrower and each Guarantor waives any right which it has or

may have under Section 1542 of the California Civil Code, as amended, to the fullest extent that Borrower and the Guarantors may lawfully waive such rights pertaining to the release of the claims contemplated by Agreement.

**27. MERGERS, CONSOLIDATIONS OR SALES.** No Borrower, Guarantor or any grantor of any Collateral shall (a) merge or consolidate with or into any other Person or (b) enter into any joint venture or partnership with any other Person without prior written consent.

**28. CHANGE IN LEGAL STATUS.** Without Lender's consent, no Borrower or Secured Guarantor shall (a) change its name, its place of business or, if more than one, chief executive office, its mailing address, or organizational identification number if it has one, or (b) change its type of organization, jurisdiction of organization or other legal structure. If Borrower or any Secured Guarantor does not have an organizational identification number and later obtains one, Borrower or such Secured Guarantor, as applicable, shall promptly notify Lender of such taxpayer identification number.

**29. DEFAULT.** The occurrence of any one or more of the following events (each an "**Event of Default**") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower, or any Guarantor or grantor of any Collateral, whether such agreements, instruments, or papers now exist or hereafter arise: (a) Lender is unable to collect any Automatic Payment Plan payment on two consecutive dates due and/or, Borrower fails to pay any Obligations on three (3) consecutive dates when payments are due daily or one (1) payment during any monthly period if payments are due and payable monthly; (b) Borrower fails to comply with, promptly, punctually and faithfully, to perform or observe any term, condition or promise within this Agreement; (c) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower or any Secured Guarantor to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (d) the occurrence of any event that would cause a "lien creditor", as that term is defined in Section 9a−102 of the UCC (other than Lender) to obtain higher priority in any of the Collateral over Lender's security interest created by this Agreement; (e) a material filing against or relating to Borrower (unless consented to in writing by Lender) of (i) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (ii) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (f) the occurrence of any event of default under any other agreement between Lender and Borrower, whether such agreement, instrument, or paper now exists or hereafter

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
| --- | --- |



arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (g) any act by, against, or relating to Borrower or Guarantor, or any of their property or assets, whereby such act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of any of the Collateral; (h) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower or any Guarantor, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower or any Guarantor; (i) in all material respects, the failure by Borrower or any Guarantor to generally pay the debts of Borrower or Guarantor as they mature; (j) adjudication of bankruptcy or insolvency relative to Borrower or any Guarantor; (k) the entry of an order for relief or similar order with respect to Borrower or any Guarantor in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "**Bankruptcy Code**") or any other federal bankruptcy law; (l) the filing of any complaint, application or petition by or against Borrower or any Guarantor initiating any matter in which Borrower or any Guarantor is or may be granted any relief from the debts of Borrower or any Guarantor pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (m) the calling or sufferance of a meeting of creditors of Borrower or any Guarantor; (n) the meeting by Borrower or any Guarantor with a formal or informal creditor's committee; (o) the offering by or entering into by Borrower or any Guarantor of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower or any Guarantor that seeks or intends to accomplish a reorganization or arrangement with creditors; (p) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (q) the occurrence of any event or circumstance with respect to Borrower or any Guarantor or grantor of Collateral such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company or an additional working capital loan without the prior written consent of Lender); (r) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (s) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower or any Secured Guarantor; (t) any act by or against,

or relating to Borrower, a Secured Guarantor or any of their assets pursuant to which any creditor of Borrower or a Secured Guarantor seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's or a Secured Guarantor's assets; (u) the termination of existence, dissolution or liquidation of Borrower or any Secured Guarantor or the ceasing to carry on actively any substantial part of Borrower's or any Secured Guarantor's current business; (v) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any Guarantor denies it has any further liability or obligation hereunder; (w) any guarantor or person signing a support agreement in favor of Lender (including without limit the Guarantor(s) and the Guaranty) shall repudiate, purport to revoke or fail to perform his, her, or its obligations under his, her or its guaranty or support agreement in favor of Lender, or any such guarantor either die or dissolve (as applicable); (x) any material change of more than 50% occurs in Borrower's or any Secured Guarantor's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (y) if any of the following result in a 50% change in control of Borrower: if Borrower or any Guarantor or grantor of Collateral is a sole proprietorship, the owner dies; if Borrower or any Guarantor or grantor of Collateral is a trust, a trustor dies; if Borrower or any Guarantor or grantor of Collateral is a partnership, any general or managing partner dies or dissolves; if Borrower or any Guarantor or grantor of Collateral is a corporation, any principal officer or 50% or greater shareholder dies; if Borrower or any Guarantor or grantor of Collateral is a limited liability company, any managing member dies or dissolves; if Borrower or any Guarantor or grantor of Collateral is any other form of business entity, any Person(s) directly or indirectly controlling 50% or more of the ownership interests of such entity dies or dissolves; (z) Borrower terminates the Authorization Agreement in accordance with its terms and another agreement is not immediately and in no less than two (2) days put in place in a form and substance satisfactory to Lender.

**30. RIGHTS AND REMEDIES UPON DEFAULT.** Unless prohibited by applicable law, if an Event of Default occurs under this Agreement, then at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. Refrain from Disbursing Loan Proceeds: Refrain from making an Advance of Borrower's Loan proceeds to the Designated Checking Account.

B. Debit Amounts Due from Borrower's Account: Debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |



C. Accelerate Indebtedness: Declare the entire Obligations immediately due and payable, without notice to Borrower.

D. Assemble Collateral: Require Borrower and/or any Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or any Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Except as limited or prohibited under applicable law, Lender also shall have full power to enter upon the property of Borrower and/or any Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and/or each Guarantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and/or Guarantor after such repossession.

E. Sell the Collateral: Have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or any Secured Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give Borrower, each Secured Guarantor and other Persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any Person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limit the expenses, costs and fees (including third-party costs and fees payable by Lender) of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (a) be payable on demand; (b) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (c) be treated as a balloon payment that will be due and payable at the Loan's maturity.

F. Appoint Receiver: Have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and

above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by applicable law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a Person from serving as a receiver.

G. Collect Revenues, Apply Accounts : Lender, either by itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or any Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

H. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or any Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

I. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the UCC, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

J. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and



C6 CAPITAL

an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**31. CONSENT TO JURISDICTION AND VENUE.** Borrower, each Guarantor and Lender each consent to and agree that venue for all actions arising from or related to this Agreement or the Loan shall be in the District Court in and for Salt Lake County, State of Utah. The parties hereto waive any objection which either may have based on lack of jurisdiction or improper venue or forum non conveniens to any suit or proceeding instituted by either party under this Agreement in any state or federal court with jurisdiction over Salt Lake County, State of Utah, and consent to the granting of such legal or equitable relief as is deemed appropriate by such court.

**32. NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty (including without limit the Guaranty) or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**33. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower and each Guarantor may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any such assignment without Lender's written consent shall be absolutely null and void. Lender's consent to an assignment by Borrower shall not release Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM (in its capacity as Servicer) or a successor servicer (if any) shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain at one of its offices in the United States a copy of each assignment agreement delivered

to it with respect to this Loan and a register for the recordation of the name of each assignee of this Loan, and principal and interest amount of this Loan owing to, such assignee pursuant to the terms hereof. The entries in such register shall be conclusive, and Borrower, Lender and each such assignee may treat each person whose name is recorded therein pursuant to the terms hereof as a "Lender" hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The register maintained for this Loan shall be available for inspection by Borrower and any such assignee of this Loan, at any reasonable time upon reasonable prior notice to BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM (in its capacity as Servicer) or the applicable successor servicer (if any). This Section shall be construed so that this Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related Treasury regulations (or any other relevant or successor provisions of the Internal Revenue Code or of such Treasury regulations).

**34. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only and shall not affect the construction or interpretation of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties hereto, having had the opportunity to consult legal counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**35. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**36. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notice to Lender shall be deemed received by Lender at the address sent forth on the first page of this Agreement by U.S. mail, postage prepaid, first-class mail; in person; by registered mail; by certified mail; by nationally recognized overnight courier; or when sent by electronic mail. Any notice directed to a party to this Agreement shall become effective upon the earliest of the following: (a) actual receipt by that party; (b) delivery on a business day to the designated address of that party, addressed to that party; (c) if given by postage prepaid and registered or certified, return receipt requested, three (3) days after deposit with the United States Postal Service, postage prepaid and registered or certified, return receipt requested, addressed to that party at its designated address;

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|



**C6 CAPITAL**

or (d) electronic mail address in Lender's records. The designated address of a party described in the beginning of this Agreement shall be the address of that party, or such other address as that party, from time to time, may specify by notice to the other parties.

**37. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by applicable law. Borrower shall at all times keep accurate and complete records of Borrower's financial records, accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (a) schedules of accounts and general intangibles; and (b) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents or representatives, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers), at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's Collateral or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third party, then Borrower consents to Lender sharing certain reasonable information about Borrower with such referring party for the purpose of such referring party verifying and/or auditing loans made through such referring party's referrals.

**38. GOVERNING LAW.** The relationship between Borrower, Lender and any Guarantor, and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with the laws of the State of Utah without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Borrower understands and agrees that (a) Lender is located in Utah, (b) Lender makes all credit decisions from Lender's office in Utah, (c) the Loan is made in Utah (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in Utah) and (d) Borrower's payments are not accepted until received by Lender in Utah. Parties agree that whenever Torah law requires, a Heter Iska should govern. Heter Iska documents are available upon request, at Business Halacha Institute 1937 Ocean Ave. Brooklyn NY 11230.

**39. WAIVER OF NOTICES AND OTHER TERMS.** Except for

any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., each Guarantor), to the extent not prohibited by applicable law, hereby waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower, each Guarantor, and any other Person who has obligations pursuant to this Agreement also agrees to the following: (a) Lender is not required to file suit or show diligence in collecting the Obligations against Borrower, any Guarantor or any other Person who has obligations pursuant to this Agreement, and Lender is not required to proceed against any specific Collateral at any specific time; (b) Lender may, but shall not be obligated to, substitute, exchange or release any Collateral; (c) Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; (d) Lender may, but will not be obligated to, sue one or more Persons without joining or suing others; and (e) Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any Person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made). In connection with such amendment, modification or renewal, Lender may require that Borrower and Guarantor each execute an Amendment and Modification Agreement to the Business Loan and Security Agreement, in the form to be provided by Lender.

**40. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** To ensure a high quality of service for Lender's customers, Borrower acknowledges and agrees that Lender may (a) monitor and/or record telephone calls between Borrower and Lender's employees, representatives or agents, and (b) communicate with Borrower electronically by e-mail.

**41. JURY TRIAL WAIVER AND CLASS ACTION WAIVER. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, BORROWER, EACH GUARANTOR AND LENDER WAIVE THEIR RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THE AGREEMENT AND ALL OTHER DOCUMENTATION EVIDENCING THE OBLIGATIONS, IN ANY LEGAL ACTION OR PROCEEDING. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY COURT SITTING WITHOUT A JURY. IF PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES THE RIGHT TO LITIGATE IN ANY COURT PROCEEDING ANY CLAIM BY EITHER PARTY AGAINST THE OTHER PARTY RELATED TO THIS AGREEMENT OR THE LOAN AS A CLASS ACTION, EITHER AS A MEMBER OF A CLASS OR AS A REPRESENTATIVE, OR TO ACT AS A PRIVATE ATTORNEY IN GENERAL. THIS PROVISION SHALL SURVIVE ANY TERMINATION, AMENDMENT OR EXPIRATION OF THIS AGREEMENT OR THE LOAN, OR**

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|



**ANY OTHER RELATIONSHIP BETWEEN THE PARTIES.**

**42. CONFIDENTIALITY. Lender,** Borrower and each Guarantor shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or make any public statement or description of the terms of this Agreement, except to (a) Borrower's or any Guarantor's subsidiaries or affiliates, or potential investors in Lender or Lender's subsidiaries, affiliates or related funds, and their respective employees, directors, agents, attorneys, accountants and other professional advisors (collectively, "Representatives"); (b) to prospective transferees, assignees, credit providers or purchasers of Lender's interests under or in connection with this Agreement or any transactions contemplated hereby; (c) as required by law, regulation, subpoena, or other order; (d) to Lender's, Guarantor's, Borrower's or Lender's, Guarantor's or Borrower's subsidiaries or affiliates regulators or as otherwise required or requested in connection with Lender's, Guarantor's, Borrower's or any subsidiary of Borrower's financial examination or audit; (e) in connection with the exercise of remedies under the Agreement or any action or proceeding relating to this Agreement or the enforcement of rights hereunder or thereunder; and (f) to third-party service providers of Lender.

**43. ENTIRE AGREEMENT.** This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**44. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement and any amendment hereof may be executed in several counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be an original, and all of which together shall constitute one (1) instrument. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought. All parties to this Agreement agree that Lender may (but shall have no obligation to) accept any signature, contract formation or record-keeping through electronic means, which shall have the same legal validity and enforceability as manual or paper-based methods, to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Utah Uniform Electronic Transactions Act, or any similar state law based on the Uniform Electronic Transactions Act. Signatures and/or initials made through DocuSign or similar technologies shall be deemed of acceptable form for manifesting such party's affirmative assent.

**45. CUSTOMER SERVICE CONTACT INFORMATION.** If you have questions or comments about your Loan, you may contact us at the address on the first page of this Agreement.

**46. GRANT OF LICENSE TO USE 1WORKFORCE**

**PLATFORM.** Subject to Borrower's compliance with this Agreement and the Terms of Use for the 1Workforce Platform, Lender grants Borrower a nonexclusive, revocable, non-transferable, non-sublicensable, limited and royalty-free license to use the 1Workforce Platform (the "**License**"). The License is effective solely for so long as any portion of the Loan is outstanding and remaining due, and so long as an Event of Default has not occurred. The License is personal to Borrower, and no rights hereunder may be transferred or assigned by Borrower to any Person without Lender's express written consent. Lender may terminate the License in its sole discretion without notice to Borrower or any other Person at any time after an Event of Default has occurred.

**47. THE GUARANTY.** Each Guarantor, including each Secured Guarantor, personally, jointly and severally (if more than one), absolutely and unconditionally guarantee the prompt payment and performance to Lender (including its successors and assignees) of any and all Obligations incurred by Borrower (the "**Guaranty**"). Each Guarantor shall repay the Obligations on Lender's demand, without requiring Lender to first to enforce or pursue of the Obligations payment against Borrower or any specific Guarantor if more than one. The Guaranty is a guarantee of payment and not of collection. The Guaranty is an absolute, unconditional, primary, and continuing obligation for each Guarantor, and will remain in full force and effect until the first to occur of the following: all of the Obligations have been indefeasibly paid and performed in full, and Lender has expressly terminated this Guaranty writing. Each Guarantor represents and warrants that (a) it is a legal resident of the United States of America, or if a non-natural Person an entity formed, incorporated or organized in the United States of America, and (b) neither Borrower, nor itself individually as Guarantor, intends to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within 6 months of the date hereof. Each Guarantor waives all notices to which the Guarantor might otherwise be entitled to by applicable law, and each Guarantor also waives all defenses, legal or equitable, otherwise available to such Guarantor. This Guaranty shall be construed in accordance with the laws of the State of Utah, and shall inure to the benefit of Lender, its successors and assigns. In accordance with Section 41 and to the extent not prohibited by applicable law, each of the undersigned Guarantors waives its right to a trial by jury of any claim or cause of action based upon, arising out of or related to this Guaranty, the Agreement and all other documentation evidencing the Obligations, in any and all legal actions or proceedings. For each Guarantor that resides in a community property state, including, without limitation Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin, or as otherwise requested by Lender, the spouse of such Guarantor shall execute and agree to the Spousal Consent to Loan, attached as Exhibit B. So long as any of the Obligations remain unpaid or undischarged

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|



**C6 CAPITAL**

or Lender has any obligation to make the Loan, (i) Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by Lender) or by any means or on any other ground, claim any set off or counterclaim against Borrower in respect of any liability of Guarantor to Borrower, or (ii) in proceedings under federal bankruptcy law or insolvency proceedings of any nature, prove in competition with Lender in respect of any payment hereunder, or be entitled to have the benefit of, any counterclaim or proof of claim or dividend or payment by or on behalf of Borrower or the benefit of any other security for any of the Obligations which, now or hereafter, Lender may hold or in which it may have any share. Each Guarantor hereby expressly waives any right of contribution or reimbursement from or indemnity against Borrower or any other guarantor, whether at law or in equity, arising from any payments made by any Guarantor, and each Guarantor acknowledges that each Guarantor has no right whatsoever to proceed against Borrower or any other guarantor for reimbursement of any such payments for so long as any of the Obligations remain unpaid or undischarged or Lender has any obligation to make the Loan. In the event any Guarantor shall receive any payment under or on account of such rights while any of the Obligations are outstanding, it shall hold such payment as trustee for Lender, to be paid over to Lender on account of the Obligations but without reducing or affecting in any manner the liability of Guarantor under the provisions of this Agreement, except to the extent the principal amount or other portion of such outstanding Obligations shall have been reduced by such payment.

**48. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the individual signing or affirming below to execute on its behalf, Borrower and each Guarantor certifies that Borrower and each Guarantor has received a copy of this Agreement and Borrower and each Guarantor has read, understood and agreed to be bound by the Agreement's terms. Each Person signing or affirming below certifies that each Person is signing on behalf of the Borrower, the Guarantor(s), and/or in their individual capacity as indicated in the Signature Page for Borrower and each Guarantor (and if Borrower is a sole proprietorship, in the capacity of the owner of such sole proprietorship), and each individual executing this Agreement is authorized to execute this Agreement on behalf of Borrower and each Guarantor (as applicable). Use of Proceeds Certification: As referred to in Section 3, by signing or affirming below, the Borrower certifies, acknowledges and understands that the Loan proceeds shall be used solely for purchasing or acquiring specific products or services, for the general working capital needs of the business of the Borrower. The

Loan shall not be used for personal, family, household or agricultural purposes.

**49. CONFESSIONS OF JUDGMENT.** Borrower and Guarantor(s) shall, upon execution of this Agreement, deliver to Lender an executed stipulation and confession of judgment ("**Stipulation and Confession of Judgment**") in favor of Lender in the amount of the Total Repayment Amount of the Loan. Upon the occurrence of an Event of Default, Borrower and each Guarantor consent to the filing of the Stipulation and Confession of Judgment in any court in the State of Utah, and Borrower and each Guarantor further consent to the entering, docketing, or domestication of any such judgment arising from or related to the Stipulation and Confession of Judgment in any court in the State of Utah or any other court (state or federal) for the purpose of collecting any such judgment.

**50. PATRIOT Act.** To the undersigned's knowledge, neither Borrower nor any Guarantor nor any of its respective constituents or affiliates, is in violation of any laws relating to terrorism or money laundering, including without limitation, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (as the same has been, or may hereafter be, renewed, extended, amended or replaced, the "**Executive Order**")' and the Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56, as the same has been, or may hereafter be, renewed, extended, amended or replaced, the "**PATRIOT Act** "). As used herein, "**Anti-Terrorism Laws**" means any laws relating to terrorism or money laundering, including the Executive Order, the PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing laws may from time to time be renewed, extended, amended, or replaced).

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |

**C6 CAPITAL**

### AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBIT)

**This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) ("Authorization Agreement") is part of (and incorporated by reference into) the Business Loan and Security Agreement ("Loan Agreement"). Borrower should keep this important legal document for Borrower's records. Capitalized terms not otherwise defined herein shall have the same meaning as defined in the Loan Agreement.**

**ADVANCE OF LOAN PROCEEDS.** By executing this Authorization Agreement, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Lender approving the Loan by Lender initiating an ACH credit, wire transfer or similar means to the checking account indicated on <u>Exhibit A</u> hereto (or a substitute checking account Borrower later identifies and is acceptable to Lender, hereinafter referred to as the "**Designated Checking Account**") in the Advance Amount set forth in the Agreement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination of this Authorization Agreement in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it, which in no event will be less than five (5) Business Days.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan (defined below) is required for Loan approval. By executing this Authorization Agreement, Borrower agrees to, and hereby, enrolls in an automatic payment plan and authorizes Lender to collect payments required under the terms of the Loan Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the Payment Schedule set forth in the attached <u>Exhibit A</u> (the "**Automatic Payment Plan**"). Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits in an amount equal to the total amount of previously scheduled payment(s) (as scheduled in the Payment Schedule) that was not paid inclusive of any and all unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination of this Authorization Agreement in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it, which in no event will be less than five (5) Business Days. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's Designated Checking Account in good standing or if there are insufficient funds in Borrower's Designated Checking Account to process any payment (or if Lender is otherwise unable to collect any amounts by ACH debit owed to Lender under the Loan or under any other loan or extension of credit by Lender to Borrower). **If Borrower revokes the authorization contemplated in this Authorization Agreement or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, then Borrower shall still be responsible for making timely payments of the Loan pursuant to the alternative payment methods described in <u>Section 6</u> of the Loan Agreement.**

**Provisional Payment.** Any credit given by us to you with respect to an automated clearing house ("**ACH**") credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive such final settlement, you are hereby notified and agree that you shall refund Lender in an amount equal to the amount credited to you in connection with such entry, and the underlying originator of such entry shall not be deemed to have paid you in the amount of such entry.

**Notice of Receipt of Entry.** Under the operating rules of the National Automated Clearing House Association, which are applicable to ACH transactions involving your Designated Checking Account, we are not required to give next day notice to you of Lender's receipt of an ACH item and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statement we provide to you.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization Agreement, Borrower agrees and certifies that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower shall promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under the Loan Agreement or this Authorization Agreement. The origination of ACH transactions to Borrower's account shall comply with the provisions of the laws of the State of Utah. Borrower agrees to be bound by NACHA rules of the Electronic Payments Association. Borrower shall provide Lender at all times, real time, view only access to any and all banking, accounting and inventory systems of Borrower, in each case in a form and substance.

[Exhibit A Follows]

| | |
|---|---|
| | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
| Loan # 1005055484 | |

**C6** CAPITAL

**Exhibit A**

AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBIT)

The following bank accounts are subject to the Authorization Agreement:

Bank Account:

| | |
|---|---|
| Bank Name: | ███████ |
| Bank City and State: | ███████ |
| Legal Title of Account: | ███████████ |
| Bank ABA#: | ██████ |
| Account Number: | ███████ |
| Type of Account: | █████ |

Bank Account:

| | |
|---|---|
| Bank Name: | |
| Bank City and State: | |
| Legal Title of Account: | |
| Bank ABA#: | |
| Account Number: | |
| Type of Account: | |

Bank Account:

| | |
|---|---|
| Bank Name: | |
| Bank City and State: | |
| Legal Title of Account: | |
| Bank ABA#: | |
| Account Number: | |
| Type of Account: | |

_Brian Rainey_
Signature of Authorized Officer of Borrower

3/27/2025
Date

BRIAN THOMAS RAINEY
Printed Name of Signer

CEO
Title of Signer

███████
Tax ID of Borrower

| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |
|---|---|

**C6 CAPITAL**

Signature **Page**

The undersigned hereby, as a duly and appointed authorized agent of Borrower and each Secured Guarantor, and in each's individual and personal capacity as a Guarantor, affirm that each has read and understand the terms and conditions of, consent to, and agree to be bound by, the attached Agreement and the attached Authorization Agreement.

**Borrower:**

| | |
|---|---|
| *Brian Rainey* | 3/27/2025 |
| Signature of Authorized Officer of Borrower | Date |
| BRIAN THOMAS RAINEY | CEO |
| Printed Name of Signer | Title of Signer |
| ███████ | |
| Tax ID of Borrower | |

**Guarantor:**

| | |
|---|---|
| *Brian Rainey* | 3/27/2025 |
| Signature of Guarantor, individually | Date |
| BRIAN THOMAS RAINEY | |
| Printed Name of Signer | |

**Secured Guarantor:**

| | |
|---|---|
| *Brian Rainey* | 3/27/2025 |
| Signature of Authorized Officer of Borrower | Date |
| BRIAN THOMAS RAINEY | CEO |
| Printed Name of Signer | Title of Signer |
| ███████ | |
| Tax ID of Borrower | |

[Notary Page Follows]

<u>For Lenders Use Only</u>: This Agreement has been received and accepted by Lender in Utah after being signed by Borrower and any Guarantor(s) (including any Secured Guarantor(s)).

**Lender:**

| | |
|---|---|
| *ANDREW FELLUS* | MANAGING MEMBER |
| Signature of Authorized Officer of Lender | Date |
| C6 CAPITAL FUNDING, LLC | |
| Printed Name of Signer | Title of Signer |

| | |
|---|---|
| Loan # 1005055484 | Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM |

Weekly Deliveries Addendum

The Loan Agreement Dated March 26, 2025 between C6 CAPITAL FUNDING, LLC  ("Lender") and BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM ET AL SEE ADDENDUM ("Borrower") is hereby modified to following Schedule:

The borrower's obligation is $ 58,095.24  weekly until the loan is paid off.

C6 CAPITAL FUNDING, LLC will withhold payments of $200,000.00  for the first 5 weeks.

This loan will have weekly payments of $58,095.24 starting six weeks after funding and each following ____THURSDAY____ until the loan is satisfied in full.

Please note if any of these days fall on a bank holiday the payment will be made the business day after.

Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Agreed to by:_____   (Signature), its:____CEO_____(title)

Print Owner's Name: BRIAN THOMAS RAINEY

Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Agreed to by:_____   (Signature), its:_____(title)

Print Owner's Name:

Lender: C6 CAPITAL FUNDING, LLC

Agreed to by:_____   (Signature), its: ____MANAGING MEMBER____(title)

**C6 CAPITAL**

**Stacking Prohibited Addendum**

This addendum is made as of 03/26/2025 (the "Addendum") to the Business Loan and Security Agreement between C6 CAPITAL FUNDING, LLC (the "Lender") and BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM (the "Borrower") dated 03/26/2024 (the "Agreement").

Whereas, Lender desires to add a Stacking Prohibited as follows; Borrower shall not enter into any cash advance that relates to or involves its Future Receipts, or any loan agreement, with any party other than Lender where the interest rate on such loan is greater than ten percent (10%) for the duration of this Agreement; notwithstanding the foregoing, the following shall be excluded from the foregoing prohibition in all events: (a) bank loans; (b) bank financing arrangements; and (c) any other financing arrangement, that enables Borrower to pay the Total Repayment Amount to Lender and the Total Repayment Amount is paid to Lender in conjunction with the closing of such financing prior to the release of any funds to the Borrower. Lender may share information regarding this Agreement with any third party in order to determine whether Borrower is in compliance with this provision.

Borrower agrees to this Stacking Prohibited addendum to the Agreement, and fully understands that breach of the Stacking Prohibited provision shall constitute an Event of Default.

By signing this Addendum, Borrower agrees and fully understands that in the event Borrower breaches the Stacking Prohibited provision, Lender fully reserves its rights to immediately exercise its rights at law and equity as provided in the Agreement and impose an additional fee equaling ten (10) percent of the Loan Amount for each incidence of stacking.

IN WITNESS WHEREOF, each of the undersigned has executed, or has caused to be executed, this Addendum as of the date first written above.

Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Agreed to by: Brian Rainey          (Signature), its: CEO (Title)

Print Owner's Name: BRIAN THOMAS RAINEY

Lender: C6 CAPITAL FUNDING, LLC

Agreed to by: ANDREW FELLUS          (Signature), its: MANAGING MEMBER (Title)



**C6 CAPITAL**

**Early Discount Addendum**

This addendum is made as of 03/26/2025 (the "Addendum") to the Business Loan and Security Agreement between C6 CAPITAL FUNDING, LLC (the "Lender") and BREAKOUT COMMERCE, INC. ET AL SEE (the "Borrower") dated 03/26/2025 (the "Agreement").

Lender and Borrower are sometimes referred to herein collectively as the "Parties" and each as a "Party". Whereas, the Parties desire to add certain terms to the Agreement.

In consideration of the above promises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, do hereby agree and add terms to the Agreement as follows:

Total Repayment Amount shall be defined as: $ 1,220,000.00    if Borrower delivers the Total Repayment Amount within 30    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Total Repayment Amount shall be defined as: $ 1,240,000.00    if Borrower delivers the Total Repayment Amount within 60    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Total Repayment Amount shall be defined as: $ 1,260,000.00    if Borrower delivers the Total Repayment Amount within 90    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Total Repayment Amount shall be defined as: $ N/A    if Borrower delivers the Total Repayment Amount within N/A    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Total Repayment Amount shall be defined as: $ N/A    if Borrower delivers the Total Repayment Amount within N/A    calendar days of the Disbursement Amount being paid by Lender. **All prior payments made shall count towards the discounted Total Payment Amount.**

Notwithstanding the above, if an Event of Default occurs pursuant to the Agreement, Borrower forfeits Borrower's rights pursuant to this Addendum.

Notwithstanding the above, the discount is not eligible if the Lender provides a refinance.

IN WITNESS WHEREOF, each of the undersigned has executed, or has caused to be executed, this Addendum as of the date first written above.

Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM ET AL SEE ADDENDUM

Agreed to by: _Brian Rainey_    (Signature), its: ___CEO___ (Title)

Print Owner's Name: BRIAN THOMAS RAINEY

Lender: C6 CAPITAL FUNDING, LLC

Agreed to by: _ANDREW FELLUS_    (Signature), its: ___MANAGING MEMBER___ (Title)



**C6 CAPITAL**

**Borrower Definition Addendum to the Business Loan and Security Agreement dated:** 03/26/2025

**Lender and Borrower hereby agree that "Borrower" is defined as follows:**

Business Name: BREAKOUT COMMERCE, INC.

Address: 228 Park Ave S Suite 21651 New York NY 10003

Tax ID: ▓▓▓▓▓▓

State of Incorporation: Delaware

Business Name: Breakout Commerce Inc d/b/a Gooten

Address: 228 Park Ave S Suite 21651 New York NY 10003

Tax ID: ▓▓▓▓▓▓

State of Incorporation: Delaware

Business Name: Breakout Commerce Inc d/b/a OrderMesh

Address: 228 Park Ave S Suite 21651 New York NY 10003

Tax ID: ▓▓▓▓▓▓

State of Incorporation: Delaware

Business Name: Gooten Inc

Address: 228 Park Ave S Suite 21651 New York NY 10003

Tax ID: ▓▓▓▓

State of Incorporation: Delaware

Borrower: BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM

Agreed to by: *Brian Rainey*    (Signature), its: _____ CEO _____ (Title)

Print Owner's Name: BRIAN THOMAS RAINEY

LENDER: C6 CAPITAL FUNDING, LLC

Agreed to by: *ANDREW FELLUS*    (Signature), its: _____ MANAGING MEMBER _____ (Title)

**ADDENDUM TO MERCHANT AGREEMENT**

In association with the Business loan and security agreement dated 03/26/2025 I BRIAN THOMAS RAINEY, the CEO of BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM d/b/a Gooten located at Corporation Trust Center 1209 Orange St do hereby attest and agree to the following terms and conditions.

- Notwithstanding anything herein to the contrary, no Event of Default shall be deemed to have occurred and be continuing if cured by the Borrower within seven (7) business days after receipt of written notice of the breach from the Lender.

I hereby represent this statement to be true and accurate:

AGREED AND ACHNOWLEDGED:

Signature: _____    Date: _CEO_____

Print Name: _BRIAN THOMAS RAINEY_____

Signature: _____    Date: _____

Print Name: _____

Company Name: _BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM_____

Company Address: _Corporation Trust Center 1209 Orange St_____

Office Phone: _____

# ADDENDUM TO THE BUSINESS LOAN AND SECURITY AGREEMENT

This Addendum, dated ___03/26/2025___ (the "Addendum") to the Business Loan and Security Agreement, effective ___03/26/2025___ ___BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM___ ("Borrower"), hereby amends and restates the Agreement as follows, all sections and provisions to the agreement that reference Guarantor shall have no effect. In lieu thereof, only the following provisions in this addendum shall apply to the Guarantor. Guarantor hereby guarantees in a personal capacity the liability under the agreement in the event of the occurrence of any one of the following:

1) Borrower interferes with Lender's right to collect the weekly amount due pursuant to the Agreement; if in the normal business operations the company does not have sufficient funds it is not an event of default
2) Borrower uses multiple depository accounts without the prior written consent of Lender;
3) Borrower changes its depositing account or its payment card processor without the prior written consent of Lender;
4) Borrower sells future receivables to another financing firm without the prior written consent of Lender; or
5) Borrower fails to provide timely notice to Lender such that: i) within any 30-day period two or more ACH transactions attempted by Lender are rejected by Borrower's bank; or ii) two or more consecutive ACH transactions attempted by Lender are rejected by Borrower's bank.

IN WITNESS WHEREOF, each of the undersigned has executed this Addendum as of the date first written above.

Borrower: ___BREAKOUT COMMERCE, INC. ET AL SEE ADDENDUM___

Agreed to by: ___Brian Rainey___ (Signature), its ___CEO___ (Title)

Print Name: ___BRIAN THOMAS RAINEY___

Guarantor (1) : ___BRIAN THOMAS RAINEY___

Agreed to by: _____(Signature), Its _____(Title)

Guarantor (2): _____

Agreed to by: _____(Signature), Its _____(Title)

Lender: C6 CAPITAL FUNDING, LLC

Agreed to by: _____ (Signature), Its _____ MANAGING MEMBER (Title)

Exhibit I

# RECOVERY OF JUDGMENT

1407 Broadway, Fl 29, New York, NY 10018

E | support@recoveryofjudgment.com

P | 6468639783

**To: Taylor Corporation**

9/30/2025

_Re: C6 Capital Funding, LLC- v. - Breakout Commerce, Inc.; Breakout Commerce Inc d/b/a Gooten; Breakout Commerce Inc d/b/a OrderMesh; Gooten Inc and Brian Thomas Rainey_

To Whom It May Concern:

Please release any and all restraints imposed in connection with the UCC lien notice sent by this office regarding the above-referenced matter, as the notice was issued in clerical error.

Feel free to contact me at 646-863-9783 with any questions or concerns you may have.

Sincerely,

_Alex Peschin_

General Counsel